IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

```
UNITED STATES OF AMERICA :    CRIMINAL ACTION
                          :    14-CR-110-1
           Plaintiff      :
      vs.                 :    Philadelphia, Pennsylvania
                          :        September 30, 2014
CHRISTOPHER STEELE,       :
a/k/a "Mike Dozer:        :        DAY II
                          :
                          :    TRIAL TESTIMONY OF
           Defendant      :    DOMINIC HUNTZINGER
```
- - - - - - - - - - - - - - - - - - - - - - - - - - -

- - -

BEFORE THE HONORABLE JUAN R. SANCHEZ
UNITED STATES DISTRICT JUDGE
and a Jury

- - -

APPEARANCES:

For the Government:     MICHELLE ROTELLA, ESQUIRE
                        UNITED STATES ATTORNEY'S OFFICE
                        615 Chestnut Street, Suite 1250
                        Philadelphia, Pennsylvania  19106

For the Defendant:      KEVIN MARK WRAY, ESQUIRE
                        200 West Front Street
                        Media, Pennsylvania  19063


- - -


ESR Operator:          Patrick Kelly

TRANSCRIBED BY:    Drummond Transcription Service
                   Haddon Heights, New Jersey  08035

     Proceedings recorded by electronic sound recording,
transcript produced by computer-aided transcription
service.

1          (At 8:36 a.m. in Courtroom 11a.)

2          (The previous proceedings have not been transcribed at

3    this time.)

4          THE COURT:  Call your next witness.

5          MS. ROTELLA:  Dominic Huntzinger, your Honor.

6          ESR OPERATOR:  Please raise your right hand.

7          DOMINIC HUNTZINGER, GOVERNMENT WITNESS, SWORN.

8          ESR OPERATOR:  Please state your name and spell your

9    last name for the record, please.

10         THE WITNESS:  Dominic Huntzinger, ah, H -- H-u-n-t-z-

11   i-n-g-e-r.

12         ESR OPERATOR:  Thank you.

13         THE COURT:  You have to move closer to the microphone.

14         MS. ROTELLA:  May I proceed, your Honor?

15         THE COURT:  You may.

16                      <u>DIRECT EXAMINATION</u>

17   BY MS. ROTELLA:

18   Q.   Good morning, Dominic.

19   A.   Good morning.

20   Q.   How old are you?

21   A.   Fourteen -- fifteen, sorry.

22   Q.   When is your birthday?

23   A.   February 9th.

24   Q.   So, you -- ah -- in the summer of 2013, you were fourteen

25   years old, right?

Dominic Huntzinger - Direct                                    3

1    A.   Correct.

2    Q.   Okay.

3              What grade are you in now?

4    A.   Tenth.

5    Q.   All right.

6              So, you just started tenth grade?

7    A.   Correct.

8    Q.   Does your school -- what -- what year does your school

9    start high school?

10   A.   Ah, start high school?

11   Q.   So, is high school ninth, tenth, eleventh and twelfth?

12   A.   In ninth, yes.

13   Q.   Okay.

14             So, last year, you were also starting high school, is

15   that right?

16   A.   Correct.

17   Q.   Okay.

18             Dominic, where is it that you live?

19   A.   Limerick, Pennsylvania.

20   Q.   And you live with your parents?

21   A.   With my parents, yes.

22   Q.   Okay.

23             You're an only child, right?

24   A.   Correct.

25   Q.   I am going to bring you back to around the spring of 2013,

1    just after you turned fourteen years old.

2           Would you explain to the jury, what is it that was

3    going on in your life at that time?

4    A.   Ah, by that time, I finally came out to my parents, that I

5    was a homosexual.

6    Q.   And when you say, you came out to them, what is it that you

7    did?

8    A.   I finally told them.

9    Q.   Who did you talk with first?

10   A.   My mother.

11   Q.   And then, you also told your father as well?

12   A.   Hm-hmm.

13   Q.   And how would you describe your relationship with your

14   parents?

15   A.   Very close and they're very accepting of it.

16   Q.   So, when you told them this, how did they react?

17   A.   Very well, actually.  And thank goodness, too, 'cause I

18   would have been a mess.

19   Q.   Okay.

20          So, you were able to talk with them about it?

21   A.   Hm-hmm.

22   Q.   All right.

23   A.   Yes.

24   Q.   Explain, though, what else was still going on though you

25   had came out to your parents, had you told, really, anybody

1   else?

2   A.   No.

3   Q.   All right.

4           So, then what is it that you were going through at

5   that point in time?

6   A.   Well, I was very lonely for one thing.  Well, I felt

7   lonely.

8   Q.   So, what is it that you did?

9   A.   I went out searching for other means of meeting people of

10  my own nature.

11  Q.   When you say, your own nature, what are you -- what are you

12  trying express?

13  A.   Homosexuals.

14  Q.   And when you went out, trying to meet people, how was it

15  that you did that?

16  A.   Through applications on my phone.

17  Q.   So, you have what's before you -- before you came in, we

18  marked it as Government's Exhibit No. 1 -- is that your phone

19  there?

20  A.   Yes.

21  Q.   Who -- who bought the phone for you?

22  A.   My father.

23  Q.   That's the -- a Razor phone, correct?

24  A.   Correct.

25  Q.   Okay.

1              And so, you said, you -- you had apps, explain to the

2    jury what that is?

3    A.   Ah, it would be applications, kind of like, Facebook almost

4    in which two people would talk to each other, except there is no

5    posting, it's just purely talking to one another.

6    Q.   Well, the thing you're talking about now is a specific

7    application, right?

8    A.   Correct.

9    Q.   So, for some people, who may not know what app -- cell-

10   phone apps -- are, would you just describe what it is, you were

11   doing on your phone?

12   A.   Talking to others through an application.

13   Q.   How do you get an application on your phone?

14   A.   You would download it.

15   Q.   Okay.

16              So, you were specifically looking for ones, where you

17   might be able to meet other people, who were homosexual?

18   A.   Correct.

19   Q.   Okay.

20              And -- and so, you came across this one that was

21   called, Jack'D, is that right?

22   A.   Correct.

23   Q.   Okay.

24              And through looking at it, what did you discover about

25   Jack'D?

1   A.   Ah, what do you mean by that?

2   Q.   Well, first in order -- after you download Jack'D, if you

3   want to create your own profile on Jack'D, what must you do?

4   A.   Ah, give basic information, like, ah, your name and age.

5   Q.   How did you know that it was geared towards homosexuals?

6   A.   It would be in the description.

7   Q.   Of the -- of the app, itself?

8   A.   Correct.

9   Q.   Okay.

10       Is there an age restriction, though, for the Jack'D

11   application?

12   A.   There is.

13   Q.   Okay.

14       And what was that?

15   A.   Eighteen.

16   Q.   All right.

17       So, you knew that when you were looking at it, right?

18   A.   Yes.

19   Q.   Okay.

20       Did you create a profile for yourself on the Jack'D

21   phone app?

22   A.   Yes.

23   Q.   Okay.

24       So, did you represent that you were eighteen years

25   old?

Dominic Huntzinger - Direct                                    8

1    A.    Yes.

2    Q.    And so, why did you do that?

3    A.    Well, as I said before, I came out at the -- I realized, I

4    was gay at the age of eleven, so by that time, I was way ahead

5    of everyone else, I kind of felt very alone and I just -- it

6    didn't feel right to me and I went to an app to look for others.

7    Q.    All right.

8          So, you created a profile for yourself on this Jack'D

9    phone app?

10   A.    Yes.

11   Q.    And did you -- did you use your true information?

12   A.    Yes.

13   Q.    Okay.

14         Other than --

15   A.    Besides my name, yes.

16   Q.    I'm sorry?

17   A.    I would use a fake name, but other that, yes.

18   Q.    All right.

19         Why did you use a fake name?

20   A.    Ah, in case of anything that would be a problem, like,

21   people that could track me down, possibly, people that could

22   possibly know me from other places.

23   Q.    Okay.

24         But there's a spot on that application in your profile

25   for you to indicate what you like, what you're interested in,

1    those kind of things?

2    A.   Correct.

3    Q.   Right.

4         Did you fill all of those out?

5    A.   Hm-hmm.

6    Q.   And was that truthful information?

7    A.   Yes.

8    Q.   Is there also a place for you to take a picture of

9    yourself?

10   A.   Yes.

11   Q.   And what's the point of that --

12   A.   Ah --

13   Q.   -- what is that used for?

14   A.   Well, that would represent who you are and it would just be

15   used as my personal photo, so that people could see who I am.

16   Q.   Okay.

17        And on the application, when you use the personal

18   photo, how does that come up on the app?

19   A.   Ah, well, on the main screen, you would see a bunch of

20   photos of a bunch of people.  And through that, you could click

21   on a photo and start to talk to them.

22   Q.   All right.

23        So, in addition to creating your own profile, what can

24   you then do when you're on this Jack'D cell-phone application?

25   A.   Talk to others.

1    Q.   And how is that you find other people on the Jack'D

2    application?

3    A.   Well, ah, you would start out on a page that shows all the

4    people around you and, like, in the local area.  And then, you

5    could also choose people, who were just generally online and you

6    could just click on them and talk privately.

7    Q.   Okay.

8         And when you say, talk, you're talking about talking

9    online, correct?

10   A.   Right.

11   Q.   Not talking on a phone --

12   A.   No.  It would just --

13   Q.   -- so that your voice is heard?

14   A.   -- be through text or not text, but messages.

15   Q.   Okay.

16        So, you're not actually giving out your cell-phone

17   number or anything like that on the Jack'D?

18   A.   No.

19   Q.   You're just messaging each other through this cell-phone

20   application?

21   A.   Yes.

22   Q.   All right.

23        So, we have some -- some slides from Jack'D in Exhibit

24   No. 5.

25        (Pause at 9:44 a.m.)

1    BY MS. ROTELLA:

2    Q.   Do you have that before you?

3    A.   Yes.

4    Q.   Okay.

5         So, explain -- explain what that first screen is?

6    A.   Ah, this would be a basic account menu, ah, through here,

7    you could put pictures, add to your profile, ah, select certain

8    settings.

9    Q.   Okay.

10        Dominic, I am going to have you take a look because

11   the jury doesn't have -- I am going to have you take look at

12   what we've marked as Exhibit No. 5 and if you can tell me, if

13   that's how you remember the Jack'D phone app, okay?

14   A.   All right.

15   Q.   Is that how -- is that accurate of how the Jack'D phone app

16   appeared to you, when you were on it in the summer of 2013?

17   A.   Yes.

18   Q.   Okay.

19        MS. ROTELLA:   The next screen.

20   Q.   So, that there seems to list, if you have music interests

21   or movie interests, that also is accurate?

22   A.   This would be part of your profile, correct.

23   Q.   Okay.

24        MS. ROTELLA:   And then, the next one.

25   Q.   And what's shown there?

1    A.   This would be members in your area or people close to you,

2    ah, this would be -- this would be the main screen or the screen

3    that would originally come up and you could click on certain

4    pictures and talk to people.

5    Q.   Okay.

6           And those are blacked out for today's purposes, but --

7    but is that how it would appear when you would go to the member

8    section?

9    A.   Yes.

10   Q.   Okay.

11          So, for all of those then --

12          MS. ROTELLA:   Sorry, is there one more?

13   BY MS. ROTELLA:

14   Q.   And what's shown there?

15   A.   This -- this shows your inbox, it would be -- this would be

16   messages from people or -- yeah, just messages from other people

17   to you, personally.

18   Q.   Okay.

19          So, if you were talking back and forth to somebody, it

20   would show up in your inbox then, correct?

21   A.   Correct.

22   Q.   And is this what it looked like, when you were using Jack'D

23   in the summer of 2013?

24   A.   Yes.

25   Q.   Okay.

1          MS. ROTELLA:  So, for all of those, then I would ask

2    that they'd be admitted into evidence, your Honor.

3          THE COURT:  Any objection?

4          MR. WRAY:  No objection, Judge.

5          THE COURT:  Very well.  G-5 is admitted.

6          (Government Exhibit G-5 received in evidence.)

7          MS. ROTELLA:  Okay.  And so, go back to the first one,

8    please.

9    BY MS. ROTELLA:

10   Q.   So, Dominic, you've indicated that you downloaded this, it

11   was a cell-phone application, but did you also use your iPad

12   when you would go onto the Jack'D --

13   A.   Yes.

14   Q.   -- application?

15        So, how -- how are you able to do that, if this is a

16   cell-phone application?

17   A.   It is both cell phone and -- ah -- all Apple -- all Apple

18   products --

19   Q.   Okay.

20   A.   -- applications.

21   Q.   So, and in fact, eventually, your father found the

22   communication that you had with a person by the name of Mike

23   Dozer in this case, correct?

24   A.   Correct.

25   Q.   And that he found on your iPad, is that right?

1    A.    Yes.

2    Q.    Okay.

3          So, let's go back then to this first screen.

4          MS. ROTELLA:  Is it up on the jury screen?  Okay.

5    BY MS. ROTELLA:

6    Q.    So, the first screen there, explain to them, again, what --

7    what is this that's being shown there on the right-hand corner,

8    there's a gray mark on an account box?

9    A.    Ah, this would be like to your basic profile and you could

10   add things.

11         And the next one would be favorites, which would --

12   this would allow you to favorite certain people, so you could go

13   back to them easily and talk again.

14         Match, I don't remember what exactly that is.

15         Inbox, as I said before, would be -- ah -- where other

16   -- other people's messages to you would be.

17         And members would be people, who are local and it

18   would show everyone around you or people online in general.

19   Q.    Okay.

20         So, the thing that you've just described is the top --

21   the bar that's at the top of -- across your screen there, right?

22   A.    Yes.

23   Q.    And those would be the different things that you would

24   click on and you would get a different screen, is that correct?

25   A.    Correct.

1    Q.   So, the screen that's showing now is the screen for

2    account?

3    A.   Hm-hmm.

4    Q.   And that's what you used to make your own profile, is that

5    right?

6    A.   Correct.

7    Q.   Okay.

8         MS. ROTELLA:   So, we can go to the next line then.

9    BY MS. ROTELLA:

10   Q.   And explain to the jury, what that is?

11   A.   This would be making up the profile, it would be of

12   interests and like -- stuff like, movies and music, what you're

13   interested in, future goals -- future goals and stuff like that.

14   Q.   Okay.

15        And then, the next one?

16   A.   And once again, this would be members, either, in your area

17   or people just generally online or you can look up a certain

18   location, that you might be looking for.

19   Q.   Okay.

20        So, those photos -- as we'd said -- are blacked out,

21   so we can't see who the people are, but underneath them, there

22   appears to be numbers?

23   A.   That would be the distance away from or how close they are

24   to you.

25   Q.   Okay.

1            So, if you're looking to try to meet with someone, who

2    actually lives near you, it indicates the distance, correct?

3    A.   And whether or not, they're online.

4    Q.   Okay.

5            MS. ROTELLA:  And then, the next one.

6    BY MS. ROTELLA:

7    Q.   And that fourth one, then, that's the messaging that you've

8    talked about, correct?

9    A.   Correct.

10   Q.   All right.  Okay.

11           MS. ROTELLA:  Thank you.

12   Q.   All right.

13           So, Dominic, now we're taking around the summer of

14   2013 and some time around August of 2013.

15           Did you come across a person online that was using the

16   name of Mike Dozer?

17   A.   Yes.

18   Q.   Okay.

19           And how is it that you came across him online?

20   A.   Ah, seeing him through the member portion of the app.

21   Q.   Okay.

22           Did you know who Mike Dozer was before you saw -- when

23   you say, the member portion, you're talking about the Jack'D,

24   correct?

25   A.   Correct.

1  Q.   Did you know who he was at that point?

2  A.   By that point, yes, due to the fact, the day before I saw a

3  picture of him online.

4  Q.   Where did you see a picture of him online the day before?

5  A.   An application called, Tumbler.

6  Q.   Okay.

7       And so, how did you know that the picture of him was

8  of him the day before, you didn't know him, right?

9  A.   Right.

10      It was labeled that under -- with his name.

11 Q.   Okay.

12      So, it was a picture of him that said, Mike Dozer

13 underneath?

14 A.   Correct.

15 Q.   And what was the picture that you saw Tumbler?

16 A.   Ah, just miscellaneous photos of him.

17 Q.   Okay.

18      Was he clothed?

19 A.   Not always.

20 Q.   So, there was more than one photo that you saw of him the

21 day before on Tumbler?

22 A.   Correct.

23 Q.   All right.

24      So, then this next day, when you find him on the

25 Jack'D application, how was it that you saw him on there?

1  A.   I can't quite -- quite remember, if it's that he messaged

2  me or if I found him and messaged him, I'm not sure.

3  Q.   But at some point that next day, you do -- the two of you

4  did end up talking?

5  A.   Correct.

6  Q.   And when I say, talking, I'm talking about typed-out

7  messages?

8  A.   Messages -- yes.

9  Q.   And this was done through the Jack'D application?

10  A.   Yes.

11  Q.   Okay.

12        And so, what was your first conversation, if you

13  recall?

14  A.   Ah, the first conversation would be just me saying, hey, I

15  saw you the day before and that I recognized him.

16        And then, after that, it immediately -- well, he -- I

17  think, by that time, he asked me my age and I did tell him my

18  age, my real age, that is.  And he --

19  Q.   Meaning what?

20  A.   What?

21  Q.   You said, your real age?

22  A.   Being fourteen.

23  Q.   Okay.  Continue.

24  A.   And he said, he was very much okay with that.

25        And after that, it went straight into planning to meet

1   the next day.

2   Q.   Okay.

3          Did -- did you ever -- did you ever know this person

4   by anything, other than Mike Dozer?

5   A.   No.

6   Q.   When you saw him on the cell-phone application, was there a

7   picture that went with his -- his profile and his message?

8   A.   Yes.

9   Q.   So, did that picture match the picture you had -- you had

10  seen the day before?

11  A.   I'm not sure, if it was the exact same photo, but it --

12  Q.   But was the person in the picture --

13  A.   Yes.

14  Q.   -- the same person, who was in the other pictures?

15  A.   Yes.

16  Q.   Okay.

17         So, you recognized him still as the person, you knew

18  as Mike Dozer?

19  A.   Hm-hmm.

20  Q.   You need to just say, yes or no.

21  A.   Yes, I'm sorry.

22  Q.   Okay.

23         Do you see that person here in court today?

24  A.   Yes.

25  Q.   And would you just describe what he's wearing for the

1    record?

2    A.    A bright green dress shirt.

3    Q.    Okay.

4          MS. ROTELLA:  And he's identified the defendant, your

5    Honor.

6          THE COURT:  So noted.

7          (Pause at 9:52 a.m.)

8          MS. ROTELLA:  Can you pull up Exhibit No. 3, please.

9    BY MS. ROTELLA:

10   Q.    All right.

11         Dominic, we've already identified this and put it into

12   evidence, this is Exhibit No. 3.

13         Would you just take a look at that and read that, do

14   you recognize that conversation that's depicted there?

15   A.    This was relatively, the first conversation we had.

16   Q.    Now, at the top of that conversation, you talk about seeing

17   him on Tumbler, it's a little bit hidden --

18   A.    Right.

19   Q.    -- on the right-hand side, is that you?

20   A.    Yes.

21   Q.    So, all of the remarks on the right-hand side are you, is

22   that right?

23   A.    Correct.

24   Q.    And how about on the left-hand side?

25   A.    That would be his --

Dominic Huntzinger - Direct                                    21

1    Q.   Is there --

2    A.   -- along with his picture.

3    Q.   His picture, okay.

4         So, you talk about seeing him on Tumbler the day

5    before?

6    A.   Correct.

7    Q.   Okay.

8         And then, what is it that he first says to you?

9    A.   Ah, the fact that he's extremely new to the porn industry.

10   Q.   So --

11        (Musical sounds in background at 9:53 p.m.)

12   Q.   All right.

13        And did you discuss that with him?

14   A.   Yes.

15   Q.   All right.

16        And there -- after talking about him being in the porn

17   industry, at what point in your first conversation here, does

18   the subject of sex come up?

19   A.   Ah, extremely after that or directly after that.

20   Q.   Okay.

21        So, it's the second thing that he says to you, is that

22   right?

23   A.   Correct.

24   Q.   And what does he say to you?

25   A.   Ah, so what if I wanted to have sex with you.

Dominic Huntzinger - Direct                                    22

1    Q.   Now, you tell him that you're fourteen --

2    A.   Correct.

3    Q.   -- and not -- he still says, that he -- that does not

4    matter, correct?

5    A.   Correct.

6    Q.   All right.

7            That he still wants to have sex with you?

8    A.   Correct.

9    Q.   All right.

10           Now, Dominic, this is a screen shot of your

11   conversation, correct?

12   A.   Hm-hmm.  Yes.

13   Q.   Was this your whole conversation?

14   A.   No, there was more after it.

15   Q.   Okay.

16           And what was the conversation after that?

17   A.   Ah, that would be -- ah -- planning out the next day of how

18   to meet and what time and where.

19   Q.   Now at that point in time, it was summer, so you were home,

20   right?

21   A.   Correct.

22   Q.   Okay.

23           Your parents work during the week?

24   A.   Yes.

25   Q.   All right.

1              So, where did you arrange to meet?

2    A.   At my house.

3    Q.   All right.

4              And you invited him to your house?

5    A.   Yes.

6    Q.   Okay.

7              And at what time did you arrange to meet that next

8    day?

9    A.   Ah, some time early in the morning.

10   Q.   All right.

11             And how did you explain to him -- you told him where

12   you lived, obviously?

13   A.   Yes.

14   Q.   Okay.

15             And did you have a cell phone for him?

16   A.   No.

17   Q.   All right.

18             You -- you didn't even have his true name, correct?

19   A.   No.

20   Q.   All right.

21             You just explained to him where to come, correct?

22   A.   Correct.

23   Q.   All right.

24             Did you ever communicate with him by cell phone?

25   A.   No.

1   Q.   Did you ever communicate with him by e-mail?

2   A.   No.

3   Q.   Did you ever talk to him on the regular land-line

4   telephone?

5   A.   No.

6   Q.   So, your communications with him were limited to this

7   Jack'D cell-phone application?

8   A.   Yes.

9   Q.   All right.

10          Did he show up that next morning?

11   A.   Yes.

12   Q.   And explain to the jury, what happened?

13   A.   Ah, he came to my door, I opened it.  I led him to my room

14   and it -- well, we started having intercourse.

15   Q.   Ah, so explain to the jury what -- what took place in your

16   bedroom?

17   A.   Ah, well, he performed oral on me and I did so back.

18          And then, he performed anal on me.

19   Q.   Was there any protection that was used?

20   A.   No.

21   Q.   Do you know whether or not, the defendant photographed or

22   videotaped what happened that day?

23   A.   He took videotapes of it.

24   Q.   And how do you know that?

25   A.   Because I saw him trying to record it.

Dominic Huntzinger - Direct                                             25

1    Q.   With what?

2    A.   His phone.

3    Q.   Okay.

4         Did -- did he ever send you a copy of the videotape?

5    A.   No.  He said that his SD card was broken and he couldn't.

6    Q.   Okay.

7         But that day -- you didn't talk about that that day,

8    did you?

9    A.   No.

10   Q.   All right.

11        So, as far as you knew, he had been videotaping that

12   day?

13   A.   Correct.

14   Q.   Do you know whatever happened to what was videotaped?

15   A.   No.

16   Q.   Okay.

17        Did he leave after that?

18   A.   Yes.

19   Q.   Okay.

20        How long, would you say that he was there, Dominic?

21   A.   Ah, a relative short amount of time, maybe like, under

22   thirty minutes.

23   Q.   Did you have contact with him again after that day?

24   A.   Ah, most likely through the Jack'D app.

25   Q.   Okay.

1            And when you say, most likely, what are you -- what is

2    it that you're talking about?

3    A.   Ah, we probably just talked a bit afterwards and then, even

4    after that, we had relatively short conversations throughout

5    time.

6    Q.   And that was all on the Jack'D cell-phone application,

7    correct?

8    A.   Correct.

9    Q.   Did you ever see him again?

10   A.   No.

11   Q.   Do you remember sending him a picture of yourself --

12   A.   Yes.

13   Q.   -- some time later?  Okay.

14           Actually, you sent him two pictures, is that right?

15   A.   Ah, I think more than two, but yes.

16   Q.   Okay.

17           Well, we found two.

18   A.   Okay.

19   Q.   And we've shown you them outside of the court, correct?

20   A.   Correct.

21   Q.   And you've identified those as the pictures that you sent

22   to him through the Jack'D cell-phone application, correct?

23   A.   Correct.

24   Q.   All right.

25           I am going to show you what we've first marked Exhibit

1    7, I guess, correct, is that the --

2          (Discussion held off the record at 9:58 a.m.)

3    BY MS. ROTELLA:

4    Q.   Okay.

5          Dominic, the -- the police also showed you this

6    picture when they were investigating this case, correct?

7    A.   Yes.

8    Q.   All right.

9          Now, the one that's before you, ah, it has been

10   cropped, correct?

11   A.   Correct.

12   Q.   All right.

13          So, it's covering up your private parts, is that

14   right?

15   A.   Correct.

16   Q.   So, but explain for the record, what it is you

17   photographed?

18   A.   It would be my private parts.

19   Q.   Your face is visible though in that photograph --

20   A.   Yes.

21   Q.   -- correct?  Okay.

22          And you took that photograph, yourself?

23   A.   Yes.

24   Q.   Using what?

25   A.   Ah, mostly likely my iPad.

1    Q.   And how is it that you sent it to the defendant?

2    A.   Through the Jack'D app.

3    Q.   All right.

4         And then, other than the cropping, so that we can't

5    see the private parts, is the picture the same one that you

6    recall sending to him?

7    A.   Yes.

8    Q.   All right.

9         MS. ROTELLA:  Move for the admission into evidence,

10   your Honor.

11        MR. WRAY:  No objection.

12        THE COURT:  Any objection?

13        MR. WRAY:  No.

14        THE COURT:  It's admitted, G-7 is admitted.

15        (Government Exhibit G-7 received in evidence.)

16        MS. ROTELLA:  Can you publish to the jury, Ed?  Okay.

17   BY MS. ROTELLA:

18   Q.   All right.

19        Now, Dominic, there was also -- you said, you thought

20   there were a number of pictures that were sent.  One other

21   picture that was found by the police and was shown to you, shows

22   you in a pair of distinctive underwear, is that right?

23   A.   Yes.

24   Q.   Okay.

25        MS. ROTELLA:  And, Mike, I'm sorry.

1          No, no, no, the one of -- excuse me one moment, your

2     Honor.

3          (Pause and whispering held off the record at 10:00

4     a.m.)

5     BY MS. ROTELLA:

6     Q.   All right, Dominic, I'm sorry, you -- before he left, when

7     he was at your house that day, did he also bring with him,

8     something that you have referred to as a hopper or a popper

9     substance?

10    A.   Correct.

11    Q.   Explain what that is?

12    A.   Ah, that was a small dark glass bottle and he would --

13    several times -- he told me to sniff it.  It's -- I guess, it's

14    something that makes you feel -- feel better during sex.

15    Q.   Okay.

16          When you say, you guess, is that something that was

17    told to you by --

18    A.   Yes --

19    Q.   -- by the defendant?

20    A.   -- he told me that.

21    Q.   Did you know what it was?

22    A.   No, not really.

23    Q.   Did you know that he was bringing that?

24    A.   No.

25    Q.   All right.

1          Did you -- did you see the bottle that day?

2   A.   Yes.

3   Q.   And did you -- did you sniff what -- do what he told you to

4   do?

5   A.   Yes.

6   Q.   All right.

7          Then, I am going to show you what we've marked as

8   Exhibit 9.

9          (Pause and discussion held off the record at 10:02

10  a.m.)

11         MS. ROTELLA:  Sorry, it's sealed.

12         May I approach, your Honor?

13         THE COURT:  You may.

14  BY MS. ROTELLA:

15  Q.   Do you recognize that?

16  A.   Yes.

17  Q.   And is that the same type of bottle that was used that day

18  and brought by the defendant?

19  A.   Yes.

20  Q.   Okay.  All right.

21         So, this -- this second photograph then, you had a

22  pair of very distinctive underwear?

23  A.   Yes.

24  Q.   Is that the photograph that you took of yourself?

25  A.   Yes.

1    Q.   And is that your underwear, that you're wearing?

2    A.   Yes.

3    Q.   Okay.

4              MS. ROTELLA:  Sir, I'd move for admission into

5    evidence.

6              THE COURT:  G what -- what number is it?

7              MS. ROTELLA:  Whoops.  Sorry.

8              THE COURT:  Government's Exhibit what?

9              MS. ROTELLA:  I can't find it on my list, so I am

10   going to mark it as Exhibit No. --

11             THE COURT:  Do you have --

12             MS. ROTELLA:  -- 7-3, okay?

13             THE COURT:  7-3?

14             MS. ROTELLA:  Yes.

15             THE COURT:  Very well.

16             MS. ROTELLA:  Thank you.

17             THE COURT:  So, admitted.  Any objection?

18             MR. WRAY:  No objection.

19             THE COURT:  It's admitted.

20             (Government Exhibit G-7-3 received in evidence.)

21             MS. ROTELLA:  So, the jury can see?

22             MR. WRAY:  Your Honor, I'd object to publishing it,

23   since it's their picture.

24             THE COURT:  Is there a need to publish it, it's

25   admitted?

1             MS. ROTELLA:  I suppose --

2             MR. WRAY:  A brief side bar, your Honor.

3             MS. ROTELLA:  -- we can -- let's go to --

4             THE COURT:  Very well.

5             (Discussion held at side bar at 10:04 a.m. on the

6     record.)

7             THE COURT:  Is there a need to publish it?

8             MS. ROTELLA:  It is, your Honor, they do need to --

9     it's part of the -- the child pornography, we have to show it's

10    child pornography.  It can come in through another witness, we

11    don't have to do it with the child.

12            THE COURT:  Okay.  That's fine, do it through another

13    witness.

14            MR. WRAY:  And I believe, it's graphic and

15    pornographic and I don't want -- it's prejudicial to my client

16    and --

17            MS. ROTELLA:  That's what the charge is.

18            THE COURT:  Yes, that's --

19            MR. WRAY:  I understand that, but --

20            THE COURT:  -- I -- I will admit it.

21            (Concluded at side bat at 10:05 a.m.)

22            THE COURT:  It's admitted.

23            MS. ROTELLA:  Thank you, Judge.

24    BY MS. ROTELLA:

25    Q.   All right.

1              I am also going to show you Exhibit No. 36.

2              (Pause at 10:05 a.m.)

3    Q.   I've just shown you exhibit 36, are those your underwear,

4    Dominic?

5    A.   Yes.

6    Q.   All right.

7              You turn them over to the police?

8    A.   Yes.

9    Q.   And are those the underwear that were -- you were using and

10   wearing in the picture that we just showed you --

11   A.   Yes.

12   Q.   -- marked -- marked in 7-3, correct?

13   A.   Yes.

14   Q.   All right.

15             So, Dominic, tell -- tell me, you never did meet up

16   again with the defendant, correct?

17   A.   Correct.

18   Q.   And you did send him some photographs, but other than that,

19   your communication with him died off?

20   A.   Yes.

21   Q.   All right.

22             So, explain why?

23   A.   Ah, we really couldn't hold a conversation.

24             And other than that the conversations were -- shifted

25   to him wanting to meet more -- and I just  -- didn't want to.

1    Q.   Why not?

2    A.   It wasn't what I was looking for.

3    Q.   All right.

4    A.   It didn't feel right.

5    Q.   So, beginning in -- ah -- shortly after that then, in the

6    weeks following that, did you start to have some difficulties at

7    home?

8    A.   Yes, ah --

9    Q.   Explain what was happening?

10   A.   I started to become very closed off and sheltered, I didn't

11   really talk to my parents very much, I kind of hid in my room a

12   lot.

13   Q.   Did you father, eventually, approach you?

14   A.   Yes.

15   Q.   Okay.

16             And did he show you, what he had found on your iPad?

17   A.   Yes.

18   Q.   Meaning the screen shot that we just saw here today, your

19   communication --

20   A.   Yes.

21   Q.   -- with the defendant?

22   A.   Yes.

23   Q.   And did you tell him, what had happened?

24   A.   Yes.

25   Q.   Okay.

1          And what did you and your father then do?

2  A.    Turned it over to the police.

3  Q.    Okay.

4          So, you went and spoke with the police?

5  A.    Yes.

6  Q.    All right.

7          And you told them, what had happened?

8  A.    Yes.

9  Q.    Okay.

10         And let them look through your iPad and your cell

11  phone and all of that, correct?

12  A.    Yes.

13  Q.    Now, Dominic, at this point, you still never knew what his

14  true name was, right?

15  A.    No.

16  Q.    All right.

17         So, you just gave them the limited information that

18  you had about the defendant, right?

19  A.    Yes.

20  Q.    Okay.

21         Now, at some point, the police came to you because

22  they wanted to show you some photographs, is that right?

23  A.    Yes.

24  Q.    Okay.

25         And they had you look through a number of photographs

1    to see if you recognized anybody?

2    A.    Yes.

3    Q.    Where did that take place?

4    A.    That took place in the police department.

5    Q.    All right.

6          Did you go with your father to the police department?

7    A.    Yes.

8    Q.    All right.

9          And that was some time in December of 2013, is that

10   right?

11   A.    Correct.

12   Q.    Okay.

13         So, I am going to show you what we've marked as

14   Exhibit No. 8.

15         MS. ROTELLA:  Just to him and the Court.

16         No, no, I'm sorry, all of the --

17   BY MS. ROTELLA:

18   Q.    So, there are nine pages here, I am just going to have the

19   agent flip through all of the pages and you tell me, if you

20   recall whether or not, this is what was shown to you by the

21   police that day?

22         (Pause and whispering held off the record at 10:09

23   a.m.)

24   Q.    So, those are all of the -- they're the photographs in the

25   printed forms, is that what you remember seeing that day?

1    A.    Yes.

2    Q.    Okay.

3          And it's still in the same form that you -- you saw it

4    in December --

5    A.    Yes.

6    Q.    -- of 2013?  Right.

7          MS. ROTELLA:  So, I would move for it's admission,

8    your Honor.

9          THE COURT:  Any objection?

10          MR. WRAY:  No objection.

11          THE COURT:  G-8 -- Government's Exhibit 8 is admitted.

12          MS. ROTELLA:  Thank you.

13          (Government Exhibit G-8 received in evidence.)

14    BY MS. ROTELLA:

15    Q.    So, let's start with Exhibit 8-1, when you first went in,

16    Dominic, you met with Detective Morris?

17    A.    Correct.

18    Q.    And it was you, your father and Detective Morris?

19    A.    Yes.

20    Q.    Okay.

21          And so, this first sheet that's popping up, do you

22    remember signing this form?

23    A.    Yes.

24    Q.    And did Detective Morris tell you, how he was going to show

25    the photographs that day?

1    A.    Yes.

2    Q.    Okay.

3          And what did he say, he was going to do?

4    A.    He said, he was going to show me a series of photos and I

5    would have to point out one that I recognized.

6    Q.    All right.

7          Did he tell you that Christopher Steele or Mike Dozer

8    was among those photographs?

9    A.    No.

10   Q.    All right.

11         At this point, did you ever know that the defendant's

12   name was Christopher Steele?

13   A.    No.

14   Q.    Okay.

15         So, you didn't know if there was going to be anybody

16   among those photos, correct?

17   A.    Correct.

18   Q.    All right.

19         And so, how is it that -- look at Page 2 then -- your

20   -- I'm sorry, on Page 1, your signature appears there?

21   A.    Yes.

22   Q.    And also your dad's signature?

23   A.    Yes.

24   Q.    And that's just saying that you were given those

25   instructions, correct?

1    A.   Correct.

2    Q.   All right.

3              MS. ROTELLA:  So, then Page 2.

4    BY MS. ROTELLA:

5    Q.   Then, you were shown a series of eight photographs, right?

6    A.   Yes.

7    Q.   And they were in the -- in this order or no, that we've --

8    that you viewed them?

9    A.   I'm not sure on the order.

10   Q.   Okay.

11             But did you view all eight?

12   A.   Yes.

13   Q.   And who is it that you picked out?

14   A.   Ah, Mike Dozer.

15   Q.   Okay.

16             Did you have any difficulty picking out Mike Dozer?

17   A.   No.

18   Q.   Was there any hesitation on your part?

19   A.   Nope.

20   Q.   Okay.

21             So, take a look at all of these for the jury, again,

22   that you've already seen, this is the second photograph, the

23   third, the fourth, the fifth, sixth -- I'm sorry -- it's a

24   little bit difficult to see on the computer screen.

25             Do you have that in front of you, Dominic --

Dominic Huntzinger - Direct                                          40

1    A.    Yes.

2    Q.    -- is that the photograph that you picked out?

3    A.    Yes.

4    Q.    Okay.

5          And on the top here, there's some handwriting, is that

6    your writing?

7    A.    Yes.

8    Q.    Did you put it on there that day when you looked at those

9    photo array?

10   A.    Yes.

11   Q.    Okay.

12         Which is --

13         (Coughing at 10:11 a.m.)

14   A.    Ah, it's -- I pointed out, which one I knew to be Mike

15   Dozer.

16   Q.    So, the actual writing says, this is Mike Dozer, correct?

17   A.    Correct.

18   Q.    And your initials?

19   A.    Yes.

20   Q.    And the date?

21   A.    Yes.

22   Q.    Which was what?

23   A.    It was the 9th of January, by that time.

24   Q.    Okay.

25         This says, December, correct?

1   A.   I'm sorry, December.  I'm not good at the dates.

2   Q.   Can you see it on your screen, there?

3   A.   Yes, I can.

4   Q.   Okay.

5            So, December 9th of 2013?

6   A.   Yes.

7   Q.   And at 4:28 p.m., right?

8   A.   Correct.

9   Q.   And this -- all of that was in your handwriting?

10  A.   Yes.

11  Q.   And then, there were two photographs after that, correct,

12  take a look.

13           (Pause at 10:12 a.m.)

14  Q.   Photo 7 and then, Photo 8.

15           So, you didn't pick out anybody but the person, you

16  knew as Mike Dozer, correct?

17  A.   Correct.

18  Q.   Dominic, there were some -- did you also have some -- or

19  receive some photographs of the defendant through the Jack'D

20  account?

21  A.   No.

22  Q.   Okay.

23           Did you -- do you remember viewing any photos of the

24  defendant?

25  A.   Yes.  One of his profile.

1    Q.    Okay.

2          So, you went and saw them on his profile?

3    A.    Yes.

4    Q.    Okay.

5          So, explain to the jury how you can get into somebody

6    else's profile?

7    A.    Ah, getting into someone else's profile, you would have to

8    go on to the main screen, where all of the members are shown.

9          (Coughing at 10:13 a.m.)

10   A.    You would then, click on their picture, it would show their

11   information, like, age and -- ah -- basic information, height,

12   weight all of that.

13         And then, you could see, either, two of their normal

14   profile pictures and then, you could see two or three normal

15   profile pictures and then, two locked pictures, if he would

16   unlock them.

17   Q.    Did he unlock pictures for you?

18   A.    Yes.

19   Q.    Okay.

20         How is that done?

21   A.    He would have to go onto his profile and unlock them.

22   Q.    Okay.

23         And so, that was done for you?

24   A.    Yes.

25   Q.    And what type of pictures did he have in the locked portion

1  of his --

2  A.   Naked.

3  Q.   -- Jack'D profile?

4  A.   Naked ones.

5  Q.   And you viewed those?

6  A.   Yes.

7  Q.   Okay.

8          Is there any -- as you sit here today -- are you still

9  positive that the person you picked out in the photographs and

10  the person, who is here in court today, is the person who

11  traveled to your house?

12  A.   Yes.

13  Q.   Okay.

14          MS. ROTELLA:  That's all I have then, your Honor.

15  Thank you.

16          THE COURT:  Cross-examine.

17          MR. WRAY:  One moment, your Honor.

18          (Pause at 10:15 a.m.)

19                    CROSS-EXAMINATION

20  BY MR. WRAY:

21  Q.  Good morning, Dominic, how are you?

22  A.   I'm well, how are you?

23  Q.   I'm fine.

24          Let's talk about your Jack'D account for a moment, if

25  you don't mind.

1   A.   Okay.

2   Q.   We saw the Government's Exhibit --

3          MR. WRAY:  Can we see 5-1, please.

4   BY MR. WRAY:

5   Q.   Do you see that?

6   A.   Yes.

7   Q.   And it says, Jack'D Pro --

8   A.   Yes.

9   Q.   -- is that the name, that's given to all of the accounts --

10  different people -- or is that a separate account for the Apple

11  -- the Apple technology?

12  A.   Ah, Jack'D Pro is just an advanced version of Jack'D, it

13  would be -- ah -- it would cost more money to get it and it

14  would have more options and applications on it.

15  Q.   Can you get that on both Android phone and a Apple phone?

16  A.   Not sure.

17  Q.   Okay.

18          And you were able to fill out a -- a complete profile,

19  correct?

20  A.   Yes.

21  Q.   And in your complete profile, you indicated you were over

22  eighteen, correct?

23  A.   Correct.

24  Q.   How old did you say you were?

25  A.   Eighteen.

1  Q.   And you were able to give your location, Limerick, PA.?

2  A.   Yes.

3  Q.   Can you put any location in, you want?

4  A.   I'm not sure.

5  Q.   And as part of ths profile, it asks activities -- could you

6  go B-2, please.

7            MS. ROTELLA:  It's not in evidence.

8            MR. WRAY:  Pardon?

9            MS. ROTELLA:  Which one are you asking for?

10           MR. WRAY:  B-2.

11           (Discussion held off the record at 10:17 a.m.)

12           THE COURT:  That's the -- isn't it, D-2?

13           MR. WRAY:  It's -- no, no, B-2 is the --

14           MS. ROTELLA:  are you talking about --

15           MR. WRAY:  -- on the --

16           MS. ROTELLA:  -- No. 5 -- 5?

17           MR. WRAY:  5-2, I'm sorry.

18           THE COURT:  Right, right.

19           MS. ROTELLA:  This is the second slide that he was

20  shown.

21  BY MR. WRAY:

22  Q.   And you indicated your -- your interest was -- one of your

23  activities was acting?

24  A.   Ah, not that -- that's not shown here.

25           MR. WRAY:  B-2 -- Slide B-2?

1           MS. ROTELLA:  There is no B-2.

2           Can we be seen at side bar, your Honor?

3           THE COURT:  Yes.

4           MR. WRAY:  Fine.

5           (Discussion at side bar held on the record at 10:17

6    a.m.)

7           THE COURT:  All right.

8           MR. WRAY:  My impression was that we admitted the

9    entire Exhibit 5.

10          MS. ROTELLA:  No.

11          MR. WRAY:  We did not, that's my problem?

12          THE COURT:  You -- one --

13          MS. ROTELLA:  I already think, I know the confusion,

14   you went --

15          THE COURT:  Okay, what -- you know the confusion?

16          MS. ROTELLA:  Because there is an exhibit list that

17   was made up -- these are -- some of these are wrong, but let's

18   see.  These are slides that were made up, these are not his

19   account, they were just --

20          MR. WRAY:  Oh.

21          MS. ROTELLA:  -- were made up.

22          MR. WRAY:  That's -- I can move on from this, that's

23   fine.

24          THE COURT:  All right.  Then --

25          MR. WRAY:  That answers my question.

1              MS. ROTELLA:  Okay.

2              THE COURT:  Okay, thank you.

3    BY MR. WRAY:

4    Q.   I am just going to ask you a new question, all right?

5    A.   All right.

6    Q.   It asks for activities, when you fill it out in advance --

7    and you can fill that in or not, correct?

8    A.   Correct.

9    Q.   It puts in interests?

10   A.   Yes.

11   Q.   And does that interest include sexual interests, regarding,

12   other me or is it just interest in general?

13   A.   I'm not sure, it was an option of what you could put in.

14   Q.   And I mean, it asks if -- what kind of movies you like,

15   what kind of movies you like, it asks all kinds of questions?

16   A.   Correct.

17   Q.   And you said, you weren't sure about the match feature on

18   this, had you never used the match feature?

19   A.   Not that I can remember, it was a long time ago, though.

20   Q.   Understood, not a problem.

21              When you're on Jack'D, though, could you do searches

22   to meet certain types of people?

23   A.   What do you mean by certain types?

24   Q.   You say, I want to meet people within a few miles of me,

25   within ten miles of me?

1    A.   Yes.

2    Q.   In fact, there's a GPS application attached to Jack'D, that

3    let's you determine how far away people are from you, correct?

4    A.   Correct.

5              MR. WRAY:  And can you put up Exhibit 3, please,

6    Government's Exhibit 3.

7    BY MR. WRAY:

8    Q.   The first part of this conversation, this -- the first

9    where you -- you write, basically, I saw you on Tumbler to the

10   person, who is identified as Mike Dozer?

11   A.   Correct.

12   Q.   Did you know who Mike Dozer was?

13   A.   At the time -- at the time, yes.

14   Q.   How long had you been aware of who Mike Dozer was?

15   A.   A day.

16   Q.   A day?

17   A.   Yes.

18   Q.   And how did you find out, who he was?

19   A.   Through Tumbler.

20   Q.   Through Tumbler.

21             And when you were looking at him on Tumbler, did --

22   did you find out what his profession was?

23   A.   Yes, that he was a porn star.

24   Q.   And this screen shot, is this the complete screen shot, the

25   screen shot you see there, all that was saved on your iPad?

1   A.   What do you mean by saved?

2   Q.   I mean, is this the complete conversation that you had with

3   Mike Dozer, is this all that there was?

4   A.   No, there was more after and before.

5   Q.   And you were going by the name, Dante on this, correct?

6   A.   At the time, I'm not sure.

7   Q.   Were you using in this conversation, your actual name?

8   A.   No.

9   Q.   Were you using the name, Dante?

10  A.   I'm not sure, if it is -- if it is that one, it could be

11  that one or another one.

12  Q.   What other names did you use while you were on Jack'D?

13  A.   Sometimes, Hunter, sometimes, Christian.

14  Q.   Is that all of the names that you used?

15  A.   I'm sure there's more, I'm forgetting.

16  Q.   Did you ever use the name, Dominic?

17  A.   Not that I'm aware of.

18  Q.   And I know you came out to your parents about -- you said,

19  that you believed -- you realized you were gay when you were

20  eleven, correct?

21  A.   Correct.

22  Q.   And it took you two years to just build up the ability to

23  explain this to your -- to your mother and then, quickly to your

24  father, correct?

25  A.   Correct.

1   Q.   That felt pretty good to be able to admit, who you were,

2   correct?

3   A.   Yes.

4   Q.   And -- well, that was a pretty scary process, wasn't it?

5   A.   No.  I always knew, they would accept me.

6   Q.   I mean, it was scary to -- not scary, that they wouldn't

7   accept you, that's not the question, let me rephrase that, I'm

8   sorry.

9        Scary in that, I don't know how the conversation is

10  going to go and I'm afraid to do it, but once you did it, you

11  knew they'd accept you, just the build up to it was scarier than

12  the realization that you knew your parents were they people that

13  they were, they loved you, they cared for you?

14  A.   Yes.

15  Q.   And in the coming days and weeks and months, nothing really

16  changed, correct?

17  A.   Correct.

18  Q.   And I believe, you testified that you -- you went on to

19  Jack'D to explore some of your sexuality, to meet other people

20  like yourself?

21  A.   Correct.

22  Q.   And to do so, you pretended to be over eighteen?

23       MS. ROTELLA:  Objection, he's indicated he was

24  eighteen, not over eighteen.

25       THE COURT:  Re -- rephrase.

1           MR. WRAY:  Eighteen and above, I'm sorry.

2           THE COURT:  It's sustained.

3           MS. ROTELLA:  Eighteen.

4           THE COURT:  Excuse me.

5           The objection is sustained, rephrase the question.

6    BY MR. WRAY:

7    Q.   You -- you went on to Jack'D, asserting that you were an

8    adult with the age of eighteen, correct?

9    A.   Correct.

10   Q.   And when you used all of your names, did you always say,

11   you were twenty -- eighteen?

12   A.   As far as -- as far as I'm aware.

13   Q.   Did you ever indicate you were older, as far as you're

14   aware?

15   A.   No.

16   Q.   Now, you have both a Razor phone and an IPad there,

17   correct?

18   A.   At the time, yes.

19   Q.   And does Jack'D work the same on both of those devices?

20   A.   The application, itself, is different formatting-wise, but

21   it does the same thing, it's still the same profile.

22   Q.   Not the profile, the -- are you able to file share with the

23   Razor phone?

24   A.   What do you mean by file share?

25   Q.   I mean, you indicated that you could open you file and let

Dominic Huntzinger - Cross                                          52

1   someone see, other photos that are in your account, correct?

2   A.   Correct.

3   Q.   Isn't that an exclusive feature for just Apple

4   applications, iPhones and Ipads?

5   A.   No.

6   Q.   So, a person -- your Razor phone, you could open that up,

7   correct and let people --

8          MS. ROTELLA:  Objection, open -- open what up?

9   BY MR. WRAY:

10   Q.   Open up your file and let people look at it, correct?

11          MS. ROTELLA:  What file?

12   Q.   The file -- the pictures on Jack'D.

13   A.   The private photos, you  mean?

14   Q.   Yes.

15   A.   Yes.

16   Q.   Could you re-close it on your Razor phone?

17   A.   Yes.

18   Q.   And with regard to Jack'D, could you change your name on

19   Jack'D as you wished without closing and opening a new account?

20   A.   I'm not sure.

21   Q.   Could you change your location, could you update your

22   profile on a daily basis?

23          MS. ROTELLA:  That's two questions, Judge.

24          THE COURT:  Very well.

25          MR. WRAY:  I believe, it's one.

1            THE COURT:  Your objection, is it's a compound

2   question?

3            MS. ROTELLA:  Yes, sir.

4            THE COURT:  Sustained, rephrase.

5            MS. ROTELLA:  Thank you.

6            THE COURT:  You --

7   BY MR. WRAY:

8   Q.   Could --

9            THE COURT:  -- you don't have to answer that.

10  Q.   -- could you change your name by updating your profile

11  everyday, if you wanted on Jack'D?

12  A.   I'm not sure.

13  Q.   Could you update your profile everyday on Jack'D?

14  A.   I would be able to change it everyday.

15  Q.   If you updated your profile, could you change your location

16  on Jack'D everyday?

17  A.   Yes, due to the fact that location was an option.

18  Q.   And could you change your -- the photo that you put on

19  Jack'D everyday, if you wanted?

20           MS. ROTELLA:  Sir, these questions --

21           THE COURT:  Do you have an objection?

22           MS. ROTELLA:  I do, your Honor.

23           THE COURT:  All right.  Speak to the Court, go ahead.

24  What is the basis of your objection?

25           MS. ROTELLA:  The objection is, that this is not the

1   proper witness to ask these questions of.  He can ask him, what

2   he did, but he's trying to ask him how Jack'D -- the whole

3   Jack'D works.

4           THE COURT:  Very well.

5           MR. WRAY:  I -- I don't believe I am, your Honor --

6           THE COURT:  All right.

7           MR. WRAY:  -- I will rephrase and see if --

8           THE COURT:  Sustained, rephrase.  I am going to

9   sustain the objection, rephrase your question.

10  BY MR. WRAY:

11  Q.   Did you ever change your name on Jack'D?

12  A.   I'm not sure.

13  Q.   You've testified that you used many different names so far,

14  you said you used, Dante, you said, you used, Hunter.

15  A.   They --

16          THE COURT:  You have to answer yes or no.

17  Q.   -- correct?

18  A.   Yes.

19  Q.   You said, you used other names?

20  A.   (No verbal response.)

21          MS. ROTELLA:  Objection to other, he's indicated one

22  other.

23          MR. WRAY:  I -- well, he's -- he named two names.

24          THE COURT:  Over -- overruled, I'll permit it.

25  A.   I'm not sure, if while on your profile, you're allowed to

Dominic Huntzinger - Cross                                              55

1   change the name.  However, if your profile, say, is deleted, you

2   can create a new one and create a different name.

3   Q.   And with regard to the photo that you put on your profile,

4   the profile that people see, who controls that, that's

5   controlled by you, correct?

6   A.   Correct.

7   Q.   So, you were able to choose what is Government's Exhibit 7

8   as your profile photo for what people see in your sleeve while

9   they're looking through Jack'D, correct?

10  A.   Correct.

11          MS. ROTELLA:  No, I'm sorry.

12          THE COURT:  He answered -- we have an answer,

13  overruled.

14  BY MR. WRAY:

15  Q.   Now, I'd like to talk to you for a moment, about --

16          (Whispering held off the record at 10:29 a.m.)

17  Q.   -- when you discovered Mike Dozer on Tumbler, was this as

18  the result of an Internet search -- a search on Tumbler?

19  A.   No.

20  Q.   Well, how did you find a picture of Mike Dozer on Tumbler

21  then?

22  A.   See, how Tumbler works is, people post pictures and someone

23  could go on Tumbler and look at those pictures, so --

24  Q.   Okay.

25  A.   -- I did not, specifically, search for him, someone else

1    posted him.

2    Q.    Okay.

3              And you saw a picture of Mike Dozer on Tumbler?

4    A.    Correct.

5    Q.    Was there just one picture of Mike Dozer on Tumbler?

6    A.    No.

7    Q.    How many pictures, approximately, were there on Tumbler?

8    A.    More than two.

9    Q.    More than ten?

10   A.    Less than ten.

11             (Pause at 10:30 a.m.)

12             MR. WRAY:  Bring up Exhibit 8-1 for a moment.

13             MS. ROTELLA:  Did you say, 8-1?

14             THE COURT:  8-1.

15             MR. WRAY:  8-1, yes, it's --

16   BY MR. WRAY:

17   Q.    Now, we went through this and you reviewed -- the detective

18   explained to you -- that he was going to show you these photos.

19   And by this point in time, you did this on December 9th, 2013,

20   correct?

21   A.    Yes.

22   Q.    And this was several months after the encounter you've

23   testified to with Mike Dozer, correct?

24   A.    Correct.

25   Q.    And from that encounter until December 9th, had you found

1   other photos of Mike Dozer on the Internet?

2   A.   Yes.

3   Q.   Had you ever done searches for pictures of Mike Dozer on

4   the Internet after the encounter that you've testified to on

5   August 8th?

6   A.   Yes.

7   Q.   Approximately, how many times did you do searches and

8   viewed picture of Mike Dozer on the Internet?

9   A.   Once.

10   Q.   Just one time from the four and half months after the --

11   the August encounter you've testified to?

12   A.   Yes.

13   Q.   And when you viewed these photos that are all appended

14   behind the front page here, were they shown to you one at a

15   time,  were they spread out on the table, if you can recall?

16   A.   One at a time.

17            MR. WRAY:  One -- one moment, your Honor,

18            (Pause at 10:33 a.m.)

19   BY MR. WRAY:

20   Q.   You went with your father to the police department to

21   report this in, approximately, October 22nd, 2013, do you recall

22   that?

23   A.   I'm sorry, what?

24   Q.   You reported this encounter with the person, you knew to be

25   Mike Dozer in October of 2013, correct?

1    A.    I don't know the date.

2    Q.    Several months later, you --

3    A.    Approximately, yes.

4    Q.    And you've alleged -- well, let's back up a second.

5          You -- do you recall telling the police, that Mike

6    Dozer arrived at -- on -- on your street -- that he'd parked up

7    the street, do you recall telling them that?

8    A.    Yes.

9    Q.    Was there available parking in front of your house?

10   A.    Yes.

11   Q.    But you -- did you tell him to park up the street from you?

12   A.    Yes.

13   Q.    And did you wait inside your home for him to arrive?

14   A.    Yes.

15   Q.    So, he went down and knocked on your door?

16   A.    Yes.

17   Q.    Did he call you on the phone or anything like that?

18   A.    No.

19   Q.    And you testified to this, he was there, approximately,

20   thirty minutes?

21   A.    Yes.

22   Q.    And did you attempt to take any pictures of him and you

23   clothed?

24   A.    No.

25   Q.    Did you try to take any, what are known as selfies with the

1    two of you together?

2    A.    No.

3    Q.    Did you have any interest in doing so?

4    A.    No.

5              (Pause at 10:36 a.m.)

6    BY MR. WRAY:

7    Q.    Approximately, how often were you using Jack'D, when you

8    discovered Jack'D and signed up for an account?

9    A.    Almost everyday.

10   Q.    And when did you begin using Jack'D, approximately?

11   A.    Some time during the summer -- no, I can't even think of

12   it, I'm not sure.

13   Q.    Well, let's -- let's try it this way.

14             Were you using Jack'D when the school year ended?

15   A.    Yes.

16   Q.    So, that would be May and June of 2013, would that be fair

17   to say?

18   A.    Yes.

19   Q.    And you were using it in July --

20   A.    Yes.

21   Q.    -- of 2013?

22             And you used it in August, September, October until

23   your parents made this discovery, correct?

24   A.    Correct.

25   Q.    And you were able to text and converse with people who were

1   on there, who wanted to text and converse, correct?

2   A.    Correct.

3   Q.    But this is a text-only application and you just text them,

4   you don't talk to -- you don't -- you don't even hear their

5   voice, correct?

6   A.    Correct.

7   Q.    In the course of the investigation, how many times did you

8   go to the police station?

9   A.    More than, twice, I'd say, less than ten.

10  Q.    And the purpose for going to the police statement was, you

11  would remember something or they had more questions for you --

12            MS. ROTELLA:  Sir, can we be seen at side bar, please?

13            THE COURT:  You -- you may.

14            (Discussion at side bar held on the record at 10:38

15  a.m.)

16            THE COURT:  All right.  Attorney Rotella.

17            MS. ROTELLA:  Your Honor, just as to this Court has

18  already ruled, that he cannot get into how many other people

19  were --

20            MR. WRAY:  I don't believe, I have yet.

21            THE COURT:  Yes I don't know -- what do you mean, when

22  were these things considered -- how many times he went to the

23  police station in Philadelphia?

24            MR. WRAY:  He -- he went to the police station on a

25  number of occasions, they used him to get more information

1  regarding the investigation in to my client?

2          MS. ROTELLA:  Well, that's not happened.

3          THE COURT:  All right.

4          MS. ROTELLA:  The answer is, he went there, because he

5  was asked about people.

6          THE COURT:  All right.

7          You know that -- the Government's permission under

8  412, so stay out of -- I mean, I'll sustain the objection.

9  Understood?

10         MR. WRAY:  Understood.

11         THE COURT:  Okay.

12         MS. ROTELLA:  Thank you.

13         (Concluded at side bar at 10:39 a.m.)

14  BY MR. WRAY:

15  Q.   In the course of the investigation, were -- first of all,

16  these meeting with the police, between two and ten, were you

17  ever advised as to the true identity of Mike Dozer?

18  A.   I'm sorry, what is the two and ten?

19  Q.   The two and ten meetings with the police stations.

20  A.   Oh.  Was I what?

21  Q.   Ever advised who -- who Mike Dozer -- who Mike Dozer was?

22  A.   You mean, his real name?

23  Q.   Correct.

24  A.   Yes.

25  Q.   Now, once again, let's again discuss, obviously, did the

1   two of you disrobe when the August event you've testified to

2   occurred?

3   A.   Yes.

4   Q.   And you don't have any tattoos, do you?

5   A.   No.

6   Q.   Does Mr. Dozer have any tattoos?

7   A.   Yes.

8   Q.   Where -- where are those tattoos?

9   A.   He has one on his shoulder.

10  Q.   Of what?

11  A.   Of what?

12  Q.   What is it a tattoo of?

13  A.   I was pretty blurry, I couldn't tell.

14  Q.   So, does he have any moles or scars or anything on his

15  body?

16  A.   I didn't exactly check for any moles, I mean, not that I

17  can remember.

18  Q.   And as far as you know, he only one tattoo?

19  A.   Yes.

20        MR. WRAY:  One moment, your Honor.

21        (Pause at 10:41 a.m.)

22        MR. WRAY:  Your Honor, I'd have no further questions

23  of this witness.

24        THE COURT:  Do you have any redirect?

25        MS. ROTELLA:  Just very quickly, your Honor.

1                          <u>REDIRECT EXAMINATION</u>

2    BY MS. ROTELLA:

3    Q.   You were asked about the exhibit No. 3, your Jack'D profile

4    that you created for yourself --

5    A.   Yes.

6    Q.   -- on cross-examination, he asked you if -- without showing

7    you -- if Exhibit No. 7, was the picture that you used for your

8    profile.

9         MS. ROTELLA:  So, would you bring up Exhibit No. 7,

10   please.

11   Q.   Exhibit No. 7, is what, have you identified it as?

12   A.   It was picture of me, whether or not, I've used it as a

13   profile picture, I am not sure.

14   Q.   Okay.

15        The profile --

16        MS. ROTELLA:  Bring up Exhibit No. 3, please.

17   Q.   That's the screen shot of the conversation that you had

18   with Mike Dozer --

19   A.   Correct.

20   Q.   -- the defendant, correct?

21   A.   Correct.

22   Q.   Is that the same picture, your little icon on the right-

23   hand side?

24   A.   No.

25        MS. ROTELLA:  Okay.  That's all then, thank you.

1          THE COURT:  Okay.  Thank you for your testimony.  You

2    are excused.

3          (Witness excused at 10:42 a.m.)

4          (The remain of the trial testimony has not been

5    transcribed at this time.)

6                              * * *

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| DOMINIC HUNTZINGER | | | | |
| By Ms. Rotella | 2_ | | | |
| By Mr. Wray | | 43 | | |
| By Ms. Rotella | | | 63 | - |

* * *

| GOVERNMENT EXHIBITS | | IDENTIFIED | EVIDENCE |
|---------------------|--|------------|----------|
| G-1 | Cell Phone | 5 | - |
| G-3 | Document | 20 | - |
| G-5 | Cell Phone Applications | 10 | 13 |
| G-7 | Photograph | 27 | 28 |
| G-7-3 | Photograph | 31 | 31 |
| G-9 | Bottle | 30 | - |
| G-8 | Photographs & Documents | 36 | 37 |
| G-36 | Underwear | 33 | - |

* * *

C E R T I F I C A T E

     I do hereby certify that the foregoing is a correct
transcript of the electronic-sound recording of the
proceedings in the above-entitled matter.


_____          Date: December 10, 2015
Gail Drummond
28 8th Avenue
Haddon Heights, New Jersey  08035
(856) 546-6270