IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

```
UNITED STATES OF AMERICA :    CRIMINAL ACTION
                          :    14-CR-110-1
           Plaintiff      :
       vs.                :    Philadelphia, Pennsylvania
                          :       October 1, 2014
CHRISTOPHER STEELE,       :
a/k/a "Mike Dozer:        :        DAY III
                          :
                          :    TRIAL TESTIMONY OF
           Defendant      :    CHRISTOPHER STEELE
```
- - - - - - - - - - - - - - - - - - - - - - - - - - - -

- - -

BEFORE THE HONORABLE JUAN R. SANCHEZ
UNITED STATES DISTRICT JUDGE
and a Jury

- - -

APPEARANCES:

For the Government:    MICHELLE ROTELLA, ESQUIRE
                       UNITED STATES ATTORNEY'S OFFICE
                       615 Chestnut Street, Suite 1250
                       Philadelphia, Pennsylvania  19106

For the Defendant:     KEVIN MARK WRAY, ESQUIRE
                       200 West Front Street
                       Media, Pennsylvania  190063

- - -

ESR Operator:          Patrick Kelly

TRANSCRIBED BY:    Drummond Transcription Service
                   Haddon Heights, New Jersey  08035

     Proceedings recorded by electronic sound recording,
transcript produced by computer-aided transcription
service.

1                    (At 9:20 a.m. in Courtroom 11a.)

2                    (The previous proceedings have not been transcribed at

3        this time.

4                    THE COURT:  Call your next witness, please.

5                    MR. WRAY:  My next witness -- witness is going to be

6        the defendant, your Honor.

7                    THE COURT:  All right.  Very well.

8                    Members of the jury, we have to take two minutes --

9        three minutes -- so, I am going to give you a very short break

10       and then, we'll -- we will continue, I believe, he will be the

11       last witness.

12                   So, remember, my instructions to you yesterday, do I

13       need to repeat them?  Thank you.  You may go into the jury room.

14                   ESR OPERATOR:  All rise.

15                   (Jury out at 9:20 a.m.)

16                   (Pause at 9:21 a.m.)

17                   THE COURT:  Okay.

18                   (Long pause.)

19                   (Jury in at 9:23 a.m.)

20                   THE COURT:  The jury may be seated.

21                   ESR OPERATOR:  Please raise your right hand.

22                   CHRISTOPHER STEELE, DEFENDANT, SWORN.

23                   THE DEFENDANT:  I do.

24                   ESR OPERATOR:  Please state your name and spell your

25       last name for the record, please.

1          THE DEFENDANT:  Christopher Steele, S-t-e-e-l-e.

2          ESR OPERATOR:  Thank you, sir.

3          MS. ROTELLA:  Your Honor --

4          THE COURT:  Yes.

5          MS. ROTELLA:  -- may we see you at side bar, briefly?

6          THE COURT:  Sure.

7          (Discussion at side bar held on the record at 9:24

8  a.m.)

9          THE COURT:  Okay.

10          MS. ROTELLA:  ...(indiscernible).

11          THE COURT:  I -- I've never done that, unless

12  there's --

13          MR. WRAY:  ... you know, admitted to other state

14  courts, it's always --

15          (Counsel are not speaking at the microphone throughout

16  the side-bar conference.)

17          MR. WRAY:  -- just the way this works, which it starts

18  off early, crosses over.

19          THE COURT:  Okay.

20          It's been the practice in our court -- have a

21  colloquy, but (indiscernible), but I think -- (indiscernible),

22  right?

23          MR. WRAY:  Right.

24          And they advise him of -- (indiscernible).

25          THE COURT:  All right.  Hold on.  (Indiscernible).

Christopher Steele - Direct                                          4

1                      (Concluded at side bar at 9:25 a.m.)

2

3                      MR. WRAY:  May I inquire, your Honor?

4                      THE COURT:  You may.

5                             DIRECT EXAMINATION

6    BY MR. WRAY:

7    Q.    Good morning, Mr. Steele.

8    A.    Good morning.

9    Q.    What do you do for a living?

10   A.    I'm -- supplies, at the time was an exterminator and --

11   Q.    Mr. Steele --

12   A.    -- and -- yes?

13   Q.    You've been dealing with me for a while, we need you to

14   speak up, please?

15   A.    Okay.

16                     THE COURT:  Move your microphone closer.  And you

17   could move your chair a little closer.

18                     THE DEFENDANT:  Hm-hmm.

19                     THE COURT:  All right.

20                     And speak in to the microphone.

21   A.    I was an exterminator.

22   Q.    And where -- where was that?

23   A.    Royal Fumigation in New Castle, Delaware.

24   Q.    And what were your hours, was it a full -- well, first of

25   all, was it full time or part time?

1   A.   It was full time.

2   Q.   What kind of hours did you work?

3   A.   Ah, long weekends.

4            Ah, there were Thursday, Friday, Saturday.  Thursday

5   was as-needed, other than that it was Friday, Saturday and

6   Sunday.

7   Q.   Well, what kind of places were you fumigating?

8   A.   Ah, warehouses and businesses, that's why it was done

9   during the weekends, because you couldn't fumigate a building,

10  when there were employees or other people in it.

11  Q.   Do you do anything else for a living?

12  A.   Well, I was doing adult modeling, yes.

13  Q.   And by adult modeling, what exactly do you mean?

14  A.   Ah, I was doing photo shoots and magazine pictorials, film

15  work, nightclub entertainment.  I was hosting parties.

16  Q.   And by film work --

17           MR. WRAY:  Michelle.

18           (Discussion held off the record at 9:27 a.m.)

19  BY MR. WRAY:

20  Q.   Do you recognize what these are?

21  A.   Yes, I do.

22           MR. WRAY:  May I approach, your Honor?

23           THE COURT:  You may.

24  Q.   Take a look at these, please.

25           MS. ROTELLA:  Are they marked?

1            MR. WRAY:  Ah, I'm marking for identification as

2   D-1 --

3            THE COURT:  One through what?

4            MR. WRAY:  -- 1 -- 1 through -- D-1 through 4.

5            THE COURT:  Okay.

6            THE COURT:  How are we going to be able to distinguish

7   which one is D-1, D-2, D-3 and D-4?

8            MR. WRAY:  Well, we'll -- I'll come down, one at a

9   time.

10           THE COURT:  Okay, go ahead.

11  BY MR. WRAY:

12  Q.   What's D-1?

13  A.   Ah, it's a movie from Ratings Gang --

14  Q.   Ah, take a good look at the front and the back and tell me,

15  does the name -- is there a name on there, that you recognize as

16  associated with yourself?

17  A.   Ah, this one, no, this one is -- this is a two-part series,

18  so it's a culmination of scenes.  And this particular DVD, I'm

19  not on, but --

20  Q.   Okay.

21  A.   -- it's Part One to the second.

22  Q.   Okay, okay.

23           Go to the next one, D-2, is that the second part of --

24  of the --

25  A.   Yes.

1    Q.    And do you -- the same question, is that a film that you --

2    that you have -- there's a name associated with you in?

3    A.    Correct.

4    Q.    And what name was that?

5    A.    Mike Dozer.

6    Q.    Go to D-3, what's the title of that film?

7    A.    *Young Americans*, Part 2.

8    Q.    Okay.

9          And take a look at the front and the back, is your

10   name -- the name, Mike Dozer, does that appear on there?

11   A.    Yes, it does.

12   Q.    Turn to D-4, what's the title of that film?

13   A.    Ah, *Relentless*.

14   Q.    And looking on the front and back, does your -- does the

15   name, Mike Dozer appear?

16   A.    Yes, it does.

17           MR. WRAY:  May I take those back?

18           THE COURT:  You may.

19   BY MR. WRAY:

20   Q.    You're a porn actor, right?

21   A.    Correct.

22   Q.    If you know to your knowledge, is that a legal business?

23   A.    Yes, it is.

24   Q.    And you've used the name, Mike Dozer, correct?

25   A.    Correct.

Christopher Steele - Direct                                              8

1    Q.    And when you're paid, are you paid as Mike Dozer?

2    A.    No.  The checks are issued to Chris Steele or Christopher

3    Steele.

4    Q.    And how long have you been into the porn business?

5    A.    Ah, the very end of May, I believe, I created the name and

6    filmed my first scene on May 28th.

7    Q.    And did you work exclusively with one film company?

8    A.    No.

9    Q.    How many film companies have you worked with?

10   A.    Ah, let's see, about six.

11   Q.    Okay.

12         And, approximately, how many films or -- well, what's

13   the difference between a film and a scene?

14   A.    Well, a scene, sometimes, they don't make it to a DVD,

15   sometimes, they're just for a website format.

16         Other companies, actually, film tangible DVDs that you

17   can purchase online.  So, I worked for both Internet-based as

18   well as Inter -- Internet and retail-based.

19   Q.    And with regard to that work, how was that -- how -- how

20   was your work -- how do you get work?

21   A.    Through my Twitter account and Facebook.

22         On my Twitter account it says, for -- ah -- for

23   booking and events, contact and it has my e-mail address.

24   Q.    And that's the -- what e-mail address is that?

25   A.    That's MikedozerXXX@gmail.com.

Christopher Steele - Direct                                    9

1  Q.   And you are the only one with access to that e-mail

2  address?

3  A.   No.

4  Q.   Who else has access to -- if you know?

5  A.   Ah, well, there was Johnny Shaw and I have a guy in Texas,

6  who helps work on the website, he has the passwords and log-ins

7  to all of my accounts.

8  Q.   And -- and how much money do you make --

9  A.   Hmm, it depended on the --

10 Q.   -- doing the film work?

11 A.   -- company -- it depended on the company, it could range

12 anywheres between -- ah -- seven fifty for a -- $750.00 for a

13 half-day work or upwards of twelve hundred a full day -- a full

14 day of filming.

15 Q.   And that doesn't sound like a lot of money?

16 A.   It's not.

17 Q.   Is there any way doing X-rated porn films, was what shown

18 to you as D-1 through 4 to make more money?

19 A.   It's through additional work, such as the modeling that you

20 get from doing that, the book work, the print work, calendars,

21 appearances and the residuals.

22 Q.   What's a residual?

23 A.   Ah, it's -- they're called, conversions residuals -- or if

24 you can direct traffic company that you've worked for, they set

25 it up, where you get links sent to you.  You distribute those

1    links and based on the amount of money they make off of the

2    links they provide you, you get a percentage of that sent to

3    you.

4    Q.   And what's that percentage, typically?

5    A.   Well, you could get -- for monthly memberships -- it was up

6    to fifty percent depending on how long the member stayed a

7    member of the site.

8              And as for DVDs, it was a flat rate of anywheres

9    between two to $5.00 per DVD that was sold.

10   Q.   So, would it be fair to say, it was in your interest to

11   promote yourself and keep your name out there?

12   A.   Absolutely.

13   Q.   And you've heard testimony, that your pictures are on

14   Tumbler, do you recall that?

15   A.   I've never put them up there.

16             But when I was getting into the industry, I had tons

17   of people, that I knew, who contacted and asked me, is that me

18   on Tumbler, because my pictures went from being nowhere to being

19   everywhere in a matter of a week or two.

20   Q.   And did you put them there?

21   A.   No.

22   Q.   Do you know who put them there?

23   A.   No.

24             MR. WRAY:  One -- one moment.

25             (Pause and whispering her off the record at 9:34 a.m.)

1           MR. WRAY:  Could we put up 39, please?

2    BY MR. WRAY:

3    Q.   Mr. Steele, the picture from Exhibit 39 is going to show up

4    in a minute.

5           (Pause and whispering continues.)

6    Q.   Do you see those pictures there, Mr. Steele?

7    A.   Yes.

8    Q.   Those are pictures of you, correct?

9    A.   Correct.

10   Q.   And do you recognize these pictures?

11   A.   Ah, yes.

12   Q.   Where are those pictures from?

13   A.   Well, they're public pictures, ah, they were -- there's

14   some that -- as you -- all of them have been on Twitter account.

15   And it looks the one right there with the hard hat was on my web

16   page.

17           And they've been on many blog writeups and interviews

18   that I've done at the beginning of my career.

19   Q.   Okay.

20           And are any of these pictures from any of your

21   modeling work -- nude modeling work?

22   A.   Yes.

23   Q.   Are any of these photos private pictures of you?

24   A.   No, they're all public, you can find them if you google or

25   used Bing or -- did any search for my name, you would find every

1   single one of those pictures.

2   Q.   Okay.

3        Have you ever done -- pictures for anyone?

4   A.   I've sent them to, maybe, somebody I was dating, but as for

5   -- to distribute on the Internet, no.

6   Q.   And back to your work, how would you get to your job as a

7   fumigator?

8   A.   Hmm.  I would, either, get a ride or I would borrow one of

9   my parents' to get to work.  They had a company vehicle and we

10  went in groups, so I would ride with four or five other guys in

11  a work truck to the sites and back.

12  Q.   So, you had no car of your own?

13  A.   Correct.

14  Q.   And did you -- how did you get to -- get to you -- when you

15  were in film work, was your film done in Delaware?

16  A.   No.

17  Q.   Where did you do film work?

18  A.   Ah, New York City.  Well, I did a photo shoot in

19  Wilmington, I'd say, primarily, New York City, Florida and

20  California.

21  Q.   And is Newark, where you live, does that have an airport?

22  A.   No.

23  Q.   Where would you fly out of?

24  A.   Philadelphia.

25  Q.   How would you get there?

1    A.    I would have somebody pick me up in the morning and take

2    me.

3    Q.    And if there were -- now, you -- were you -- are you

4    familiar with the Boys of Summer event?

5    A.    Yes, I am.

6    Q.    Have you ever participated in that event?

7    A.    Yes, I did.

8    Q.    Have you ever appeared there as Mike Dozer?

9    A.    Yes, I did.

10   Q.    And for that event, how did you get there?

11   A.    The person I was dating at the time, they picked me up and

12   they accompanied me up there, stayed with me and did all of the

13   events with me.

14   Q.    Did anybody ever take you, who you weren't dating?

15   A.    What was that?

16   Q.    Did anybody take you, who -- you weren't dating?

17   A.    Ah, not to the Boys of Summer event, no.

18   Q.    To your -- your film work?

19   A.    Oh, yes.

20   Q.    So, if you needed a ride to the airport to do your film

21   work, someone would give you a ride?

22   A.    Correct.

23   Q.    Did you parents ever take you there?

24   A.    No.

25   Q.    Did you ever go into detail about your film work with your

Christopher Steele - Direct                                        14

1   mother?

2   A.   I didn't go into detail about the film work, but I went

3   into detail about events and things that happened.  She knew

4   about all of my trips, she knew where I was staying, she knew if

5   I was doing a nightclub event.

6          The only thing that I didn't tell my mother was, there

7   was a camera in the room, a Camcorder.  But everything else, she

8   knew.

9   Q.   Do you know, there's a website called, Jack'D, Mr. Steele?

10  A.   Yes, I do.

11  Q.   Did you ever sign on for a Jack'D account?

12  A.   Yes.

13          MR. WRAY:  And may I have this --

14          (Pause at 9:39 a.m.)

15          MR. WRAY:  May I approach the witness?

16          THE COURT:  You may.

17  BY MR. WRAY:

18  Q.   I am going to show you Government Exhibit 35.2, do you

19  recognize that?

20  A.   Yes, I do.

21  Q.   Would you take it out, please.

22  A.   (Witness complies.)

23  Q.   Is that your cell phone?

24  A.   It's one of my cell phones.

25  Q.   How many cell phones, do you have?

1    A.    Ah, well, I had several.

2    Q.    This cell phone, it's been attested is the one with the

3    phone number of 302-229-4981, do you believe that that's the

4    same cell phone?

5    A.    Yes, I do believe that.

6    Q.    And is that the cell phone that you signed on to Jack'D

7    with?

8    A.    It was one of the cell phones that was used to sign on to

9    my Jack'D account.

10   Q.    Can you sign on to Jack'D with -- with a cell phone?

11   A.    Yes, you can.

12   Q.    For the same account?

13   A.    Correct.

14   Q.    Is there a limit?

15   A.    You can only have one account per cell phone, but you can

16   have one account, you can sign on with multiple devices -- but

17   you could only have one account per cell phone.

18   Q.    And there's been expert testimony, that referred to that as

19   what's called an Android phone, is that correct?

20   A.    That's correct.

21   Q.    And with regard to Jack'D, are there any limits on what

22   Android phones can do?

23   A.    Yes.

24   Q.    What are those limits?

25   A.    Well, there's the two platforms, the Apple and the Android.

1              With the Apple platform, you can open and -- you can

2       open and close your private pictures at will.

3              With the Android, once you open them, they stay

4       opened, there is no re-closing.

5              With the Apple, you can file share, you can send and

6       receive the phones through the messaging service.  With the

7       Android, you cannot, it's only a message application.  So, you

8       could only text message with the Android.

9       Q.   And if you'd text message with people on Jack'D -- Jack'D

10      -- and you open your cell phone to them, you can't close that

11      up?

12      A.   No, you -- once -- with the Android, once you give them

13      access, you can't take it away.

14              (Coughing at 9:41 a.m.)

15      BY MR. WRAY:

16      Q.   And did you have private photos on your cell phone?

17      A.   Yeah, it was used to promote the adult industry.

18      Q.   So, you did not have a Jack'D account for Chris Steele,

19      just for Mike Dozer?

20      A.   Correct.

21      Q.   That's what you're telling us?

22      A.   Correct.

23      Q.   Did you go on and promote yourself on that?

24      A.   Yes.

25              Part of my profile on that was, ah, breaking -- I

1   believe, it said, breaking out in the adult industry, follow me

2   on Twitter.  And it had my Twitter account.

3          So, that when people saw the pictures, they would go

4   to the Twitter account and I would then build a fan base without

5   really attempting, because that profile was up all of the time

6   for anybody to look at.

7   Q.  And that was another means of promoting your career as a

8   porn star?

9   A.  Correct.

10  Q.  And as an adult model?

11  A.  Correct.

12         MR. WRAY:  Government's Exhibit 3, please.

13  BY MR. WRAY:

14  Q.  You've seen this before, correct, Mr. Steele?

15  A.  Yes, a few times.

16  Q.  Do you personally recall this conversation?

17  A.  Ah, I don't recall the conversation, but it looks as though

18  it was -- it occurred -- on an account that had my picture and

19  my name, but that could have been anybody.

20  Q.  Well -- ah --

21         (Pause at 9:43 a.m.)

22  Q.  Do you do anything to keep people -- well, first of all,

23  it's been testified several times, you'd needed to be eighteen

24  on Jack'D, correct?

25  A.   Correct.

1   Q.   To your knowledge, has anybody ever been on Jack'D who is

2   not eighteen?

3   A.   You come across them, occasionally.

4   Q.   And what options are there, once you discover someone is on

5   Jack'D, who is not eighteen?

6   A.   Well, you can, either, report them or block them.

7   Q.   Well, what do you mean by block them?

8   A.   Ah, there's a feature -- described by the gentlemen

9   yesterday -- you just hit the block button and it's irreversible

10  on the Android.

11        You can block and unblock on the Apple format as well,

12  but what you do is, you block them, they have no access to send

13  you messages and you don't have access to message them anymore,

14  either.

15        So, it actually severs all connection.  They don't

16  know that you're on, they can't send you messages.  There is no

17  way to verify if you're on and it's vice-versa as well.

18  Q.   I want you to look to the third line with a photo of Mike

19  Dozer, the third line down, would you read that phrase out loud

20  to me, please?

21  A.   Are you really eighteen?  I don't care, I kind of like

22        my guys young.

23  Q.   What would be the purpose of sending that message?

24  A.   To uncover the person --

25        MS. ROTELLA:  Objection, your Honor, I mean, I think

1  he's testified, he did not send it, so he's speculating on what

2  somebody else would do.

3          THE COURT:  Very well.  Your response?

4          MR. WRAY:  I'll withdraw the question, Judge.

5  BY MR. WRAY:

6  Q.   If you were having a conversation on Jack'D with somebody

7  who was under eighteen, what would you do?

8          MS. ROTELLA:  Objection.

9          THE COURT:  Basis?

10          MS. ROTELLA:  For the same reason.

11          THE COURT:  Your response?

12          MR. WRAY:  Your Honor, I think this is relevant

13  testimony about whether or not, he would --

14          THE COURT:  I'll permit it, overruled, this is what he

15  would do.  Go ahead.

16  Q.   If you came across someone, who you discovered was

17  underage, what would you do?

18  A.   You'd block that -- I would block it and report them.

19          MR. WRAY:  Do you want to bring up, 19 -- 19 up by

20  itself or not?

21          (Discussion held off the record at 9:46 a.m.)

22  Q.   This is trans -- Exhibit 19 is a transcript of the

23  statement you gave to police and you watched it yesterday,

24  you're familiar with it, correct?

25  A.   Right, yes.

1    Q.   And you recall giving that statement, correct?

2    A.   Yes.

3    Q.   And you were arrested outside of your home, correct?

4    A.   Correct.

5    Q.   What happened next?

6    A.   I was taken to the police department after put in cuffs.

7    Q.   Okay.

8         Do you remember who took you there?

9    A.   I don't recall, I believe, it was one of the Delaware

10   detectives.

11   Q.   Okay.

12        When you got to the police station, where were you

13   put?

14   A.   In a holding cell.

15   Q.   Were you given any paperwork or given any other information

16   at that point?

17   A.   Ah, that point, yes.  I was told why I was being arrested

18   and they told me, that a broad basis of what the allegations

19   were.  I was put in a holding cell.

20        And if I recall, they gave me the arrest warrant to

21   look at in the holding cell, just because they said, it was

22   gonna be a few minutes.

23        MR. WRAY:  I'm sorry, could we flip over to 11,

24   please.

25   BY MR. WRAY:

1    Q.   Take a look at this document, does this document look

2    familiar to you?

3    A.   Yes, it does.

4    Q.   Is that the document you were handed?

5    A.   Ah --

6    Q.   Hold on, look -- look through the previous one time.

7              MR. WRAY:  Can we go to the second page, please.

8    BY MR. WRAY:

9    Q.   Does that page look familiar to you?

10   A.   Yes, it does.

11   Q.   Flip to the third page, please, does that page look

12   familiar to you?

13   A.   Yes, it does.

14   Q.   Look to the next page, please, does that look familiar to

15   you?

16   A.   Yes, it does.

17   Q.   Look to the next page.

18   A.   Yes.

19   Q.   Does that page look familiar to you?

20   A.   Yes.

21   Q.   And what does it say at the top of that?

22   A.   Affidavit of probable cause.

23   Q.   And look to the next page, please and look to the last

24   page.

25             And what number is on the bottom of the third page?

1    A.    What numbers?

2    Q.    Yes, the page number.

3    A.    Oh, three.

4    Q.    And if you'd flip back to -- I guess, the -- two pages back

5    to the original -- the one that says, affidavit of probable

6    cause, what page number is on that?

7    A.    One of one.

8    Q.    And did you read this entire document?

9    A.    Yes, I did.

10   Q.    Approximately, how long were you sitting in a cell with

11   this document?

12   A.    Hmm, upwards to twenty, thirty minutes.

13   Q.    And upon reading this, what was your reaction?

14   A.    Hmm, I was terrified and trying to make ends of what --

15   what was going on.

16         MR. WRAY:  Now, can move to nineteen, I'm sorry, thank

17   you very much for your indulgence.

18   BY MR. WRAY:

19   Q.    You watched the video with us and you could see the

20   transcript at the same time?

21   A.    Correct.

22   Q.    And you gave answers to them?

23   A.    Correct.

24   Q.    And at the beginning of that -- that interview, what --

25   what documents were given to you?

1  A.   The exact same warrant, the one that was just up.

2         (Pause and whispering held off the record at 9:51

3  a.m.)

4  BY MR. WRAY:

5  Q.   Were you also given a <u>Miranda</u> warning?

6  A.   Ah, yes, it was placed in front of me.

7  Q.   And they went through that with you?

8  A.   Yes.

9  Q.   And they told you how to fill that out?

10  A.   Ah, yes, they did.

11  Q.   And --

12         (Pause continues.)

13  Q.   -- in this statement that you gave on Page 9 -- well, Page

14  9, the first question, do you see that?

15  A.   Yes.

16  Q.   And that refers to what kind of cell-phone applications you

17  have, there's two listed there?

18  A.   Correct.

19  Q.   One is Jack'D, what is the other one?

20  A.   It's Scruff.

21  Q.   Scruff -- Scruff is a similar program?

22  A.   Yes.

23  Q.   And does Scruff have a special meaning?

24  A.   It indicates the type of person that you're gonna meet on

25  that application.

1  Q.   And what kind of person would that be?

2  A.   That would be the more rugged, alpha male, hairy, scruffy

3  face as the name.

4  Q.   And with regard to that --

5           (Whispering held off the record at 9:52 p.m.)

6           MR. WRAY:  May I approach the witness with D-1 through

7  5, please, your Honor?

8           THE COURT:  You may.

9  BY MR. WRAY:

10  Q.   Look at the -- the models that are on page -- D-1 through

11  4.

12  A.   Yes.

13  Q.   Do they match what you just described?

14  A.   Yes.

15  Q.   And the film work that you've done, you're with similar

16  actors all the time?

17  A.   Yes.

18  Q.   Have you ever done film work with younger actors than

19  yourself?

20  A.   No.

21  Q.   Have you ever been asked to do work with actors younger than

22  yourself?

23  A.   I have been, yes.

24  Q.   And what was your response?

25  A.   Ah, if you want a more genuine scene, I need to be cast

1    with somebody more appropriate and I'd prefer hair and a manly

2    look.

3    Q.   And did you give them any answers regarding what kind of

4    ages of people that you liked?

5    A.   Ah, I like my age or older, it would be age appropriate.

6              MS. ROTELLA:  Your Honor, could we be seen at side

7    bar, please?

8              THE COURT:  You have an objection?  Yes.

9              (Discussion held at side bar on the record at 9:54

10   a.m.)

11             THE COURT:  Very well.

12             I -- I don't know where you're going with this, I --

13             MR. WRAY:  I'm moving, actually, only from this point,

14   so.

15             THE COURT:  Okay.

16             MS. ROTELLA:  And I would -- I mean, we had a pretrial

17   motion on this very issue --

18             THE COURT:  Okay.

19             MS. ROTELLA:  -- and he's opening the door.  I mean,

20   it's --

21             MR. WRAY:  I don't believe, I'm opening the door.

22             MS. ROTELLA:  -- he's telling that he doesn't like

23   young kids.  And we have evidence that he was doing the same

24   thing --

25             THE COURT:  Right.

1          MS. ROTELLA:  -- with a second boy.

2          MR. WRAY:  Well, be conscious and I'm moving away from

3    this point, anyway, your Honor.

4          THE COURT:  Very well.

5          I don't know what you're doing, but be -- be very

6    careful, you don't to open the door, right?

7          MR. WRAY:  And I'm -- Judge.

8          THE COURT:  I'm giving you a fair trial, I'm holding

9    the Government -- or precluding -- the Government from

10   introducing that evidence --

11         MR. WRAY:  Okay.

12         THE COURT:  -- but if you continue.

13         MR. WRAY:  I'm not going to continue on this point.

14         THE COURT:  All right.

15         MR. WRAY:  And if I don't -- I have other areas to go

16   to.

17         THE COURT:  Because that's not the issue in this case,

18   okay?

19         MR. WRAY:  Okay.

20         THE COURT:  All right.

21         (Concluded at side bar at 9:55 a.m.)

22   BY MR. WRAY:

23   Q.   This was the entire statement you gave, correct?

24   A.   Ah, at -- yes, I did -- New Castle County.

25   Q.   And at some point during your interview, you requested a

1   lawyer?

2   A.    Correct.

3   Q.    Why did you request a lawyer?

4             MS. ROTELLA:  Objection.

5             THE COURT:  Sustained.

6             (Pause at 9:56 a.m.)

7   BY MR. WRAY:

8   Q.    Your cell phone there --

9             MR. WRAY:  I'm done with -- oh, 19, I'm sorry.

10  Q.    -- your cell phone

11  A.    Yes.

12  Q.    -- does that have a lock on it?

13  A.    Ah, not it was not locked --

14  Q.    And --

15  A.    -- I didn't have a lock on it.

16  Q.    What about the other cell phones you owned?

17  A.    No.

18  Q.    And how many people had access to your e-mail accounts?

19  A.    Ah, twelve, fifteen -- or access to the phone, anybody who

20  picked my phone up had access to my e-mails.

21  Q.    You had a computer at home, right?

22  A.    Correct.

23  Q.    How would someone -- did anybody know your password besides

24  you and Johnny?

25  A.    My passwords are -- yeah, they had the passwords.  I had --

1    the person I was dating at the time, ah, wanted full

2    transparency in our relationship, because of the type of work I

3    was doing.

4           So, that's what it was, full transparency, he had

5    access to all my accounts.  That's why the lock was not on the

6    phone.

7    Q.   Okay.

8           And you gave a statement to the police, that you knew

9    someone named Dominic?

10   A.   Yes.

11   Q.   Do you know someone named Dominic?

12   A.   Ah, well, there's a lot of people named Dominic, I had

13   forty thousand people contacting me Twitter in a matter of six

14   months.  And five thousand people on -- ah -- Facebook.

15          And I -- there's a Dominic out of Germany, that I'd

16   speak to, there's a Dominic out in California.

17   Q.   How about the name, Hunter, do you know any Hunters?

18   A.   Well, there's tons of Hunters that contact me.

19   Q.   How about Skylar?

20   A.   There's a lot of Skylars that contact me, we're talking

21   about upwards of fifty thousand people sending you messages.

22   Q.   Do you answer them all, personally?

23   A.   I do my best, yes.

24          MR. WRAY:  One moment, your Honor.  I need to consult

25   with my associate for one moment, your Honor.

1              THE COURT:  All right.

2              (Pause at 10:00 a.m.)

3    BY MR. WRAY:

4    Q.   Did you go to Dominic Huntzinger's address in Limerick,

5    Pennsylvania?

6    A.   No, I did not.

7    Q.   Other than seeing him in court, had you met him at any time

8    during the spring or summer of 2013?

9    A.   No, I did not.

10   Q.   Did you have oral sex with the person, who came into the

11   courtroom, named Dominic Huntzinger?

12   A.   No, I did not.

13   Q.   Did you perform anal sex on the person, Dominic Huntzinger?

14   A.   No, I did not.

15   Q.   Did you have any sexual contact, whatsoever with Dominic

16   Huntzinger?

17   A.   No, I did not.

18   Q.   When you're online, what's your name?

19   A.   Mike Dozer.

20   Q.   And when you speak to people on Jack'D, do you know their

21   names?

22   A.   I know the name that's on the account profit.

23   Q.   Do you know any information about them beyond what's on

24   their profile?

25   A.   No.

Christopher Steele - Cross

1   Q.   Unless you were to ask them?

2   A.   Correct.

3            MR. WRAY:  No further questions.

4            THE COURT:  Ms. Rotella.

5                    CROSS-EXAMINATION

6   BY MS. ROTELLA:

7   Q.   So, Mr. Steele, you seem to be skirting around it a little

8   bit, but the -- let's be direct about it.

9            So, you lied to the police, that's what you led the

10  jury to believe, correct?

11  A.   I did.

12  Q.   Yes.

13           You lied to them, when you were under arrest and when

14  you were worried about, what was going to happen to you that

15  day, you choose to lie to them?

16  A.   It wasn't what I was worried about, it was what happened to

17  me, it was what was going to happen to somebody close to me.

18  Q.   Oh, so you were doing it to protect somebody else, that's

19  what you would like them to believe?

20  A.   Correct.

21  Q.   So, you were taking the wrap for somebody else?

22  A.   Correct.

23  Q.   But today, that ends, right?

24  A.   Correct.

Christopher Steele - Cross

1    Q.   Okay.

2         So, today you're telling the truth?

3    A.   Correct.

4    Q.   Today when you're facing being convicted on three counts

5    involving sexual exploitation and having sex with a fourteen-

6    year-old boy, today you're going to come and tell us the truth?

7    A.   Correct.

8    Q.   Okay.

9         MR. WRAY:  Your Honor --

10   Q.   Well, let's go --

11        MR. WRAY:  -- your Honor, can we have a side bar?

12        THE COURT:  Overruled -- overruled, I --

13        MR. WRAY:  I think she's shouting at him --

14        THE COURT:  This is --

15        MR. WRAY:  -- for no reason at all.

16        THE COURT:  -- this is cross-examination, I --

17        MR. WRAY:  I -- I didn't yell at anyone.

18        THE COURT:  -- sit -- sit down, objection overruled.

19   I'll permit it.  You may proceed.

20   BY MS. ROTELLA:

21   Q.   Let's go through how you knew what was being alleged

22   here --

23   A.   Okay.

24   Q.   -- when you spoke to the police.

Christopher Steele - Cross

1   A.   Okay.

2   Q.   That was December 13th of 2013, correct?

3   A.   Correct.

4   Q.   Okay.

5        So, you were given the affidavit of probable cause,

6   you claim, correct?

7   A.   Correct.

8   Q.   Which is in Exhibit No. 11.

9   A.   Correct.

10       MS. ROTELLA:  Would you pull that up?

11  Q.   And that was given to you back in the holding cell?

12  A.   Correct.

13  Q.   All right.

14       That's your entire knowledge of why you had been

15  arrested, is that right?

16  A.   Correct.

17  Q.   Because up until that point, you had not heard anything --

18  you -- you hadn't talked to your friend, you didn't know that

19  any boy was involved in anything.  The first time you hear about

20  this is December 13th of 2013?

21  A.   You mean, the first time that I'd seen this -- yes.

22  Q.   No, that's not what I asked you, pay attention.

23       The question is, the first time you knew about any of

24  this, you knew about a fourteen-year having sex with an adult

Christopher Steele - Cross

1   named Dominic Huntzinger.  The first time you learned about it

2   was when you saw the paper?

3   A.   Correct.

4   Q.   All right.

5        And so, you just assumed that it had to have been your

6   friend that was involved?

7   A.   He was the only one, who had full access to my accounts.

8   He often -- based off of my job -- was turned on by it.  And he

9   would get on and talk to people, ah, under my name.  And I had

10  no problem with that at the time.

11       Now, in hindsight I see that it was probably not the

12  best idea to be that open with my career, my name, but yes, he

13  had full access to all of that information.

14  Q.   So, to be fair, though, you've also testified -- and your

15  witness that came in here this morning -- also testified that he

16  had access to some of your things as well?

17  A.   Correct.

18  Q.   But you're not going to blame this on your friend that was

19  here today?

20  A.   My friend did not have access to Jack'D, the only one who

21  had access --

22  Q.   Oh.

23  A.   -- to Jack'D on a regular basis was the person I was dating

24  at the time.

Christopher Steele - Cross

1   Q.   And you, correct?

2   A.   Correct.

3   Q.   And you?

4   A.   Correct.

5   Q.   So, everything that you've learned about why the police

6   were there and the sexual abuse of this fourteen-year-old boy,

7   everything -- every bit of your knowledge -- came from that

8   paper, is that right?

9   A.   At the time, correct, yes.

10  Q.   Okay.

11       So, let's go through what you confessed to the police.

12  A.   Okay.

13  Q.   You told them, that you  met him on Jack'D, correct?

14  A.   Correct.

15  Q.   That it was the summer of 2013, you think it was some time

16  in August?

17  A.   That's what the affidavit and I said, August, because I had

18  a fractured foot and there was a month that him and I had split

19  -- went ways and I couldn't account for his behavior during

20  August.

21       But up until August, I had spent lots of time with

22  him, he was in and out of my life for the better part of ten

23  years.

24  Q.   Okay.

Christopher Steele - Cross

1         So, let's focus on the question and then, if you need

2    to explain it, you can do it after you answer my question, okay?

3         What you told the police, was that this took place in

4    the summer of 2013 and you believed, it was some time in August,

5    is that right?

6    A.   Correct.

7    Q.   That's what you said in your confession?

8    A.   Correct.

9    Q.   Okay.

10        You also told them, that you identified yourself as

11   Mike Dozer online on the Jack'D account, which was true?

12   A.   No, I didn't say that I identified myself.  They asked, if

13   I used the name, I believe that's what it said.

14   Q.   Okay.

15        And you did use the name of Mike Dozer?

16   A.   Mike Dozer was my work name, correct.

17   Q.   Okay.

18        And you told them, that's what your -- you have a

19   Jack'D account in that name, correct?

20   A.   Correct.

21   Q.   All right.

22        You also told them, that you chatted a few times with

23   this fourteen-year-old boy, correct?

24   A.   Ah, I -- correct -- I don't have the information to review

Christopher Steele - Cross

1    it, but ah, yeah.

2    Q.   Okay.

3         Well, I'll bring up the information there.  Why don't

4    we take a look at Exhibit No. 19.

5         When you talked to them, you told that, you spoke

6    online to this boy, if you'd take a look at Page 9, is that up

7    before you there?

8    A.   It is now.

9         MS. ROTELLA:  Is it up before the jury?  Okay.

10   BY MS. ROTELLA:

11   Q.   So, at the bottom of Page 9 there, you're saying, that:

12        The name Dominic Huntzinger sounds familiar and it

13        could have been anybody, I chat with or have chatted with.

14        A JUROR:  We don't have it.

15        MS. ROTELLA:  You don't have it.

16        THE COURT:  You --

17        MS. ROTELLA:  Can you put it before the jury, please.

18        THE COURT:  Yes.

19        MS. ROTELLA:  Okay, thank you, thank you.

20   Q.   You told the police that:

21        The name Dominic Huntzinger sounds familiar, it could

22        have been anybody I chatted with or have chatted with.

23   A.   Correct.

24   Q.   Okay.

Christopher Steele - Cross

1           And then, you go down a little bit and you're asked:

2           Did you come to Limerick Township, Montgomery County

3      to meet a fourteen-year boy?

4           And you said:  Yes, I did and it was a mistake.

5           Correct?

6   A.   Correct.

7   Q.   They're your words?

8   A.   Correct.

9   Q.   All right.

10          What was that boy's name?

11          I can't remember, I chatted with him on the app a

12      couple of times.

13          Do you remember saying that?

14  A.   Yes, I do.

15  Q.   Okay.

16          So, you did, you chatted with him a couple of times.

17          And then you tell, that:

18          He used several names, every time I chatted with him.

19          Correct?

20  A.   Correct.

21  Q.   All right.

22          So, if we'd go to the next page then, right, Page 10.

23          All right.  So, how do you remember him?

24          You said:  He used several different names.

Christopher Steele - Cross

1          That's the question that was posed to you, is that

2     right?

3     A.    Correct.

4     Q.    And your answer was:

5          Yes, I believe, he used the name, Skylar, then the

6          name Hunter and as well as the name Dominic.

7          Correct?

8     A.    Correct.

9     Q.    Skylar, Hunter and Dominic.

10         Why don't you take a look at the affidavit of probable

11    cause and I am going to give you a hard copy of it.

12         And you tell me where anywhere in here, it says,

13    Skylar, Dominic or Hunter?  Exhibit No. 11.

14         (Pause at 10:08 a.m.)

15    A.    Now, there's a black spot where a bunch of --

16    Q.    I'll give you an un-redacted version.

17    A.    Thank you.

18         (Pause continues.)

19    A.    It's not in the affidavit of probable cause.

20    Q.    Hmm, how about that.

21    A.    However, the name was mentioned by the detective, if I knew

22    that.

23    Q.    Sir, you're saying, that they told you the names, first?

24    A.    I believe, he said, are you familiar with the name of -- ah

Christopher Steele - Cross

1    -- can you go back a few pages?

2             I believe that he --

3    Q.   I'll give you a hard copy --

4    A.   -- thank you.

5    Q.   -- to make sure you go through it, you can go through it

6    yourself.  It's starts on Page 9 and 10.

7             (Pause continues.)

8    A.   Okay.

9             Do you know Dominic Huntzinger, the middle of Page 9.

10   Q.   Yes.

11            Show me in there, where they told you the names Skylar

12   or Hunter, you mentioned them first, isn't that right, Mr.

13   Steele?

14   A.   I mentioned the names, yes, I did mention those two names.

15   Q.   Yes.  And what a coincidence.

16            Were you here when the victim testified, that he used

17   those names, also?

18   A.   I believe he said, he used, Dante.

19   Q.   And the other two names?

20   A.   Okay.

21   Q.   You also told the police in your confession, that the

22   victim identified himself as being eighteen years of age?

23   A.   Correct.

24   Q.   Take a look in that affidavit of probable cause and tell

Christopher Steele - Cross

1  me, where it says, that the victim identified himself as

2  eighteen years of age?

3  A.   It does not say it in the affidavit of probable cause.

4  Q.   So, you came up with that one all on your own, too?

5  A.   That would be an assumption, because the transactions had

6  been on Jack'D and they had to be an adult to be on there.

7  Q.   Hmm.  Did you represent yourself as eighteen?

8  A.   No, I did not.

9  Q.   No, you did not.  So, you just guessed, eighteen and that

10  happens to be the exact age that the victim said, he was when he

11  initially met you on Jack'D?

12  A.   Having my experience with people on Jack'D and the

13  Internet, if someone was underage, they're not gonna be able to

14  pass as twenty-seven or twenty-eight.

15  Q.   So, you're a good guesser, that's what you're trying to

16  tell us?

17  A.   It was an assumption that --

18  Q.   You also told the police, that you traveled to his house,

19  correct?

20  A.   Correct.

21  Q.   And that you had sex in his bedroom?

22  A.   Correct.

23  Q.   Show me in the affidavit of probable cause, where it says,

24  you had sex in his bedroom?

Christopher Steele - Cross

1              (Pause at 10:11 a.m.)

2    A.    It's not in the affidavit of probable cause.

3    Q.    So, would that be another good guess on your part?

4    A.    That would be an embellishment of a story to cover for

5    somebody.

6    Q.    Hmm, that just happens to match exactly with what the

7    victim says, happened in this case, correct?

8    A.    Isn't that where most people have sex in their bedroom?

9    Q.    So, it was a good guess?

10   A.    (No verbal response.)

11   Q.    Then, you told the police, that you had oral and anal sex,

12   correct --

13   A.    Correct.

14   Q.    -- with this fourteen-year-old boy?

15   A.    Correct.

16   Q.    You were crying when you were talking about that, correct?

17   A.    Correct.

18   Q.    And then, you told them, that you videotaped part of the

19   sexual encounter with that boy, correct?

20   A.    Correct.

21   Q.    Show me in the affidavit, where it says that?

22   A.    It does not say that in the affidavit of probable cause.

23   Q.    So, is that another good guess?

24   A.    Having been with my partner for ten years, he liked to

Christopher Steele - Cross

1   videotape us having sex.  And there have been several times, he

2   strayed out of our relationship and he would always videotape

3   that as well.  I had found those several times in our

4   relationship.

5   Q.   So, that would be --

6   A.   I have --

7   Q.   -- matching exactly what the victim says happened, too,

8   correct?

9   A.   Correct.

10       All conclusions based off of ten years experience with

11  the same person in an intimate, close relationship, correct.

12  Q.   Well, you passed the test, then, right?

13  A.   If you dated somebody for ten years, wouldn't you know them

14  like the back of your hand?

15  Q.   So, what we do know in this case, in addition to all of

16  those things that are not in the affidavit of probable cause, is

17  that you lied -- what you want to say is that you lied to the

18  police?

19       We know you've lied at some point, right, because your

20  story today is different from what your story to the police was

21  in December of '13 --

22  A.   I --

23  Q.   -- correct?

24  A.   Yes, I lied.

Christopher Steele - Cross

1   Q.   So, one of them is a lie?

2   A.   Correct.

3   Q.   Right.

4        Did you take a look at the cell site records, that --

5   that were turned over to you and your attorney?

6   A.   I did.

7   Q.   So, there's one day in the thousands of calls that were

8   made with your cell phone -- one day, August the 8th of 2013 --

9   where you are right near the victim's home?

10  A.   My cell phone is near the victim's home, correct, in those

11  cell phone records.

12  Q.   And it's traced right back to your house?

13  A.   Correct.

14  Q.   Correct?

15       And it's -- your cell phone is there the morning

16  before, because there were calls that are made at midnight,

17  before you traveled to the victim's house?

18  A.   Correct.

19  Q.   And at two o'clock in the morning, before you traveled to

20  the victim's house -- or 1:54 a.m.?

21  A.   From the cell phone records?

22  Q.   Yes, from the cell phone records.

23  A.   There were no calls made, my cell phone rang.  There was no

24  extended conversation.

Christopher Steele - Cross

1    Q.    So, you had your cell phone at 2:00 a.m. -- 1:54 a.m. in

2    the morning -- of August 8th, before anybody ever traveled to

3    Limerick, correct?

4    A.    My cell phone was Delaware.  I did not have the phone on

5    me.

6    Q.    Oh, the phone was no on you?

7    A.    No, it was not.

8    Q.    So, if the cell site records show it pinging right near

9    your house, the cell phone records are wrong, too?

10   A.    No.  My partner is off on Wednesdays, the 7th was a

11   Wednesday.  He spent all day with me.  I don't have a vehicle,

12   him and I were out.  He stays at my house often on Wednesday

13   night, get up early in the morning and goes where he lives,

14   which is forty miles away.

15         So, we had gone out to the movies that night, the cell

16   phone was left in his car by mistake.

17   Q.    Did you -- does he live in Limerick?

18   A.    No, he does not.

19   Q.    Okay.

20         Does he live in Delaware?

21   A.    Yes, he does.

22   Q.    Somehow that cell phone ended up right by the victim's

23   house, just six hours later, 8:09 in the morning is the first

24   call, correct?

45

Christopher Steele - Cross

1    A.   If that -- if that's what it says.

2    Q.   By the victim's house?

3    A.   Correct.

4    Q.   Okay.

5         Of all of the photographs that -- that you were shown

6    this morning, the twelve photographs of you, some of the naked,

7    some of the clothed, the twelve that you looked at --

8    A.   Yes.

9    Q.   -- which is --

10        MS. ROTELLA:  What number exhibit, 39 or something.

11   BY MS. ROTELLA:

12   Q.   All of them, you indicate are from public websites,

13   correct?

14   A.   Goggle Images or my Twitter --

15   Q.   Goggle Images --

16   A.   -- page, correct.

17   Q.   -- somebody can pull them off, correct?

18   A.   Correct.

19   Q.   You're aware that all of them ended up on the victim's

20   Jack'D account, right?

21   A.   I am at this point.

22   Q.   You also know that on your cell phone -- your cell phone --

23   the victim's picture was found, correct?

24   A.   That's what I -- I've come to find out, correct.

Christopher Steele - Cross

1   Q.   Not on the Sim card, on the cell phone memory, correct?

2   A.   Correct.

3   Q.   All right.

4        And you've seen that picture?

5   A.   It's been shown to me, yes.

6   Q.   Yes.

7        Do you remember receiving that picture --

8   A.   No, I did --

9   Q.   -- from the victim in this case?  So, you don't remember

10  ever seeing --

11  A.   No.

12  Q.   -- you don't remember ever getting the picture?

13  A.   No, I don't remember getting that picture.

14  Q.   You're saying, you saw the picture when it came time for

15  this trial?

16  A.   Correct.

17  Q.   Okay.

18       How about the picture that was sent to you and it was

19  on your Jack'D account?

20  A.   What do you mean, the picture that was sent to me on my

21  Jack'D account?

22  Q.   The victim's picture, do you remember seeing that picture?

23  A.   No, I do not.

24  Q.   The one that has the Jack'D watermark in the corner of it?

Christopher Steele - Cross

1    A.    No, I do not remember that photo.

2          MS. ROTELLA:  Well, why don't we pull it up.

3          (Long pause and whispering and sneezing held off the

4    record at 10:18 a.m.)

5    BY MS. ROTELLA:

6    Q.    Do you see that photo there?

7    A.    Yes, I do.

8    Q.    All right.

9          You're saying that that -- you never saw that photo?

10   A.    No.

11   Q.    So, your Jack'D account was used, correct?

12   A.    Correct.  Well, that --

13   Q.    You cell phone was used, correct?

14   A.    Correct.

15   Q.    Your e-mail accounts were used, correct?

16   A.    Where were my e-mail accounts used?  I'm confused with how

17   my e-mail accounts were tied into this.

18   Q.    I'm sorry, I'm mistaken, your profile pictures were used,

19   correct?

20   A.    Ah, it was -- ah, I don't believe they are profile

21   pictures, they are pictures that can be obtained anywhere on the

22   Internet.

23   Q.    Okay.

24          But they're of you?

Christopher Steele - Cross

1   A.   Correct.

2   Q.   They're of you?

3   A.   Well, they're of Mike Dozer.

4   Q.   Okay.

5        Well, you are Mike Dozer, correct?

6   A.   In -- in a theoretical sense, correct.

7   Q.   All right.

8        So, you don't need to refer to yourself in the third

9   party, the pictures there are of you?

10  A.   Okay, correct.

11  Q.   So, your photos, your Jack'D account, your cell phone, all

12  of your things were used, correct?

13  A.   Correct.

14  Q.   And we have your confession saying that, you were the

15  person that did this, correct?

16  A.   Correct.

17  Q.   And we have the victim coming into court and saying, you

18  were the person that he had sex with, isn't that right?

19  A.   Correct.

20  Q.   The popper substance was found in your bedroom, isn't that

21  right, Mr. Steele?

22  A.   Poppers are widely used among gay men.  I'm sure you'd be

23  hard pressed to find a gay man, that does not know what poppers

24  are?  They're used in -- I'd say -- over fifty percent of adult

Christopher Steele - Cross

1  films.  If anybody watches a gay adult film, they'll see the

2  models sniffing them while engaging in sex.

3          You can buy them over the Inter -- over the Internet,

4  you can buy them in an adult sex shop.  That is something that's

5  widely known amongst the gay.

6          So, me having poppers, it is not different from the

7  man down the street having poppers.

8  Q.   So, the answer to my actual question would be, yes, the

9  poppers were taken from your bedroom --

10  A.   Correct --

11  Q.   -- correct?

12  A.   -- correct.

13  Q.   The same poppers, that the victim said, were used when you

14  had sex with him?

15  A.   No, not the same poppers, the same substance.

16  Q.   The same substance?

17  A.   Correct.

18  Q.   And the photo that was on your cell phone, that was taken

19  from you in December of 2013, correct --

20  A.   Which --

21  Q.   -- your cell phone?

22  A.   -- which started --

23  Q.   When you were arrested, your cell phone was taken off of

24  your person, is that right?

Christopher Steele - Cross

1    A.    That's -- correct.

2    Q.    And that was December 13th of 2013?

3    A.    Correct.

4    Q.    The allegation in this case when the victim says, that you

5    came to his house and had sex with him, it was in August of

6    2013, correct?

7    A.    Correct.

8    Q.    So, some four months later, you were still carrying around,

9    a sexually-explicit photo of a fourteen year old, that you say,

10   you've never seen, is that what you're telling us today?

11   A.    What I'm telling you is, I had thousands of photos on my

12   cell phone.  I don't know what, exactly, was on my cell phone.

13   There are tons of pictures that get loaded to my phone and I do

14   keep a Rolodex file of exactly what photos are on my phone,

15   correct.

16   Q.    Well, one of those photos, Mr. Steele, was of this

17   fourteen-year-old victim in a sexually-explicit position,

18   correct?

19   A.    Correct.

20   Q.    You told the police, you were sorry about what you did?

21   A.    Correct.

22   Q.    You told them, it was wrong to have sex with a fourteen-

23   year-old boy?

24   A.    Correct.

Christopher Steele - Cross

1   Q.   Cried to them?

2   A.   Correct.

3   Q.   You would admit, Mr. Steele, that of all the people that

4   sit in this courtroom today, you are the person, who stands to

5   lose the most by the outcome of this case, isn't that right?

6   A.   Correct.

7   Q.   So, you are the person, who has the most motivation to make

8   up a story about what happened that day, don't you?

9   A.   Ah, at this point, I've already lost more than anybody can

10   understand.  Ah --

11   Q.   There is still more to come, though, right, Mr. Steele?

12   A.   That's for the jury to decide, but yes, that's what a legal

13   process is.

14          MS. ROTELLA:  That's all I have, your Honor, thank

15   you.

16          THE COURT:  You don't have any redirect, do you?

17          MR. WRAY:  I have brief redirect, two questions,

18   Judge.

19                    REDIRECT EXAMINATION

20   BY MR. WRAY:

21   Q.   With regards to the statement that you gave to the police,

22   did you ever sign that statement?

23   A.   No, I did not.

24   Q.   And you've testified that your boyfriend at the time, had

52

1    access to your cell phone?

2    A.   Yes.

3              MS. ROTELLA:  Nothing further.

4              THE COURT:  Thank you for your testimony, you're

5    excused.

6              (Witness excused at 10:22 a.m.)

7              (The remainder of the proceeding are not being

8    transcribed at this time.)

9                              *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHRISTOPHER STEELE | | | | |
| By Mr. Wray | 4 | | | |
| By Ms. Rotella | | 30 | | |
| By Mr. Wray | | | 51 | - |

* * *

| GOVERNMENT EXHIBITS | | IDENTIFIED | EVIDENCE |
|---|---|---|---|
| G-11 | Affidavit of Probable Cause | 32 | - |
| G-19 | Document | 35 | - |

* * *

| DEFENDANT'S EXHIBIT | | IDENTIFIED | EVIDENCE |
|---|---|---|---|
| D-1 thru | DVDs | | |
| D-6 | | 6 | - |

* * *

<u>C E R T I F I C A T E</u>

        I do hereby certify that the foregoing is a correct
transcript of the electronic-sound recording of the
proceedings in the above-entitled matter.


_____            Date: <u>December 12, 2015</u>
Gail Drummond
28 8th Avenue
Haddon Heights, New Jersey  08035
(856) 546-6270