IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

```
UNITED STATES OF AMERICA :   CRIMINAL ACTION
                          :   14-CR-110-1
              Plaintiff   :
        vs.               :   Philadelphia, Pennsylvania
                          :      October 1, 2014
CHRISTOPHER STEELE,       :
a/k/a "Mike Dozer"        :
                          :   JURY TRIAL - DAY III
              Defendant   :
```
- - - - - - - - - - - - - - - - - - - - - - - - - - -

- - -

BEFORE THE HONORABLE JUAN R. SANCHEZ
UNITED STATES DISTRICT JUDGE
and a Jury

- - -

APPEARANCES:

For the Government:    MICHELLE ROTELLA, ESQUIRE
                       UNITED STATES ATTORNEY'S OFFICE
                       615 Chestnut Street, Suite 1250
                       Philadelphia, Pennsylvania  19106

For the Defendant:     KEVIN MARK WRAY, ESQUIRE
                       200 West Front Street
                       Media, Pennsylvania  19063

- - -

Deputy Clerk:          Stacy Wertz

ESR Operator:          Patrick Kelly

TRANSCRIBED BY:    Drummond Transcription Service
                   Haddon Heights, New Jersey  08035

    Proceedings recorded by electronic sound recording,
transcript produced by computer-aided transcription
service.

2

1              (At 8:59 a.m. in Courtroom 11a. The jury is present.)

2              ESR OPERATOR:  All rise.

3              Court is now in session, the Honorable Juan R. Sanchez

4      presiding.

5              THE COURT:  All right.

6              (Discussion held off the record.)

7              MR. WRAY:  The first witness is John Shaw, he's in the

8      courtroom now, ready to go.

9              THE COURT:  All right.  Bring him forward -- bring him

10     forward.

11             How many witnesses, do you have, four you said, right?

12             MR. WRAY:  Three, your Honor.

13             THE COURT:  Who is your last witness?

14             MR. WRAY:  My client.

15             THE COURT:  Okay.

16             A VOICE:  Here's my notes.

17             THE COURT:  Remain standing.

18             You may be seated, the jury may be seated, you may

19     remain standing.

20             ESR OPERATOR:  Please raise your right hand.

21             JOHN SHAW, DEFENSE WITNESS, SWORN.

22             ESR OPERATOR:  Please state your name and spell your

23     last name for the record, please.

24             THE WITNESS:  John Shaw, S-h-a-w.

25             ESR OPERATOR:  Thank you.

John Shaw - Direct                                                3

1     THE COURT:  You may be seated.

2     MR. WRAY:  May I inquire, your Honor?

3     THE COURT:  You may.

4                    DIRECT EXAMINATION

5  BY MR. WRAY:

6  Q.   Good morning, Mr. Shaw.

7  A.   Good morning.

8  Q.   How do you know Christopher Steele?

9  A.   I've known Chris for a few years, we met through mutual

10 friends and then, we connected a few years later.

11 Q.   And do you have a professional relationship with him?

12 A.   I do.

13 Q.   And what is that?

14 A.   Ah, I'm his promoter for his screen name, Mike Dozer.

15 Q.   And to be clear, Mike Dozer is what kind of personality?

16 A.   He's an entertainer.

17 Q.   Does he do any film work?

18 A.   He does film work, he does modeling.

19 Q.   Anything else?

20 A.   Ah, he -- he works a full-time job as an exterminator.

21 Q.   And this film work, these are X-rated films, correct?

22 A.   Correct, it's all --

23 Q.   And what, exactly, does a promoter have to do?

24 A.   We come up with the promotions and advertisements and we

25 will -- ah -- create the -- ah -- the banners and things like

John Shaw - Direct                                          4

1    that and put them out there.

2             We access the Facebook page, the Twitter page to run

3    the promotions with dates and things like that.

4    Q.   And dates would be for appearances and events --

5    A.   Appearances and --

6    Q.   -- or for films?

7    A.   -- such as, like, the Boys of Summer in Philadelphia, ah,

8    which is very popular, several thousand people show up for that,

9    ah --

10   Q.   And -- I'm sorry.

11   A.   -- that is the biggest one to date.

12   Q.   Were you done answering?

13   A.   Yes. I'm sorry.

14   Q.   Okay, I'm sorry.

15            The Boys of Summer, what -- is that held every summer?

16   A.   Every summer in Philadelphia, yes.

17   Q.   When was it held in 2013?

18   A.   August -- the weekend of August 9th, 10th, and 11th, I

19   believe.

20   Q.   And I believe, you just said, that he worked on the

21   weekends?

22   A.   Correct.  He put in for special time off.

23   Q.   And that's a weekend event, this Boys of Summer?

24   A.   Yes, it is.

25   Q.   And with regard to the Facebook page, as his promoter, do

John Shaw - Direct                                    5

1  you have access to that?

2  A.   I do.

3  Q.   Do you know his passwords, et cetera to that?

4  A.   Yes, I do.

5  Q.   And with regard to the Twitter page --

6  A.   Yes.

7  Q.   -- the same question, do you have access to that?

8  A.   Yes, I do.

9  Q.   And do you know the passwords to that?

10  A.   Yes, I do.

11  Q.   And about how often is that page updated?

12  A.   Ah usually, back in the early 2000 -- mid '13 -- ah, it was

13  updated pretty much every single day up until around December,

14  then it was less frequently, here and there.

15  Q.   And what was the purpose of updating it everyday?

16  A.   Everyday, to get his -- to get his name and recognition to

17  make him more popular than he already was.

18  Q.   And how many people, approximately, would go to that page?

19  A.   On the Twitter page, about forty-seven thousand.

20  Q.   How about the Facebook page?

21  A.   There's about five thousand.

22  Q.   And you get paid --

23  A.   Yes.

24  Q.   -- to be his promoter, correct?

25  A.   I do.

John Shaw - Direct                                        6

1   Q.   What do you get paid?

2   A.   Roughly, about ten percent.

3           And the goal was, once you'd reach a certain band base

4   and more money comes in, then, I'm making money as well.

5   Q.   How does the money come in?

6   A.   The money comes in from appearances, more films, things

7   like that, modeling, photo shoots.  I was trying to get him in

8   magazines.

9   Q.   And did you have any problem booking him for films?

10  A.   No, not at all.

11  Q.   And this Twitter page, is it still getting things posted on

12  it?

13  A.   Yes.

14  Q.   And was Chris Steele as Mike Dozer, was he having problems

15  getting film work and appearances, et cetera?

16  A.   No.

17  Q.   Would you characterize him as successful in this business?

18  A.   I would, extremely, in a matter of weeks.

19           MR. WRAY:  One moment, your Honor.

20           (Pause at 9:05 a.m.)

21  BY MR. WRAY:

22  Q.   Did Mike Dozer ever create a web page for himself?

23  A.   Yes.

24  Q.   And beyond the Facebook page?

25  A.   Yes.

John Shaw - Direct                                              7

1   Q.   And what was the purpose of that?

2   A.   For -- ah -- to promote himself.  Also to be able to

3   merchandise.

4        Also to put banners and links on for different film

5   companies, so if you click on that link, you can link over to

6   them and become a member, which in turn, you get residuals from

7   that.

8   Q.   And what is a residual?

9   A.   Money.

10  Q.   And how much money can you make from residuals?

11  A.   Up to fifty percent of --

12  Q.   Of --

13  A.   -- depending on --

14  Q.   -- of -- fifty percent of what?

15  A.   Oh, the membership fees, depending on how many people click

16  on it.  Ah, you can get a return, it's roughly about $30.00 a

17  membership and the more people click on it, the more money you

18  make.

19       MR. WRAY:  I have no more questions, your Honor.

20       THE COURT:  Do you have questions?

21                     CROSS-EXAMINATION

22  BY MS. ROTELLA:

23  Q.   Sir, the defendant is not working now, correct?

24  A.   Correct.

25  Q.   And he has not been working for you in the capacity that

Side Bar                                                      8

1    you just testified to --

2              MR. WRAY:  Side bar, your Honor.

3              THE COURT:  Very well.

4              MR. WRAY:  I object to the relevance, but I need a

5    side bar here.

6              THE COURT:  Okay.

7              (Discussion at side bar held on the record at 9:07

8    a.m.)

9              THE COURT:  Do you even have to question him, I --

10             MR. WRAY:  I think those --

11             THE COURT:  -- I don't know --

12             MR. WRAY:  -- he's in jail, which I guess, anybody

13   but --

14             THE COURT:  Does this person know that he's in jail?

15             MR. WRAY:  Does he --

16             THE COURT:  Does he know?

17             MR. WRAY:  Oh, he knows he's in jail.

18             THE COURT:  Okay.

19             MS. ROTELLA:  The point is -- he's still supplying, he

20   said, he makes money off of this defendant, so there's a bias

21   there.

22             There's an argument, if you're working for me now,

23   you'd have every reason to try to help him out, which goes to

24   the charges.  I don't -- I don't need to --

25             THE COURT:  Okay.  Very well.  Let's move on.

John Shaw - Cross                                               9

1              (Concluded at side bar at 9:08 a.m.)

2    BY MS. ROTELLA:

3    Q.    Sir, did you used the -- you used the defendant's cell

4    phone to book appointments and things for him?

5    A.    Ah, I had in the past, but I mean, I wasn't really doing

6    all of the booking.  I was doing the promoting and contacting

7    and going from there.

8    Q.    Okay.

9              So, do you know his cell phone?

10   A.    I do.

11   Q.    What do know his cell phone to be?

12   A.    The phone number?

13   Q.    Yes.

14   A.    302-22 -- I -- I'm not going to say it.

15   Q.    If I told you, XXX-XXXX, does that sound familiar?

16   A.    It does.

17   Q.    Is that his cell phone?

18   A.    I -- I believe it was.

19   Q.    All right.

20             Did you ever know to contact him by anything other

21   than that one cell-phone number?

22   A.    Ah, by phone-wise?

23   Q.    Yes.

24   A.    (No verbal response.)

25   Q.    Okay.

1              So, that's the only one you ever had?

2    A.    Right.

3    Q.    Okay.

4              Sir, you indicated that he had a full-time job as an

5    exterminator?

6    A.    He worked for extermination companies, yes.

7    Q.    And did you say, full time?

8    A.    It was full-time weekends, like, overnights, he would work,

9    like, a couple of shifts.

10   Q.    Did he tell you that?

11   A.    I knew that, yes, I knew that.

12   Q.    Because he told you?

13   A.    He told me, but I also had been there --

14   Q.    Okay.

15   A.    -- to the docks where he would do the fumigation and things

16   like that.

17   Q.    All right.

18             So, you would see him working, sometimes, on the

19   weekend, but --

20   A.    Yes.

21   Q.    -- his hours and things like that, came from him telling

22   you, that's what he did, correct?

23   A.    Yes.

24   Q.    All right.

25             Are you aware that he hid your job that you did with

1   him from his parents?

2   A.   I know that -- ah --

3          MR. WRAY:  Object --

4   A.   -- it wasn't really hidden.

5          THE COURT:  Overruled, I'll permit it, go ahead.

6   A.   Ah, I mean, I was his promoter, I don't know what there was

7   to hide, it's not --

8   Q.   So, did you know, that he failed to tell his parents and

9   his family, that he was working in the pornography industry?

10  A.   I was not really aware of that.

11  Q.   Okay.

12  A.   I know that, they knew that he was a model --

13  Q.   They knew that he modeled?

14  A.   Yes.

15  Q.   And that was the extent of it?

16  A.   I'd have no way of answering that, I don't know.

17  Q.   Okay.

18         Other than the things that you've mentioned, the

19  Facebook and the Twitter accounts, that's what you had access

20  to, correct?

21  A.   Correct.

22  Q.   Nothing else?

23  A.   His web page as well.

24  Q.   And beyond that, nothing else?

25  A.   No.

1   Q.   Okay.

2               MS. ROTELLA:  Thank you.

3               THE COURT:  Than you for your testimony, you're

4   excused.

5               (Witness excused at 9:10 a.m)

6               THE COURT:  Call your next witness.

7               MR. WRAY:  The next witness is his mother and she's

8   outside the courtroom, may I get her, please?

9               THE COURT:  You may.

10              (Pause at 9:11 a.m.)

11              MR. WRAY:  If you could just come up here.

12              THE COURT:  Very well.

13              Did -- this is the witness?  Okay.  Can everybody see

14   the witness?

15              (Affirmative responses from the jurors.)

16              THE COURT:  Very well.

17              MR. WRAY:  May I inquire, your Honor?

18              THE COURT:  Hold on a minute, we've got to swear her

19   in.

20              MR. WRAY:  Okay.

21              ESR OPERATOR:  Please raise your right hand.

22              BOBBY STEELE, DEFENSE WITNESS, SWORN.

23              ESR OPERATOR:  Please state you name and spell your

24   last name for the record, please.

25              THE WITNESS:  Bobby is my first name, Rose is my

Bobby Steele - Direct                                                13

1   middle name, Steele, S-t-e-e-l-e.

2                ESR OPERATOR:  Thank you.

3                THE COURT:  You may.

4                MR. WRAY:  Thank you, your Honor.

5                            DIRECT EXAMINATION

6   BY MR. WRAY:

7   Q.   Good morning, Bobby, how are you?

8   A.   Okay.

9   Q.   This is your son, Christopher Steele, correct?

10  A.   Yes, it is.

11  Q.   And are you aware, he's a homosexual?

12  A.   Yes, I am.

13  Q.   And when did you and -- do you know when your husband --

14  found out he was homosexual?

15  A.   When he was eighteen years old and he graduated from high

16  school.

17  Q.   Did he tell you this?

18  A.   Yes, he did.

19                (The witness is barely audible throughout her

20  testimony.)

21  Q.   Did you have any issues with it?

22  A.   No, my brother was homosexual.

23  Q.   And what was Chris doing work-wise in 2013, if you know?

24  A.   He was working at an exterminating, Royal Pest (ph) and

25  modeling, male modeling.

Bobby Steele - Direct                                    14

1   Q.   And the fumigation work, when was that work being done?

2   A.   During the day.

3   Q.   Do you know what his hours were?

4   A.   It would be long hours, early in the morning till --

5   sometimes -- late in the afternoon, sometimes --

6   Q.   And --

7   A.   -- into the evening.

8   Q.   Okay.

9        And with regard to the male modeling, do you know what

10  his hours or schedule was for that?

11  A.   The weekends and late at night.

12  Q.   And -- the cell phone -- the cell phone, did you get a cell

13  phone for him?

14  A.   Yeah, my cell phone.  I got it transferred.

15  Q.   Did you pay for that?

16  A.   Yes, I did.

17  Q.   And did you also get him an e-mail account, if you know?

18  A.   I think that's on my -- it comes to my house every -- I

19  guess, that's the same thing.  I'm not really good with that.

20  Q.   And how old is Chris?

21  A.   His birthday was last week, he's thirty-four.

22  Q.   And do you work full time?

23  A.   Yes, I do, I work six days a week, forty -- about forty-

24  five hours a week.

25  Q.   What are you hours?

1   A.   I -- well, my -- I have one night a week, I work at a

2   grocery store, I work 7:00 to 3:30 most days, sometimes, 5:30 to

3   -- sometimes, 7:00 to -- I work at a grocery store, so on the

4   holidays, we're busier, special events, when the Eagles play or

5   something, it's longer.

6   Q.   Okay.

7           And in the course of a week, how often do you see

8   Chris?

9   A.   Every day.

10  Q.   And for how much time?

11  A.   Four or five hours or even when I was -- well, dinnertime.

12  Q.   And you've known Chris your entire life, correct?

13  A.   Yes.

14  Q.   And you know other people, who know Chris?

15  A.   Yes, I do.

16  Q.   And among the people who know Chris Steele, what's his

17  reputation for honesty?

18  A.   He is very honest.  Sometimes, even when saying, too much

19  information.

20          MR. WRAY:  No further questions, depending on cross, I

21  may need to redirect.

22          THE COURT:  Do you have any questions?

23          MS. ROTELLA:  Yes, sir.

24                        CROSS-EXAMINATION

25  BY MS. ROTELLA:

Bobby Steele - Direct                                    16

1    Q.   Ma'am, you said, you work six days a week?

2    A.   Yes, I do.

3    Q.   So, you're out of the house during the day?

4    A.   Well, I'm out of the house.  On Sundays, I -- I'm usually

5    home by 10:30 in the morning hours, 6:30 to 10:30.  7:00 to 3:30

6    usually.  And like, I said, I work one night a week.

7    Q.   All right.

8         So, that would mean that you're out of the house

9    during those hours when you're working, correct?

10   A.   Yes.

11   Q.   All right.

12        You said, you son just turned thirty-four?

13   A.   Yes.

14   Q.   His birthday was September 23rd?

15   A.   Correct.

16   Q.   Okay.

17        So, you indicated that you -- but he still lives at

18   home with you, right and your husband?

19   A.   Yes.

20   Q.   Okay.

21        You pay for his cell phone?

22   A.   It's my -- (indiscernible) phone, yes.

23   Q.   Okay.

24        And you pay for the Internet services that's at the

25   house?

Bobby Steele - Direct                                          17

1    A.    Yeah, that's cable, so -- it's all three, phone and

2    Internet and cable.

3    Q.    And that's something that you pay for, correct?

4    A.    Yes.

5    Q.    You don't set up his e-mail accounts?

6    A.    No, I don't.

7    Q.    He did that all on his own, right?

8    A.    I guess.  I can't do that, I -- I set mine up -- well, my

9    daughter-in-law set mine up.

10   Q.    You don't know how to do that, so you are not involved in

11   what he's doing on the computer, correct?

12   A.    Correct.

13   Q.    All right.

14         You know him to have worked at -- you said -- the

15   fumigation company?

16   A.    Royal Pest.

17   Q.    Royal Pest.

18         Do you know hat he's not worked there since July of

19   2013 -- July 27th to be exact, do you know that?

20   A.    Yes, I do.  I know, because he broke his foot.

21   Q.    And that's why he stopped working there, right?

22   A.    Because he broke his foot --

23   Q.    Okay.

24   A.    -- he could not do it, because -- he could not do it.

25   Q.    All right.

1      So, you knew him, you said, to be working there, but

2  ending in July of 2013, right?

3  A.   Yes.

4  Q.   And also he told you that he was doing some modeling work,

5  correct?

6  A.   Yes.

7  Q.   And that's all that you knew, correct?

8  A.   Yes.

9  Q.   All right.

10      In fact, you didn't find out that he was involved in

11  adult pornography until the police were at your house in

12  December of 2013?

13  A.   Right.

14      I knew that he was doing nude pictures for males --

15  table -- or whatever it is, showing -- and he said, he told you

16  not nude pictures but for-profit pictures.

17  Q.   But you didn't know the extent that he was involved in

18  pornography and making movies and things like that, you didn't

19  know he was doing any of that until the police told you,

20  correct?

21  A.   Correct.

22  Q.   So, that's something he kept from you, yes?

23  A.   Not the nude pictures, not --

24  Q.   Yes.

25      The movies and the things like that that he was

Bobby Steele - Direct                                      19

1   involved in, correct?

2   A.    (No verbal response.)

3   Q.    Okay.

4         So, then, you would admit that there is a part of --

5   at thirty-three years old -- there's portions of your son's

6   life, that he didn't tell you everything about what was going on

7   in his life?

8   A.    Some of it, yeah, he told me, because that would piss me

9   off, so he would back off, because I would say, too much

10  information.

11        There are certain lines you do not discuss with your

12  mother and father, just certain things, you just don't.

13        He didn't have a problem telling me, I just did not

14  want to hear it.

15  Q.    Well, you didn't know that he was involved in the porn

16  industry, you said, correct?

17  A.    I didn't know he was doing adult films, I knew that he was

18  filming and in pictures.

19  Q.    Okay.

20  A.    I mean, not filming, he was having -- he was going to New

21  York, he was going to Philadelphia and he was going into

22  Wilmington and people were picking him up -- his friends were

23  picking him up -- to take him to have nude pictures taken.

24  But I didn't know that.

25  Q.    Okay.

1          But you can recognize, that there are some things in a

2    thirty-three-year-old man's life, that he's -- he's not telling

3    you, correct?

4    A.   Correct.

5          MS. ROTELLA:  All right.

6          And that's all I have, your Honor, thanks.

7          MR. WRAY:  Your Honor, brief redirect?

8          THE COURT:  Go ahead.

9                      REDIRECT EXAMINATION

10   BY MR. WRAY:

11   Q.   And you said, that people were picking him up, well, why

12   were people picking him up?

13   A.   He didn't have a car, his car broke down, his oil thing --

14   it blew his motor up to his car.  So, it -- he didn't have a

15   car.

16   Q.   So, when he went to work in the fumigation business, what

17   would he do for a car?

18   A.   He borrowed his dad's car, because I needed a car for work.

19   Q.   And when he was doing film work and nude modeling, what --

20   you were there?

21   A.   Well, his friend, John, who became a -- or somebody else

22   would pick him up.

23        MR. WRAY:  No further questions.

24        THE COURT:  Okay.  Thank you for your testimony,

25   you're excused.

1          (Witness excused at 9:19 a.m.)

2          THE COURT:  Call your next witness.

3          MR. WRAY:  My next witness is going to be the

4    defendant, your Honor.

5          THE COURT:  All right, very well.

6          Members of the jury, we have to take two minutes --

7    about three minutes -- so, I am going to give you a very short

8    break and then, we'll -- we will continue, I believe, he will be

9    the last witness.

10         So, remember my instructions to you yesterday, do I

11   need to repeat them?  Okay, thank you.  You may go into the jury

12   room.

13         ESR OPERATOR:  All rise.

14         (Jury out for a brief recess at 9:20 a.m.)

15         (Resumed in open court at 9:23 a.m.)

16         THE COURT:  Okay.

17         The jury may remain seated.  You'll remain standing.

18                        *  *  *

19         (The testimony of Christopher Steele has been

20   previously transcribed from 9:23 until 10:22 a.m. and filed

21   under separate cover.)

22                        *  *  *

23         (At 10:23 in open court.)

24         THE COURT:  Okay.  May I see you at side bar?

25         (Discussion at side bar held on the record.)

1      THE COURT:  All right.

2      I am going to spend a few minutes talking to you about

3  the charge and then, I guess, we're ready to close.

4      MS. ROTELLA:  Hm-hmm yes.

5      MR. WRAY:  Correct.

6      THE COURT:  And you -- well, basically, all of your

7  evidence is admitted, I --

8      MS. ROTELLA:  I --

9      THE COURT:  -- I was admitting them as I was going

10  along.

11      MS. ROTELLA:  There's -- I did go over it with the

12  Clerk, already this morning, so I'll just -- I can put on the

13  record, the ones that are not yet admitted and --

14      THE COURT:  Okay.

15      MS. ROTELLA:  -- and move for their admission.

16      THE COURT:  Right.

17      We'll do that during those fifteen minutes --

18      MS. ROTELLA:  Okay.

19      THE COURT:  -- and anything else that you have.

20      So, I am going to give the jury a fifteen-minute break

21  a little bit early, right?

22      MS. ROTELLA:  Okay.

23      THE COURT:  You don't have any --

24      MR. WRAY:  I have question, first, your Honor.

25      THE COURT:  Well, I'm going to give you a fifteen-

1  minute break.

2          You don't have rebuttal, right?

3          MR. WRAY:  No.

4          THE COURT:  Okay.

5          (Concluded at side bar at 10:23 a.m.)

6          THE COURT:  Members of the jury, at this point, you've

7  heard all of the testimony.  I need a fifteen-minute break, so

8  we're going to take a fifteen-minute break a little early.

9          And when we come back, you're going to hear the

10  closing arguments and then, if we're done before 12:00, you will

11  probably hear my charge and then, you will have the case at some

12  time this morning or before lunch or close to lunch.

13          So, remember my instructions, I'll be back in fifteen

14  minutes and we will listen to the closing arguments.

15          ESR OPERATOR:  All rise.

16          THE COURT:  Stacy, is my --

17          (Discussion held off the record.)

18          (Jury out for a brief recess at 10:24 a.m.)

19          (At 10:25 a.m. in open court.)

20          THE COURT:  Attorney Rotella, you rested yesterday in

21  front of the jury and we -- we were going to deal with the

22  exhibits later.  So, this is probably a good time.

23          I think I have been admitting exhibits as you were

24  offering them, so most of your exhibits have been admitted, I

25  think, 1 through 12 were admitted on the 30th.

24

1          MS. ROTELLA:  And I -- ah -- I did go over this

2     morning with your Clerk --

3          THE COURT:  Right.

4          MS. ROTELLA:  -- the ones that I believe are in

5     evidence, so if I -- if I could just go through which ones, I

6     believe are not and ask for admission?

7          THE COURT:  Okay.  Well --

8          MS. ROTELLA:  Ah, so I don't think 1 or 2 has been

9     admitted, I would ask that they'd both go in.

10          THE COURT:  Okay.

11          I'll admit them, those are the -- right.

12          (Government Exhibits G-1 and G-2 received in

13     evidence.)

14          MS. ROTELLA:  3, 4 and 5 have all been admitted

15     already.

16          THE COURT:  Right.

17          MS. ROTELLA:  I would ask 6 be admitted.

18          THE COURT:  It's admitted.

19          (Government Exhibit G-6 received in evidence.)

20          MS. ROTELLA:  7-3, which is the photo of -- the

21     cropped photo --

22          THE COURT:  Ad --

23          MS. ROTELLA:  -- that's already in.

24          THE COURT:  Admitted, yes.

25          MS. ROTELLA:  8 is already admitted.

1          THE COURT:  8 was admitted.

2          MS. ROTELLA:  I'd ask for 9 to be admitted.

3          THE COURT:  9, the poppers --

4          MS. ROTELLA:  Yes.

5          THE COURT:  -- it was identified -- it's admitted.

6          (Government Exhibit G-9 received in evidence.)

7          MS. ROTELLA:  10-1 and 10-2, have been admitted.

8          I would ask that Exhibit 11 be admitted.

9          THE COURT:  The criminal complaint, it was identified,

10   submitted, it's not going to go to the jury.

11          MS. ROTELLA:  No, correct.

12          THE COURT:  But it's admitted.

13          (Government Exhibit G-11 received in evidence.)

14          MS. ROTELLA:  12 is already in.

15          THE COURT:  It's admitted.

16          MS. ROTELLA:  I would ask -- oh, 17 and 18 -- 18-1 and

17   18-2 are already in.

18          THE COURT:  Right.  Those are admitted.

19          (Government Exhibit G-18-1 and G-18-2 received in

20   evidence.)

21          MS. ROTELLA:  19 is already in, I believe.

22          THE COURT:  It's -- if it's not in, I'll admit it --

23          MS. ROTELLA:  Okay.

24          THE COURT:  -- because it's the hard copy of the

25   transcript.

1           MS. ROTELLA:  Yes, sir.

2           22 is in already.

3           THE COURT:  That was admitted.

4           MS. ROTELLA:  I would ask that 23 be admitted as well.

5           THE COURT:  23-1 through 3 are admitted.

6           (Government Exhibit G-23-1 through G-23-3 received in

7   evidence.)

8           MS. ROTELLA:  Okay.

9           And that's the certification also from AT&T.

10          THE COURT:  Right, I think that's what I admitted

11  during the trial, the certification, the other portions --

12          MS. ROTELLA:  All right.

13          THE COURT:  -- haven't been moved in, but I will admit

14  23-1 and -- through 23-23, including the certification from

15  AT&T.

16          MS. ROTELLA:  Actually, I think, I mis-numbered that,

17  it's -- the certification is the 23-4, your Honor.

18          23-2 never came in --

19          THE COURT:  All right.

20          MS. ROTELLA:  -- so, it should be 23-1, 3 and 4.

21          THE COURT:  All right.

22          MS. ROTELLA:  The cell-site map, which is Exhibit 24,

23  I would ask for admission?

24          THE COURT:  I will admit it.

25          (Government Exhibit G-25 received in evidence.)

1          MS. ROTELLA:  And 25 is already in.

2          THE COURT:  That was admitted, that's the phone.

3          MS. ROTELLA:  Oh, I would ask for the admission of 38,

4    which was the --

5          THE COURT:  The --

6          MS. ROTELLA:  -- booking photo with the tattoo.

7          THE COURT:  With the tattoo, that's admitted.

8          (Government Exhibit G-38 received in evidence.)

9          MS. ROTELLA:  39, which is the twelve photos.

10          THE COURT:  The Jack'd account.

11          MS. ROTELLA:  Yes.  Thank you.

12          THE COURT:  That will be admitted.

13          (Government Exhibit G-39 received in evidence.)

14          MS. ROTELLA:  And 40, I guess --

15          THE COURT:  The --

16          MS. ROTELLA:  -- that's it.

17          THE COURT:  -- the e-mail --

18          MR. WRAY:  Your Honor --

19          THE COURT:  -- image.

20          MR. WRAY:  I do have an objection to the -- Exhibit

21    40.

22          THE COURT:  That's the e-mail describing --

23          MR. WRAY:  But --

24          MS. ROTELLA:  The file path that the forensic

25    expert --

1              MR. WRAY:  The file path --

2              MS. ROTELLA:  -- referred to.

3              MR. WRAY:  -- however, on cross-examination, he

4    admitted he couldn't put a date or a time to it --

5              THE COURT:  I -- I --

6              MR. WRAY:  -- so, that's why --

7              THE COURT:  It's admitted --

8              MR. WRAY:  Okay.

9              THE COURT:  -- over your objection.

10             MR. WRAY:  That's fine, Judge, that's fine.

11             THE COURT:  40 is admitted over objection.

12             (Government Exhibit G-40 received in evidence.)

13             MS. ROTELLA:  That would be all, thank you.

14             THE COURT:  Okay.

15             You -- I think, I have admitted Defense 1 through 4,

16   the -- the DVDs and there's testimony about them, that's all you

17   offered, right?

18             MR. WRAY:  That's all I've offered.

19             (Defense Exhibits D-1 through D-4 received in

20   evidence.)

21             THE COURT:  All right.

22             Did you have an opportunity to -- well, let's go over

23   the charge since -- go ahead.

24             MS. ROTELLA:  I'm sorry, I asked -- I don't have a --

25   I forgot to bring my copy over, your Honor.

1          THE COURT:  You did?

2          MS. ROTELLA:  I apologize, I forgot to bring it this

3     morning.

4          THE COURT:  All right.

5          Is it the same as the one I have from before or it's a

6     little different --

7          DEPUTY CLERK:  It is.

8          THE COURT:  It's a little different.

9          MS. ROTELLA:  I forgot to bring the one that you e-

10    mailed me last night, is what I mean.

11         THE COURT:  Okay.

12         So, you don't have -- did you have access to it?  Did

13    you --

14         MS. ROTELLA:  She did e-mail it's --

15         MR. WRAY:  I have it right here.

16         MS. ROTELLA:  -- not her problem, it's mine, I --

17         THE COURT:  I know, I know.

18         MS. ROTELLA:  Yeah.

19         THE COURT:  But I'm trying to solve the problem, so --

20         MS. ROTELLA:  Okay.

21         THE COURT:  -- and you're confusing me here.

22         So, to be clear, the printed or -- do I -- did you e-

23    mail it to me, too?

24         (Discussion held off the record.)

25         THE COURT:  Because you could e-mail it to me and I

1   could lend you my copy and you could take a look at it.

2          MS. ROTELLA:  Okay.

3          DEPUTY CLERK:  But, actually, I have it for you, it's

4   right here.

5          THE COURT:  Okay.

6          Why don't you go over there and just print out another

7   copy, print out two copies.

8          MS. ROTELLA:  Thank you.

9          THE COURT:  But let me -- I think, most of it, I -- I

10   think -- if you have your table of contents, it's -- it's going

11   to be -- it's going to be routine.

12          So, the first part has just the general instructions.

13   Role of the jury, I will cover.  The issue of evidence --

14   Request 5 -- will be read.

15          Direct and circumstantial evidence will be read.  Jury

16   controls, Request No. 2, will be read.  Credibility, general

17   Request 8, will be read.

18          (Pause at 10:29 a.m.)

19          THE COURT:  Credibility of officers as to -- as to

20   anyone else, any objection that I read that?

21          MR. WRAY:  No.

22          THE COURT:  I think that's fair.

23          Opinion evidence and expert witness, I will read,

24   because we had, at least, one expert, David Schanes testified.

25          No all evidence, not all witnesses, I will read.

1          Presumption of innocence, burden of proof, Request No.

2     4, I will read.

3          Penalty not to be considered, I will read.

4          And I will read defendant's choice -- ah -- I will

5     read the first portion of the submission, Request No. 13, no,

6     the second portion, which is that he chose to testify and of

7     course, you have to take that into consideration.  So, I will

8     read only that portion.

9          You want me to read that, right?

10         MR. WRAY:  Yes.

11         THE COURT:  Request No. 14, I think, I will read.

12         Impeachment.  I don't think that was in the case, do

13    you -- do you agree, Attorney Rotella?

14         MS. ROTELLA:  (No verbal response.)

15         THE COURT:  You -- you cross-examined him on the

16    <u>Miranda</u> statement, which you are moving in as the substantive

17    evidence, because it's his admission, right?

18         MS. ROTELLA:  Ah --

19         THE COURT:  But do we have impeachment?

20         MS. ROTELLA:  Well, that particular instruction says,

21    if you find that he said, something different, then you should

22    decide what he said -- if he was -- what he said here in court

23    was true.

24         In addition, you can consider the earlier statement as

25    evidence of the defendant's guilt.

1          I mean, I think, because he's saying -- he's plainly

2     saying, there's two different statements, one, was false and one

3     is -- you know -- there's testimony, it's not.

4          So, I -- I think it goes right to that.

5          THE COURT:  All right.  I'll read it.

6          Character evidence, I think we heard character

7     evidence from his mother.

8          MS. ROTELLA:  Yes.

9          MR. WRAY:  Correct.

10          THE COURT:  So, I'll give that.

11          Judicial -- there was no stipulated evidence here,

12     right?  There is no stipulation, so I don't think I need to read

13     that.

14          MS. ROTELLA:  No.

15          THE COURT:  That will be deleted.

16          Sympathy and bias, I will read.  Motive to explain, I

17     will read.  Separate consideration, separate charges, I will

18     read.

19          The nature of the indictment, I will read.

20          Request No. 18, on or about in the conjunctive, I will

21     read.

22          Venue, I think I need to read that, correct?

23          MS. ROTELLA:  Yes.

24          THE COURT:  Specific techniques, not required, is that

25     in this case?

 1              MS. ROTELLA:  No, nothing.

 2              THE COURT:  You'd withdraw it?

 3              MS. ROTELLA:  Yes.

 4              THE COURT:  That is withdrawn.

 5              And then, do you have any objection the substantive

 6   charges?  I thought they were okay.  Mr. --

 7              MR. WRAY:  No, we do -- I do not, your Honor.

 8              THE COURT:  All right.

 9              So, I will read them as submitted and I think that's

10   all we need.

11              MS. ROTELLA:  Okay.  Thank you.

12              THE COURT:  Okay.  So, we're ready to go, right?

13              I need a word with my Law Clerk.  Hold on a minute,

14   give me a minute -- give me a -- five more minutes and I will

15   be back in here to begin closings.

16              MS. ROTELLA:  Okay.

17              THE COURT:  All right.

18              MR. WRAY:  Okay.

19              ESR OPERATOR:  All rise.

20              (Brief recess is held at 10:33 a.m.)

21              (Resumed in open court at 11:08 a.m.)

22              THE COURT:  Closing arguments and you don't have to

23   take notes on the closing arguments, the important thing was the

24   testimony, but -- so, the Government will begin their opening --

25   their closing argument, the Assistant United States Attorney,

1    Michelle Rotella.

2           MS. ROTELLA:  Thank you, your Honor.

3           THE COURT:  You're welcome.

4                  GOVERNMENT'S CLOSING ARGUMENT

5           MS. ROTELLA:  So, now we are at the end of the case

6    and sometimes, ladies and gentlemen, even when there is a

7    mountain of evidence against a defendant, even in the face of a

8    proof that has not been damaged in any way, there are still some

9    defendants, who just cannot accept responsibility for what

10   they've done and that is what this case is about.  There is no

11   issue in this case, you have nothing, really under -- being

12   contested in this case.

13          It's simply about a man, who cannot admit, that he had

14   sex with a fourteen-year-old boy and nothing more.

15          So, let's go through some of the evidence that you saw

16   in this very brief trial.

17          What you've heard first, was that it was the

18   defendant's Jack'd account that was used to correspond with the

19   victim in this case.  It was the defendant's account.

20          He admits that, even when he testifies here today, he

21   admitted it to the police when he was questioned in December of

22   2013, after he was arrested.  So, we know for certain, it was

23   his account.

24          And there's a little bit of a confusion, because in

25   the beginning when you heard the opening statements in this

1   case, at first, you heard counsel tell you, that what you could

2   expect to hear as part of the evidence in this case, was that

3   the defendant would admit that he had actually, corresponded

4   with the fourteen year old.  And I think, he used the term, cat

5   fishing, which I assume means that he was trying to catch a

6   fourteen year old or catch somebody, who was underage.

7          And he told you, that what you were going to hear the

8   defendant say, is that as soon as he heard the victim say, he

9   was fourteen years old, he immediately left and shut it down.

10         But that's not what you heard in this case.  That's

11   not what the defendant told you.  So, when did his story change?

12         Now, you've heard, sort of three versions of what you

13   can expect, you heard the version, when he confessed to the

14   police.

15         You heard the version about the cat fishing.

16         And then, you've heard the version on the stand here,

17   that oh, no, it wasn't me at all.  I didn't do that conversation

18   at all.

19         (Ms. Rotella is not speaking at a microphone

20   throughout the closing argument.)

21         MS. ROTELLA:  But what you do know is, that it is the

22   defendant's -- if you could you put up Exhibit 43.  And I'm

23   going to use the big words here.

24         It's his Jack'd account, right, Mike Dozer is at the

25   top.  And he is Mike Dozer, it's the defendant's photograph,

Ms. Rotella - Closing Argument                                    36

1    clearly and it's his account.

2           And what does he say?  They're talking about, I saw

3    your picture on Tumbler.  The defendant says, I'm extremely new

4    to the industry.  The victim says, I read that somewhere, you're

5    gonna be big in no time.

6           And then, immediately, well, cool.  So, what if I

7    said, I wanted to have sex with you?  Are you eighteen?

8           And then, he asked him, are you really eighteen?  I

9    don't care, because I kind of like my guys young.  And he says,

10   well, you caught me, I'm fourteen.

11          He knows.  What does he say, I'd play with you, if you

12   weren't eighteen yet.  Well, I do want to have sex with you.

13   Even though, he knows he's fourteen years old.

14          And that's what this case really turns on, even though

15   he knows he's just fourteen years old.

16          You have the fact that it's his Jack'd account, it's

17   not some grand coincidence, so big --

18          (Coughing at 11:11 a.m.)

19          MS. ROTELLA:  -- conspiracy as he would have you

20   believe.  You have his Jack'd account -- you have the victim

21   come in here and testify and tell you, that I spoke with him on

22   Jack'd account -- this profile picture -- but it was him -- him

23   -- that showed up the next day, not some mysterious -- friend,

24   him.  He's the one, who he had sex with.

25          You heard him say, he knew that he was in the porn

1    industry, he told him -- (indiscernible).  He didn't have

2    trouble recognizing him, he picked this defendant out.

3          You have the photo array, because you heard that

4    happened -- and you know from his cell-phone records and we'll

5    get into that in a little bit -- it happened on August the 8th

6    of 2013.

7          December 9th, four months later, the victim is shown a

8    photo array.  And he never saw him again in person.  You heard

9    the detective testify to how that photo array identification

10   went.  You heard the victim testify.  He was given a pile of

11   papers, all with faces similar to the defendant, all with the

12   facial hair, mustaches, all looking like the defendant.

13         He looked through every single one of these.  And the

14   reason for this, is so that it's not suggestive or not trying to

15   put, say, you know, one white person and the rest Asian and

16   black, so you could pick the one white guy.  They try to make it

17   look the same to make sure that he's actually picking out the

18   guilty person.

19         And what did you hear both of them say?  That he had

20   no hesitation, as soon as he saw the victim's picture -- I mean,

21   excuse me -- the defendant's picture, he picked it out right

22   away and he said, this is him.

23         He was so certain, he didn't even need to look at the

24   others that were in the pack.  But the detective made him go

25   through it and keep on looking to make sure, he didn't make a

1  mistake, this is him.  And we know, it's the defendant's

2  picture.

3         So, you have those three things, the victim's

4  testimony, his identification, his photo-array identification,

5  the fact that it was the defendant's Jack'd account that was

6  used.

7         And you have the defendant's cell phone and we know,

8  it's his phone, he admits it's his phone, but there's some grand

9  coincidence that, well, it's not -- he want to try to distance

10 himself from the phone.

11        And why is that?  Well, two reasons, because the phone

12 is found at the victim's house in August -- on August 8th, 2013,

13 at the very time that the victim and the defendant, both say,

14 that they were there and that he has sex with the victim.

15        So, the map here, you see the blue circles, down here

16 at the bottom, is the defendant's residence.  Up at the top is

17 the victim's residence.  You heard the FBI person say, there

18 were thousands of calls in the records from May the 1st, 2013

19 till October 31st, 2013,  And on one day -- one day, only --

20 August the 8th, was the phone matched with the victim's house

21 and the defendant's house.

22        Now, the defendant does not deny that the phone

23 traveled up there, but he wants you to believe that there's -- a

24 friend had on that day and that he's the one that traveled up

25 there even though, the victim told you, it was him that came

1    that day.

2           He wants to distance himself, because you cannot

3    refute proof like this.  So, he has to put the phone somewhere

4    else.  Oh, well, then, you know, I didn't have the phone,

5    somebody else had it.

6           And he wants to distance himself from the phone,

7    because the fifth piece of evidence against him is, there's a

8    naked and sexually-explicit photograph of the victim on the

9    defendant's phone in the phone memory.  Four months -- more than

10   four months -- after the photo is sent by the victim.  It's

11   retained by the defendant, it was saved by the defendant and

12   it's on his phone when he gets arrested.

13          So, that's why he wants you to believe, that somebody

14   else used his phone that day and somebody else, must have

15   received the picture.  And oh, I have thousands of pictures on

16   my phone, I just -- I just didn't know it was there.  But it's

17   another log on the fire, it's another stack of evidence against

18   him.

19          The other evidence you have, too, is that the victim

20   has on his Jack'd account, the defendant's photographs.  So,

21   what does that show you?  It shows you there is something that's

22   happening between the victim and the defendant, it's another

23   piece of evidence that shows you that.

24          You say, there were twelve -- can you put them up --

25   twelve photos of the defendant on the victim's Jack'd account.

Ms. Rotella - Closing Argument                              40

1        So, not only does it show you that there -- some of

2   them are -- not only does it show you, there was something

3   between the defendant and the victim, to the extent that you can

4   look at them, because (indiscernible).  Okay.

5        If you'll remember, he was asked -- the victim was

6   asked by the defense attorney -- does my client have any scars

7   or moles or tattoos?  And the victim told you, well, he's got a

8   tattoo right on his shoulder.  None of those photos had that.

9        How do you think, he knows that?  Because he had sex

10  with him.  None of the photographs, in any part of the -- with

11  the exception of the booking photograph when he was arrested to

12  prove he has a tattoo -- none of the photographs show a tattoo

13  and he knew, because he saw it.  Because it was the defendant

14  who was at his house that day, not some mystery person.

15       In this case, ladies and gentlemen, the person who has

16  the greatest motivation to falsify their testimony is this

17  defendant.  And so, what did you hear as a part of his testimony

18  here today?

19       You heard his confession, you saw the videotape.  You

20  heard at the moment that he was arrested -- and use your own

21  common sense -- if you are arrested and taken to the police

22  station, accused of having sex with a child, would your first

23  inclination be to say -- to confess to doing this -- would that

24  be the first thing you'd do, the very first thing?

25       But that's what he wants you to believe, he did, that

Ms. Rotella - Closing Argument                          41

1  it was false.  It was all a lie.

2         He admitted in his confession, that he'd met the

3  victim on Jack'd.  The victim told you the same thing.  He

4  admitted in his confession that it happened in the summer of

5  2013 and he believes it was August.  He'd like you now, to

6  believe, that was a good guess.  The victim told you the same

7  thing.  And you know it from the cell-phone records, oh, look,

8  he guessed right, it was August.

9         He admitted in his confession that he used the name,

10  Mike Dozer, which was what the victim told you as well.  He

11  admitted that they chatted a few times.  The victim told you,

12  the same thing.

13         He admitted -- or he said -- that victim identified

14  himself with different names, that's what he said in his

15  confession.  And the victim told you, he did the same thing.

16  Well, what's the significance of that, because it's not in the

17  affidavit of probable cause.

18         You'll remember when he testified just shortly ago,

19  that he says, all of his knowledge about this came from

20  affidavit of probable cause.  They left me with this complaint,

21  that charges me and they told the story in the affidavit of

22  probable cause and I went through it and I memorized it,

23  apparently, and then, I confessed to this crime, I didn't do.

24  But that detail never was in there.  And that's the only one,

25  there's more details, that he says, he guessed correctly.

Ms. Rotella - Closing Argument                    42

1          How does he know details that are not in the affidavit

2     of probable cause?  Because he also says, the victim identified

3     himself as eighteen.  The victim didn't, he told you that.  But

4     that's not in the affidavit of probable cause.

5          He also says, that he traveled to the house and they

6     had sex in his bedroom, how does he know that?  The victim said,

7     that's what happened, because that's what did happen, but that's

8     not in the affidavit of probable cause, oral and anal sex.

9          And he says, that he videotaped it, which is what the

10    victim said, because it did.  But that's not in the affidavit of

11    probable cause.  So, how does he know that?  Because he was

12    there.

13          He doesn't even pretend to tell you that he's -- I

14    hadn't told him all about it and so, well, maybe, I had to know

15    the details.  He just tells you that, oh, I guess, you're right,

16    there was a videotape and -- videotapes.  He has an excuse and a

17    reason for every single one of those things.

18          You recall correctly, the videotape that he took in

19    this case, here it is.  There's no -- (indiscernible) -- that

20    nobody would ever know.  It's not like you're going to find it

21    anywhere.  You wouldn't know about it, unless the only two

22    people, who were there told you about it and they did.  The

23    victim told you about it and the defendant told you about it.

24          Because the only way he knows things that are in this

25    affidavit -- that are not in the -- affidavit of probable cause,

Ms. Rotella - Closing Argument                    43

1    is because he was there, that's how he knows it.

2              In his confession, ladies and gentlemen, he is asked

3    -- the detectives lose -- begin to lose a little bit of patience

4    with him and he does admit in his statement, which is in

5    evidence -- he's asked early on, did you come to Limerick

6    Township, Montgomery County, Pennsylvania to meet a fourteen-

7    year-old boy?  And he says, yes, I did and it is in his

8    statement.

9              And then, he got soft a little bit and well, that's

10   what it says in the paper there.  Yes, that's -- it says, he's

11   fourteen in the paper there.

12             And then, on Page 15.

13             As they're with him, he takes his bathroom -- a

14   bathroom break and he comes back and then, he's talking about,

15   yes -- well, it says, fourteen on the paper, yes, it says, I had

16   sex with him on the paper.

17             And at the bottom of that Page 15, which I think is on

18   your screen, Detective Anders finally says:

19             Look, I'm not asking you what the paper says.

20        Did you know prior to coming to Limerick and when you

21        got there, that he was fourteen years old?

22             And he says:  Yes, he did say that.

23             And the next words out of his mouth were that, he

24   needs a lawyer, because that's what time the (indiscernible).

25             The defendant would have you believe -- I assume from

Ms. Rotella - Closing Argument                                44

1  the admission of those videotapes that you saw here today and

2  because of what he does for a living, he's into sex with adult

3  males (indiscernible).

4       Do you know how many varied pedophiles are convicted

5  and are serving time in prison, because you have sex with one --

6  doesn't mean that you're precluded from having sex with

7  (indiscernible).

8       We know that he lied, because he told you that he

9  lied.  We know that he lied to his parents and he kept hidden

10  from them, a part of life, he was engaged in the pornography

11  industry.  And so, he keeps things hidden or lies when it suits

12  him, which is exactly what he did here to you as part of this

13  trial.

14       All of the evidence points to his guilt, including his

15  own confession, ladies and gentlemen, not what you heard here on

16  the stand.

17       So, when you go back and review all of the evidence in

18  this case, I'd ask you to return the only verdict that makes

19  sense and the only one that holds him responsible for what he

20  did to the fourteen-year-old child in this case and that is to

21  find him guilty.  Thank you.

22            THE COURT:  Mr. Wray.

23            MR. WRAY:  Thank you, your Honor.

24                      DEFENDANT'S CLOSING ARGUMENT

25            MR. WRAY:  So, one of the first things I told you if

1   you need this file, it doesn't get worse than this, these are

2   horrible -- to deal with -- how do we begin, you can hide things

3   or try to soft coat them or -- he's trying to build a car and

4   try to make it look new and made no pretense about who my client

5   was.

6          He didn't hide his business from you, he didn't try to

7   tell you, he was somebody else, he said, he was just an

8   artist/model and he told you, exactly what he did.  He makes his

9   own films, not a crime.  But he does art modeling, not a crime.

10         They keep saying, pornography, like, it's a crime,

11  it's a legal business, don't consider it for two seconds.  It

12  was -- you may not like it, it's legal.  Some people don't like

13  militarization in the United States and the building of armies,

14  legal -- conscious -- we get to build armies.  They may not like

15  chemical companies or pharmaceutical companies, legal

16  businesses.  And when they're legal businesses, you put it out

17  of your mind that somehow that makes everything he does and

18  says, somehow corrupted.

19         He has different jobs, no one is going up to you and

20  saying, hey, are you trying to make value judgments here?  You

21  need to decide two things, the facts and you will get

22  instructions on credibility, which I'll get to momentarily.

23  It's your job to just decide those facts and not let things like

24  that affect you.  And I know it's hard, I told you that right at

25  the -- even before you -- days ago.

Mr. Wray - Closing Argument                              46

1      The best witness I saw in this entire trial -- not my
2  client -- Dominic Huntzinger, I wish all parents were like that.
3  Your son has been struggling with his sexual identity.  By
4  Dominic Huntzinger's own statement for a couple of years.  He
5  goes to his mother, he goes to his father and says, I'm gay --
6  I'm a homosexual.

7      And his father did -- and mother -- did the exact
8  thing we would want, they hugged him and said, I love you no
9  matter what.  I am not going to judge you, I'm your father, I
10  love you, I am your mother, I love you.  All parents should be
11  like that in our society.

12      There are people who make judgments against people for
13  that.  Homosexuality is not a crime in this country, it is
14  legal.  Their sexual orientation has nothing whatsoever to do
15  with what you do for a living and who you are as far as a member
16  of our society, they just aren't.  And you can't sit there and
17  say, well, he's gay, he's this, he's that, no.  Being a
18  homosexual is not a crime in this country.

19      It isn't for Dominic Huntzinger and it isn't for
20  Christopher Steele or anyone and that's what people are supposed
21  to be thinking about.

22      I'd repeat, somewhat, what the ensuring months were
23  for Dominic, he came out to his parents, he said, hey, I'm gay.
24  It was towards the end of the school year in the spring of 2013,
25  he started the summer and then began the fall semester.  Mike

Mr. Wray - Closing Argument                                    47

1   Huntzinger said, hey, you know, having some problems or noticing

2   some behavioral issues.

3          I asked him, if he had the same set of friends and he

4   said, at least, one friend has sort of dropped off, that

5   happens, I mean, when you start a new school year and -- and

6   from a different approach, I'm no longer young, gay -- kid, you

7   know, say, hiding my identity, I am now a person.  I've

8   explained who I am to my parents.  And I'll deal with the rest

9   of the world, they love me, they support me.

10         A new school year, it's going to be difficult, but

11  that's an added identity that suddenly becomes a stress factor

12  in your life.  We all know that.  If you move to a new town and

13  everybody knows each other and you went to school, you know what

14  it's like to be different.  I'm -- I'm in a new environment, it

15  creates new sets of problems.  Who is going to be my friend?

16  What do people think about me?

17         So, it's not unusual at all, that he would say, he's

18  having some problems, that's not unusual at all.

19         And Michael Huntzinger said, you know, he has his iPad

20  and he looked over that and his cell phone to see what's going

21  on.  And Michael Huntzinger sat there and said, he found gay

22  porn on his iPad and a Twitter beep for Mike Dozer, triple X.

23  That's what he said, he said.

24         So, I'm looking at this and then he saw these

25  conversations on Jack'd and he became concerned.  I saw a

1   Twitter beep from Mike Dozer and I saw a conversation -- on the

2   screen -- with Mike Dozer.

3          Dominic Huntzinger told us, oh, no, I found him on

4   Tumbler.  But apparently, in the ensuing months, he was

5   following him on his Twitter feed, seeing him all the time,

6   because that's the only way that statement could be true.  Saw

7   him on Tumbler and suddenly, I was following him on Twitter

8   beep, because in October it was two and a half months later.

9          (Pause at 11:31 a.m.)

10         MR. WRAY:  And we -- we have -- this Government's

11  Exhibit 3, this screenshot, this screenshot concerned me

12  greatly, not because of its content, which is somewhat -- I -- I

13  don't go into dating sites -- but you see the back and forth, I

14  saw you on Tumbler.

15         But this is the screenshot that had been saved and

16  Detective Morris tells us, actually, first Michael Huntzinger

17  tells us, I take this, I said, my son has been on these date

18  porn sites, there's a name that matches, the name that I see on

19  the iPad, I take it to the police.  Good move, I mean, we want

20  to protect children, there's no doubt about it.  You want to do

21  that.

22         Detective Morris says -- and it was difficult to

23  determine, who took the screenshot by the police -- Detective

24  Morris ultimately said, I made a screenshot of that thing.  Had

25  custody of the computer, get a screenshot to print it.

1    And I said, did you try to scroll up or down?  And

2  then, his next words out of Detective Morris' mouth were:

3    I don't know a lot about computers, so I just did

4      the screenshot and I just turned it over to the people

5      who do that.

6    And we've had countless people in this case, that they

7  -- an expert witness -- Detective Schanes sat there and said, it

8  was irretrievable.  You heard me ask two different witnesses, if

9  they knew who Jonathan Crutchley was.  Detective Schanes said,

10  yeah, I think that's the guy, ultimately, that owns this.  And

11  he said, first it was in -- the Jack'd.com website -- was in

12  Denmark and then, it was in Seattle and finally, somebody in

13  Massachusetts owns this and he said, his name and he said -- and

14  the name of the other things that he owns and he said, I think

15  that's the guy -- I think that's the company -- and they said,

16  we don't save any of this.

17    And Detective Schanes said, all we were left with was

18  photos on one phone -- one account -- and photos on the other

19  account and no text messages.

20    The Government has attempted to turn this (indicating)

21  into more than it is.  That's what they do.  They're saying,

22  there's a conversation here on the top end of this, there's a

23  conversation after this, there's a little problem, they don't

24  have it.  And by their own admission, they don't have it because

25  they let it go, if it existed at all.

1       So, when you look at this, remember, they printed the

2  screenshot, they give it to the lab person and the person, who

3  took this screen shot, put -- a controlled print -- of what I

4  see on the screen of this iPad -- and you never got one before -

5  - he sat there on that witness stand and he said, I don't know

6  that much about computers.  I didn't touch it.  And suddenly, we

7  can't get the rest of this conversation before or after.  But we

8  need to rely on Dominic Huntzinger to tell us, that it was an

9  ongoing conversation that went on and on and on and on and on.

10      They can't close -- you'll get instructions.  It's not

11 your job to sit there and say, well, I think, X should be over

12 here now or Y should have been here.  You've got a snippet of

13 evidence.

14      And Mr. Steele's testimony -- and yes, I'll talk about

15 his testimony -- I don't -- I won't walk away from it, I didn't

16 walk away from what he does for a living -- was, hey, asked him

17 the question, found out he was fourteen, blocked -- I blocked

18 it.

19      MS. ROTELLA:  Your Honor, I am going to object,

20 because there is absolutely no proof of that, whatsoever.  His

21 client did not testify to that.

22      THE COURT:  Very well.

23      The jury will remember what the testimony was --

24 continue --

25      MR. WRAY:  Thank you.

Mr. Wray - Closing Argument                    51

1          THE COURT:  -- for the record.

2          MR. WRAY:  But you guys decide what the witnesses

3    said.  Mr. Steele did state that he had the ability to block

4    people -- and when he found people under eighteen, he blocked

5    them.

6          How do you find out how old somebody is on the

7    Internet?  Based on a dating website, Match.com, Girlfriend

8    Finder or whatever websites you go on, you ask questions, you

9    exchange pictures, you don't know who you're talking to.  You

10   see a picture and you sit there and say, you know what, I would

11   love you folks to see what I looked like ten years ago or twenty

12   years ago, I was a lot thinner, I looked good, I was working

13   out, now, not so much.  That would be nice to do.

14         On the Internet, I can do that exact thing.  I can

15   say, hey, I don't really have thinning hair, I still look like

16   my gut is gonna bust over my belt -- I wore suspenders.  I could

17   redo my face.  I could pretend to be somebody else.  It's

18   perfectly capable.

19         I (indiscernible) -- I pretended to be eighteen, I

20   used different names, I used the word, Dante.  I used the word

21   Dante in this conversation.  And the police never asked him

22   about Dante.  They never asked him about who that conversation

23   was with.  They said, hey.

24         And that's something that should be in your minds of,

25   hey, everyone on the Internet is a stranger.  And we teach it in

1   elementary school now, we teach it in middle school, we teach it

2   in high school, you can watch the TV news for adults and they

3   say, you don't know what you're getting on the other end.

4   Someone can be whoever they want to be.

5         I could put a picture of George Clooney when he was

6   twenty years old on a website with my name on it and say, this

7   is me.  I'm gonna get caught in two seconds, but I can do it.  I

8   can put a profile up and if somebody doesn't know what George

9   Clooney looked like in his twenties, when he was skinnier and

10  had -- I can do it, I can pretend to be George Clooney.  I could

11  pretend to be George Clooney, especially, in places where people

12  might not know who I am.

13        Now, the Government presented another police

14  investigator and not simply, Detective Morris and they presented

15  Mary Anders.  And Mary Anders brought us two pieces of -- of --

16  of testimony or she identified two pieces of testimony.

17        She went through the Google search and said, what do

18  we have here?  Well, we have a website for Mike Dozer triple X,

19  a website for cmsteele923.

20        You may recall, I asked her, what about all of the IP

21  addresses?  And she admitted, there's IP addresses for both of

22  these accounts.  It's not like, someone sitting at their home

23  and logging on.  Many log-on spots were on here.  And Mary

24  Anders said, oh, yeah, there's multiple log-ons.  It's the --

25  was there five or six, but multiple places to log on.

Mr. Wray - Closing Argument                                53

1      And you might check your e-mail and say, you know

2  what, my e-mail, well, I logged on it, when I first get there

3  and have my morning cup of coffee and I log on at home, 'cause

4  I'm home.  Once you get to four or five the reality is, a lot of

5  people have access to our e-mail or you're going to multiple

6  locations.

7      'Cause once you get past the office and home, then,

8  you guys have to say, well, where else are you going to log on

9  to your personal business?

10      Mr. Steele told us, point blank, hey, my promoter, he

11  knows my log ons -- my two accounts.  In fact, he helps me with

12  those accounts.  He said, I have a Facebook account, I have a

13  Twitter account and John Shaw knows both of them, hands down and

14  he logs on and does stuff for me, that's what John Shaw told us.

15      So, let's not pretend, somehow, that Mr. Steele is

16  carving this life of secrecy, his life is an open book.  He

17  testified, he has a boyfriend.  Didn't block his cell phone --

18  transparency -- and that he had access, un-controverted to that

19  cell phone.

20      Now --

21      (Pause at 11:42 a.m.)

22      MR. WRAY:  This is missing a page, so I'll just rely

23  on mine.

24      Would you please put 24.1 up, please?

25      The FBI agent came in and told you about this mapping

1    software.  And before we saw this mapping software, we heard

2    from AT&T's custodian of records.  The custodian of records sat

3    there and said, hey, that's -- that's the best antenna, the best

4    signal and you don't really know where the phone is, but the

5    phone is searching for a reliable antenna and the best signal at

6    the same time.  And the phone calls move along depending on

7    which direction you're going.

8            And -- and Agent Carter got up and showed us,

9    carefully, through the Government's things about this and we've

10   reviewed the fact that he took it all off of this (indicating),

11   the phone call off of this.  A huge phone log for a relatively

12   short period of time, too.  May 1st -- May, June, July, August

13   September -- six months of time.  And that's all the phone calls

14   that were made off of this phone, all of them.

15           Every minute of the day, around the clock, this is --

16   this cell phone -- this many phone calls (indicating).  And he

17   took the phone calls from a specific date, he took them from

18   August 8th and he plotted all of the phone calls.  And there's

19   two of them late at night.

20           One at ten minutes after 12:00 in or around his house

21   and one at 1:54, that's there but -- as Mr. Steele testified --

22   it's not a call that was completed, but it rang, but the cell

23   phone lists the calls, because we heard Mr. Enright say, there's

24   a capture of the phone call, it captures the phone call whether

25   it rings or not, it's inconsequential.  There's that moment when

1   you pull your cell phone out and say, I'm gonna make a call and

2   you've dialed the number and the phone call ends for whatever

3   reason, there's still that capture.

4         And we have through Agent Carter, this list of travel

5   down from Limerick, you had it at 8:09 at one spot, at 8:27 at

6   one spot, at 8:31 at one spot, 8:39 -- near Malvern, I believe.

7         Then, it's right across the state line at 9:03.  Then,

8   ten minutes later, it's in Wilmington.  And finally, at 9:46, it

9   appears it's finally at a location near his home and then,

10  there's a call at 12:19, he mapped it all out.

11        Curiously, of course, there's not a trip up there.

12  There is no trip to Limerick, PA., those were from Limerick, PA.

13  And the Government can't explain that.

14        (Mr. Wray is not speaking at a microphone.)

15        MR. WRAY:  Mr. Steele, when talking to the police

16  said,    these are -- on the phone -- and no records of any

17  kind of (indiscernible) were found on his phone.  As a matter of

18  fact, no e-mails, no phone calls, no communication of any kind.

19  The -- says, I gave it my address the day before, wrote my

20  address down and it's -- without a phone call.  No set of time.

21        And, apparently, with nobody in front of his house,

22  had him park up the road, he said, he parked up the road, so I

23  didn't even see him when he parked.  The parking lot in front of

24  his home was empty.  But there's no trip to Limerick.

25        And we had multiple people come up here with this

Mr. Wray - Closing Argument                    56

1   cell-phone tower stuff and there's no cell-phone tower data to

2   take us to that location.

3              (Coughing at 11:47 a.m.)

4        MR. WRAY:  And Mr. Steele tells us, my partner had

5   access to that phone at the time.  And that I think we went out

6   and gave him complete access to the phone.

7              (Pause at 11:48 a.m.)

8        MR. WRAY:  Now, things were found on the cell phone,

9   very little, because Detective Schanes told us, hey, by the time

10  we got to the cell phone, by the time we got to the Ipad, by the

11  time we go to this evidence, it had disappeared.  Someone saved

12  this conversation for months on end, this snippet, supposedly,

13  that was lost in an instant and there were no records, no cell-

14  phone calls, no e-mails.  No other communication, whatsoever.

15  Use your life experience.

16             You're gonna come here tomorrow, you'd better call.

17  Call me when your close, I'll tell you if it's okay.  Fourteen

18  years old, listen, when you get close, you need to call me, that

19  you're nearby, so I can say, yes or no.

20             I'm gonna suggest to you that it didn't happen at all

21  and that it's made up.  And that he saw a picture of Mike Dozer

22  on the Internet and became obsessed with him and he kept

23  pursuing -- pursuing him and he probably, kept suggesting that

24  he find him -- blocking him.

25             So, the one thing I didn't hear in all of his

Mr. Wray - Closing Argument                                    57

1   confession, was the one that Dominic Huntzinger swore that he

2   was using, was the identity in -- it was in Defense Exhibit 3 --

3   is Dante.  And Dante doesn't appear anywhere.

4          We've heard a lot of testimony regarding Jack'd, this

5   mystery company and how it works.  And let me freeze on two

6   essential facts about Jack'd and they're important and I want

7   you to remember them carefully.

8          Text -- only application that runs off cell phones,

9   that's Fact No. 1.  You never get live chat -- you never talk to

10  the person.

11         No. 2, you have no control over what their identity

12  is, whatever, they say they are, they say they are.

13         And No. 3, you need to be eighteen to use it.

14         And fundamentally, whether you like it or not, Dominic

15  Huntzinger represented himself as Dante, he represented himself

16  as eighteen.  And told us, you can fill in your profile with

17  whatever you want.  You can create an identity of your very own.

18         Mike Dozer -- or Mr. Steele -- was using it to

19  identify himself as a porn star and saying, oh, by the way,

20  here's my websites, you can go to them.  This is how you find

21  out more about me.

22         (Pause at 11:52 a.m.)

23         MR. WRAY:  Now, let's talk about the photo array, that

24  photo array was interesting.  Handed photos and said, here's a

25  stack, go through it.  He goes through and he pulls out Mike

1  Dozer.  He has to be told to look at the other two, but he knows

2  who Mike Dozer is.  His father said, I found a Twitter feed for

3  Mike Dozer on his iPad and his cell phone, so I know, he knows

4  who Mike Dozer is.

5          And the photos that are -- you can pretty much

6  identify someone if you get their Twitter feed and they're

7  telling you, they're porn stars, you're gonna see, exactly, what

8  they look like.  And that's what he wrote down.  That's what I

9  found interesting.

10          Detective Morris said, stop when you see somebody you

11  know -- the instructions said that, actually.

12          (Coughing at 11:53 a.m.)

13          MR. WRAY:  And did they give him any other

14  instructions?  This is Mike Dozer.  They could have done that

15  with, this is Hillary Clinton or anybody else.  This is the

16  person that came and had sex with me.  This is the person, who

17  came to my house.  This is the guy that I had oral/anal sex

18  with.  This is the guy who came to my house in August.  Now,

19  that would be damning but this is Mike Dozer?

20          Christopher Steele told you from this very stand, his

21  picture is everywhere, his images are everywhere.

22          Could we put up 39, please?

23          MR. WRAY:  These are the pictures of Mr. Dozer and

24  they're public pictures, they are pictures from his Twitter feed

25  and they're available for the public.

Mr. Wray - Closing Argument                              59

1          You can put it off now, thank you.

2          They're everywhere.  Put in a person's name -- a

3   famous or infamous -- but known and you'll get pictures of them.

4   Put in someone you don't know and it's a different flash -- we

5   all know that.  Put in a picture of Mike Dozer, you're gonna get

6   a picture of Mike Dozer.

7          And that was what this investigation was about, let's

8   find out, who this Mike Dozer character is and find him.  And

9   they found him.

10          There was, like, two pieces of testimony when the

11   defense was put on, that were not controverted by the

12   Government.  One was his lack of a car, he didn't have one, it

13   had broken.  He had access to get to work -- work -- sometimes,

14   his parents would drive him.  But just to tool around town, he

15   did not have a car.

16          But more importantly than that, was Mr. Steele and his

17   mother told you something else.  He also had broken his foot.

18   So, a guy with no car, with no (sic) broken foot, goes all the

19   way up to -- well, he comes all the way back out from Limerick

20   to Newark.

21          And when the victim is asked to identify this guy, he

22   doesn't say, he had a broken foot, he was limping, he had a cast

23   or a boot or whatever was on it, he doesn't give that

24   description of him.  He describes Mike Dozer to a T, because

25   he's looking at pictures of Mike Dozer.

Mr. Wray - Closing Argument                     60

1       And for two and a half months, this complaint was

2  never made.  He sat there and said, hey, that this happened in

3  August but Dominic Huntzinger says, that two and a half months

4  later, his parents find out about it and say, you're looking at

5  gay porn and then, the story comes out, oh, I had sex with this

6  guy.  Waited and waited and waited without complaint.

7       And we have a vague story of trouble at school.  Some

8  of this had to do with simply identifying himself as a

9  homosexual and saying, I came out to my parents.  I'm starting a

10  new school year.

11       They searched -- searched -- and they found a Twitter

12  feed and Mike Dozer was easily identified after that.  There is

13  no question, you can identify someone in that situation.

14       (Pause at 11:57 a.m.)

15       MR. WRAY:  Ladies and gentlemen, there is not a lot of

16  evidence in this case, you were shown a lot of police work and a

17  lot of detective work, but a lot of the evidence has been lost.

18  And it wasn't lost because of this man.  He didn't destroy any

19  evidence, lose evidence, print something out and find out, I

20  don't know enough about computers to make sure, this entire

21  conversation is here or not here, if it exists or doesn't exist.

22       And a lot of the evidence is, we are supposed to

23  believe that this liaison, this meeting, this violation occurred

24  when, the beginning of the day after the parents had left at

25  7:00 a.m., before they would have returned home, during a

1    weekday.

2           It looks, like, roughly down 202 on this map, but

3    there's no specific route here, it's just marked -- at the

4    height of rush hour without a problem.  That's what we're

5    expected to believe.

6           Now, this alleged meeting and contact does not have to

7    have occurred -- and you'll get instructions on this -- because

8    the indictment is on or about the summer of 2013.

9           But we don't have anything, other than Dominic

10   Huntzinger saying, I saw him on Tumbler one day, found him on

11   the Internet the next day -- on the second count -- met up with

12   him on another day and maybe, I talked to him and maybe, I

13   didn't, that's a little fuzzy to me, but again, you guys get to

14   decide.

15          But he would have easily have had time in two and a

16   half months to know exactly what Mike Dozer looked like, because

17   he didn't reveal this conversation until then.

18          And Dominic Huntzinger says, the guy was at my house

19   for thirty minutes, he had to get there after 7:00.  And

20   according to the Government, he left at 8:09.

21          And, you know, again, we don't have a phone call,

22   there's no checking to make sure it's an okay situation.  That's

23   the third here -- if you're going pull this off, if you're gonna

24   make this work, if you're gonna meet up with someone for sex,

25   the key ingredient here is, I don't want my parents to know what

Mr. Wray - Closing Argument                              62

1   I'm doing.  I don't want them to find out that I've been on

2   Jack'd, pretending -- stating I'm eighteen.  I don't want them

3   to know anything about this and how do I get there?  First, I

4   make sure the coast is clear.

5           So, I'd have to tell him, get here after 7:00, I'm

6   there for half an hour and then, that's not thirty minutes then.

7   Supposedly, (indiscernible).

8           And he leaves at 8:09 and we don't know how he got

9   there, but we know he leaves at 8:09, because there is a phone

10  call made and then, phone calls further on, that takes us down

11  towards Delaware.

12          And at the very end -- the second page --

13          (Pause at 12:01 p.m.)

14          MR. WRAY:  -- there's multiple stops and multiple --

15  down there.

16          Now, neither FBI Agent Carter nor Mr. Enright, the

17  AT&T guy, can tell us who had the phone, they don't know.

18          Identified as being Mr. Steele's phone and by his own

19  admission, his phone number, although it belonged to his mother,

20  but we understand, it's somebody's phone.  But a phone where he

21  said, hey, my partner -- it was not locked -- my partner had

22  access to it and it was an issue in my relationship.

23          There should really be a phone call telling us how he

24  got there.  And Detective Schanes gets the cell phone and

25  there's no GPS information, there is nothing in this phone,

Mr. Wray - Closing Argument                                63

1   except a handful of photos -- public photos -- on.

2           And think about this, you've got Dominic Huntzinger's

3   picture from his cell phone and his iPad in October -- in

4   October -- and you have twelve photos that were available from

5   the Twitter accounts and Google image searches, whatever, they

6   were all publicly known.

7           And the only picture that they have that is on my

8   client's phone is the picture that he's using on Jack'd by his

9   own admission as Dante and Mr. Steele says, there's no passwords

10  on that -- passwords on my phone, no locks on my phone.

11          And I was with somebody in the summer of 2013, doing

12  -- using -- checking out my phone to see what I was up to.  He

13  spoke of a jealous relationship.  And he spoke of issues with

14  that ex-partner.  He was saying, hey, I don't know.

15          Now, let's get down to what my father used to call the

16  brass tacks.  I want you to bear in mind that when I sit down

17  after this -- and you'll all be glad I'm done -- I don't get to

18  jump up and say, wait a minute, that's not the way this works.

19  It's important that you pay attention to everyone at a trial,

20  but after this, I don't get to speak again.  And it's important

21  that you recognize that.

22          Anyone can say anything on the Internet and what we

23  have is a lot of unexplained losses of evidence and a lot of

24  quirky conclusions.

25          And the Government is going to sit there and say, we

1   have his confession.  They have a statement, he made it clear,

2   he thought his partner had done something in some way.  He gave

3   vague explanations as to what was in the affidavit of probable

4   cause.  You saw him sitting there in that room, his head is

5   down, he's crying at times.  He says, my heart is racing, I've

6   got a pit in my stomach towards the end, I have to go to the

7   bathroom.  He even ask to make a phone call.

8           There's a lot of reasons for having those kind of

9   reactions.  Take your life experiences, bad news, a difficult

10  situation, a concern, anxiety, generally, fear.

11          I mean, Mr. Steele saw his name on this, he knows

12  they're accusing him.  They're not accusing anyone else, they're

13  accusing him and his name was on that criminal complaint and his

14  name was on that affidavit.

15          So, fear is probably part of what he's gonna -- but

16  understand, love is probably the most understood (sic) emotion

17  in our society.  We see so many things that happen because of

18  love every day, good and bad, evil, dysfunctional, life-

19  affirming and we think of those things.

20          And we say to ourselves, boy, they must really be in

21  love, boy, he'd do anything for her.  She backs her man up to

22  the hilt.  If her husband says, the sun rises in the east --

23  west -- and it does, she believes everything he tells her.  And

24  no one could ever tell him, he's wrong.  My husband may not be

25  the best guy in the world, but I love him, he's got these flaws

1   and I don't care.

2          Sometimes, we see them for the worst of things, my

3   spouse or partner is beating me and you still -- you look and

4   say why doesn't this person leave?  Love is the most under --

5   misunderstood emotion.

6          And we know we're in love, we know why we care and we

7   know what affects us, people, when we see how much we sacrifice

8   in our own lives to make them happy, to protect them.

9          It took Michael Huntzinger two seconds to act as a

10  loving, caring parent when he found out his son was gay.  He was

11  un-hesitant.  He could have done things, horrible.  He could

12  have shown him the front door.  He could have said, I hate you.

13  He could have said, you disgust me.  He did the best thing in

14  the world, he said, I love you no matter what and I don't care

15  about anything, other than you are my son and I love you.

16         And when we look at our relationships with our

17  spouses --

18         THE COURT:  Mr. Wray, you -- when are you -- the time.

19         MR. WRAY:  I'll be less than five minutes, your Honor,

20  I'm apologizing.  I am wrapping up.

21         THE COURT:  Go ahead.

22         MR. WRAY:  Thank you.

23         And when we're in love with someone, we protect them

24  no matter what, we stand behind them, no matter what.  And we

25  say, I will stand between you and do anything to protect you.

Mr. Wray - Closing Argument                                66

1      Christopher Steele stood here and said, I had a

2  partner in the summer of 2013 and I knew -- based on the

3  relationship -- there was something wrong here and it was not

4  about, just simply -- anything other than, I'll just take this

5  now and I'll deal with it later.  We've all done it, every one

6  of you, you stop and say, wait a minute, I don't have an answer,

7  I can't call this person right now, but for right now, don't

8  tell me anything bad about this person.

9      Ladies and gentlemen, after the Government speaks, you

10 are going to hear a lot of instructions and the most important

11 instruction is, what a reasonable doubt is.

12     I'm just going to be less than two minutes, Judge.

13     And I always tell people, when you go in to that room,

14 remember this, reasonable doubt -- in order to make sure you

15 follow the instruction of finding every element of every offense

16 charged in these indictments -- beyond a reasonable doubt, you

17 cannot let the mindset of, I feel, I think, it seems like,

18 maybe, it happened this way, this kind of seems right to me.

19 Those phrases, I feel, I believe, I think this, those are

20 reasonable doubt and I beg you to embrace them.

21     Because the Government brought a lot of evidence and

22 showed it to you and then, explained that they didn't have the

23 complete evidence here and incomplete evidence.

24     And it's your duty here -- whether you like porn stars

25 or not, whether you like gay people or not -- is to put all of

1    that aside, be objective and say, what evidence is really here.

2           And when you do, I believe, you will find my client

3    not guilty of the crossing of state lines, eliciting sexual

4    conduct over the Internet and -- end up -- (indiscernible) here

5    -- this evidence is not beyond a reasonable doubt, that he is

6    the person, who did this.  Thank you for your kind attention.

7           THE COURT:  Attorney Rotella.

8           MS. ROTELLA:  Thank you, Judge.

9           THE COURT:  Rebuttal.

10                 GOVERNMENT'S REBUTTAL ARGUMENT

11          MS. ROTELLA:  So, Counsel glosses over the fact that

12   his own client told you that he was currently working back in

13   August of 2013, so.

14          But he also wants you to believe that, because we have

15   the cell-site records from August 8th, the (indiscernible).

16          He told you from the stand that if he -- they were

17   (indiscernible.)  He wouldn't even have --

18          He never named this person, he never gave him

19   information, he was never called as a witness and the defense

20   doesn't have to do any of that, because that's the Government's

21   burden at all time.  But he wants to argue it here at trial.

22          They were not together, it's a ridiculous --

23   ridiculous -- story in the face of the evidence that is here

24   before you today.

25          If all we had was the victim saying, that's what

Ms. Rotella - Rebuttal Argument                    68

1    happened, we could still bring this case to you and ask you to

2    go and decide whether or not there was cause to convict this

3    defendant, but we have more than just the victim's testimony.

4         We have the defendant's confession on videotape, that

5    matches, exactly, what the victim says, happened in this case.

6         The other evidence, all adds to the proof.  The cell-

7    phone records in this case -- the cell-site records that you saw

8    -- Counsel wants to argue that there's no calls, I guess, he had

9    one thing on his mind, ladies and gentlemen, I guess, he was

10   thinking about one thing that morning and guess, what it was?

11        Because the phone puts him there at their house at

12   2:00 a.m., six hours later, he already did what he did with the

13   fourteen year old and he's leaving and he's on the phone,

14   chatting it up.

15        We know that the phone crossed state lines, we know it

16   was in Delaware at the defendant's residence at 2:00 a.m. and we

17   know at 8:00 a.m., the very next morning, six hours later, it's

18   up at the victim's house.  So, we know he crossed state lines.

19   That's what the cell-site stuff shows you.

20        Counsel keeps saying, that all you have is the victim

21   saying this or the victim saying that, it's not all you have,

22   ladies and gentlemen.  You have the defendant confessing to it

23   on videotape.

24        It's not just the victim's word here, you have the

25   pictures on the victim's Jack'd account, you have the pictures

1   on the defendant's Jack'd account.

2          You have the victim telling you details that he --

3   that are not on any pictures -- that he would only know, had he

4   seen this person live.

5          There is absolutely no reason for the fourteen-year-

6   old boy to make up a story -- for what -- he's not in trouble

7   with his parents.  He's got a good relationship with his

8   parents.  They know all about him.  He didn't do anything wrong.

9          He has no motivation to come in here before a room

10  full of strangers -- other than -- and tell them, he engaged in

11  sex -- oral sex, anal sex -- would you want to get up in front

12  of people and say that type of thing?

13         It is the defendant, who has every reason to lie to

14  you in this case.  He is the one that stands to lose here.  He

15  told you the truth at one point -- well, he didn't tell you the

16  truth -- but he told the truth at one point, when he was faced

17  with his arrest.

18         It's wasn't just bad news, his name is on a criminal

19  complaint, he's been accused of having sex with a fourteen-year-

20  old boy.  He reacted in the videotape, the way most people would

21  react, guilty people would react, because they're caught.

22         Not after they've had ten months or whatever it is --

23  October 1st now -- to sit and think about they're going to

24  testify or what they're story is going to be.

25         The defendant is guilty, ladies and gentlemen, and all

1   of this evidence that you have here, the chat screen that we

2   have here, thank goodness, that the police captured a screenshot

3   of it, because what you heard -- and we are in a culture today,

4   you see it all of the newspapers -- these providers are leaning

5   towards not keeping records anymore to protect your privacy.

6   You've heard that's what Jack'd did, they got rid of their

7   records, they save pictures.  But they don't keep your texts

8   anymore.

9          They changed ownership three times during the pendency

10  of this investigation, so thank goodness, he took a screenshot,

11  because we wouldn't have any of it.

12         And he thinks it doesn't prove anything?  My God, the

13  wording, itself:

14         I want to have sex with you, are you really eighteen?

15         No, I'm fourteen years old.

16         Well, I still want to have sex with you in black and

17  white.

18         You don't even need this to convict him, you can

19  believe, what the victim tells you and what the defendant tells

20  you, when he admits to it in his confession.  But you have it in

21  black and white, independent proof.

22         It shows you that they used the Internet, which is

23  Count 1.

24         And it shows you, that when the victim said, he'd show

25  up at his house the next day and you know that, it shows you his

1    intent, what's he traveling for, why does he go there?  Well,

2    because he wanted to have sex and that's what he did, it's plain

3    and simple, it's not a difficult case.  You don't have to

4    believe far-fetched stories, you can look at the evidence that

5    is before you.

6            Remember, the videotape, think about his confession

7    and find him guilty.

8            THE COURT:  Very well.

9            Counsel, may I see you at side bar?

10           (Discussion at side bar held on the record at 12:17

11   p.m.)

12           THE COURT:  Very well.

13           What I intend to do is, just give them a brief lunch,

14   because I think I've brought lunch in and then, bring them back

15   at one o'clock.

16           MS. ROTELLA:  Okay.

17           THE COURT:  And I'll give my charge, I think it's

18   about thirty-five minutes.  So, that's what I intend to do.

19           In the meantime, I want you to take a look at the

20   verdict slip --

21           MS. ROTELLA:  Hm-hmm.

22           THE COURT:  -- we changed a couple of things --

23           (Discussion held off the record.)

24           THE COURT:  -- you will -- yeah, you will get -- and

25   take a look at the -- the instructions, particularly, the

1   charges, make sure you're okay with them.

2          MS. ROTELLA:  Okay.

3          MR. WRAY:  Okay.

4          THE COURT:  All right.  Thank you.

5          (Concluded at side bar at 12:18 p.m.)

6          THE COURT:  Members of the jury, it is 12:20 -- 12:19

7   -- I think we've brought lunch in for you, so what I intend to

8   do is, give you about forty minutes for lunch, bring you back at

9   one o'clock and then, I am going to give you the charge of the

10   court at 1:00, it's about thirty-five, forty minutes.  And then,

11   you will have the case before two o'clock.

12          So, remember my instructions.  You've heard the

13   closing arguments, you still have not heard my instructions, so

14   you cannot talk to each other at this point in time about the

15   evidence that you've heard, the arguments or anything connected

16   with this case until I give you the charge at one o'clock and I

17   send you back to begin your deliberations with your other fellow

18   jurors.

19          So, avoid any contact with any of the parties, any of

20   the witnesses or any of the lawyers.  Do not allow anyone to

21   speak to you or speak in your presence about this case.

22          For most of the time, I think you're going to be

23   having lunch in the jury room, so have a good lunch.  And I

24   shall bring you back here at one o'clock promptly, so that I

25   could give you the charge of the Court.

1          ESR OPERATOR:  All rise.

2             (Jury out for luncheon recess at 12:19 p.m.)

3          THE COURT:  Two -- two things, take a look at the

4     charge, but also remember to put all the evidence together, just

5     in case they ask.  Okay.  Thank you.

6             (Luncheon recess is held at 12:19 p.m.)

7                                 *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          A F T E R N O O N   S E S S I O N

3          (In open court at 1:00 p.m., the jury is present)

4          THE COURT:  And I am going to now give you an

5   instruction on the applicable law.

6          Before I talk to you a little bit about your role as

7   jurors in this case, let me just let you know that my charge is

8   divided into three parts.

9          The first part will deal with how you are to consider

10   the evidence.

11          The second part will give you the elements, of the

12   charges, the substantive part of the charges, the three counts

13   that have been brought in this case.

14          And the third part will discuss how you are to go

15   about reaching your verdict.

16          You don't have to take notes, to help you, I will give

17   you the second part of the instructions dealing with the

18   substantive charges and you will have that with you along with

19   the verdict slip and a copy of the grand jury indictment, so

20   that you'll have that information as you deliberate.

21                          CHARGE OF THE COURT

22          THE COURT:  So, your job as jurors is twofold, you

23   have two duties, your first duty is to decide the facts from the

24   evidence that you have heard and seen in the courtroom during

25   the course of the trial.  That is your job and your job alone.

1    I play no part in finding the facts.

2           You should not take anything that I might have said or

3    done during the course of the trial as indicating to you, what I

4    think of the evidence or what I think about what your verdict

5    should be.  Your second duty then, is to apply the law that I

6    will give you to those facts in reaching a decision.

7           My role now will be to explain to you the legal

8    principles that will guide you in making a judgment in this

9    case.  And you must apply my instructions carefully.  Each of

10   the instructions is important and you must apply all of them.

11          You must not substitute or follow your own notion or

12   opinion about what the law is or ought to be.  You must apply

13   the law that I give you whether you like it or not -- or whether

14   you agree with it or not.

15          Whatever your verdict, it will have to be unanimous,

16   all of you will have to agree to it or there will be no verdict.

17          When you go back into the jury room, you will discuss

18   the case among yourselves, but ultimately, each of you will have

19   to make up his or her own mind about the verdict.  And this is a

20   responsibility that each of you has and that you cannot avoid.

21          During the deliberations, you must not communicate

22   with or provide any information to anyone by any means about

23   this case -- I am going to repeat that -- during your

24   deliberations, you must not communicate with or provide any

25   information to anyone by any means about this case.

Charge of the Court                                    76

1        You may not use any electronic device or media, such

2    as a telephone, cell phone, Smart Phone, iPhone, Blackberry or

3    computer, the Internet, any Internet service, any text or

4    instant-messaging service, any Internet chat room, blog or

5    website, such as Facebook, MySpace, LinkedIn, YouTube or Twitter

6    to communicate to anyone any information about this case or to

7    conduct any research about this case until I have accepted your

8    verdict in this case.

9        In other words, members of the jury, you cannot talk

10   to anyone on the phone, correspond with anyone or electronically

11   communicate with anyone about this case.  You can only discuss

12   this case in the jury room with your fellow jurors during your

13   deliberations.

14       So, you could discuss the case with each other till

15   your heart's content until I say -- once I send you back to the

16   jury room to begin your deliberations.

17       You may not use these electronic means to investigate

18   or to communicate about the case, because it is important that

19   you decide this case solely on the evidence that you've heard in

20   this courtroom in the presence of the Court and the defendant as

21   well as the Government.

22       You are only permitted to discuss the case with your

23   fellow jurors during the deliberations, because they have seen

24   and heard the same evidence that you have seen and heard.  In

25   our judicial system, it is important that you are not influenced

1    by anything or anyone outside of the courtroom.

2          Perform these duties fairly and impartially.  Do not

3    allow sympathy, prejudice, fear of public opinion influence you

4    in any way.

5          You should also not be influenced by any person's

6    race, color, religion, national ancestry, gender, sexual

7    orientation, occupation, economic circumstances, position in

8    life or position in the community.

9          We've talked a little bit about this before, but let

10   me remind you.  The evidence from which you could find the

11   facts, you must make your decision in this case based solely on

12   the evidence that you saw and heard in the courtroom.  Do not

13   allow any rumor, suspicions, conjectures or anything else that

14   you may have seen or heard outside of the courtroom influence

15   you decision in any way.

16         The evidence from which you could find the facts

17   consists of the testimony of the witnesses that testified before

18   you under oath.  The documents and other things that were

19   received as exhibits and are available, if you wish to see them

20   here in the courtroom.  And any fact or testimony that was

21   stipulated to, that is, that it was formally agreed to by the

22   parties.  That is the source of the evidence from which you

23   could find the facts.

24         I told you that there was some things that are not

25   evidence, for example, the indictment is not evidence and you

1    cannot consider that as evidence.

2              The statements and arguments of the lawyers for the

3    parties in this case is not evidence.  The questions by the

4    lawyers and questions that I might have asked, objections by the

5    lawyers, including objections in which the lawyer stated facts,

6    any testimony that I struck or told you to disregard and

7    anything you may have seen or heard about the case outside of

8    the courtroom.

9              You should use you common sense in weighing the

10   evidence.  Consider it in light of your everyday experience with

11   people and events and give it whatever weight you believe it

12   deserves to receive.

13             If your experience and common sense tells you, that if

14   certain evidence reasonably leads you to a conclusion, you may

15   reach that conclusion.  And as I told you in my preliminary

16   instructions, the Rules of Evidence control what can be received

17   into evidence and considered by you.

18             During the trial, the lawyers objected when they

19   thought that the evidence was offered and that evidence was not

20   permitted by the Rules of Evidence.  These objections simply

21   meant that the lawyers were asking me to decide whether the

22   evidence should be allowed under the Federal Rules of Evidence.

23             You should not be influenced by the fact that an

24   objection was made, you should also not be influenced by my

25   rulings on objections or any side-bar conferences that you may

1    have overheard.

2            When I overrule an objection, the question was

3    answered or the exhibit was received in evidence and you should

4    treat that testimony or exhibit like any other.

5            When I allowed evidence for a limited purpose only and

6    I instructed you to consider that evidence only for a limited

7    purpose and you must do that.

8            When I sustained an objection, the question was not

9    answered or the exhibit was not received in evidence.  You must

10   disregard the question or the exhibit entirely.  Do not think

11   about or guess, what the witness might have said in answer to

12   the question.  Do not think about or guess what the exhibit

13   might have shown.

14           Sometimes, the witness may have already answered

15   before a lawyer objected or before I had an opportunity to rule

16   on the objection.  If that happened and if I sustained the

17   objection, you must disregard the answer that was given.

18           Also, if I ordered that some testimony or other

19   evidence be stricken or removed from the record, you must

20   disregard that evidence.

21           When you are deciding this case, you must not consider

22   or be influenced in any way by the testimony or other evidence

23   that I told you to disregard.

24           Although the lawyers may have called to your attention

25   -- although the lawyers may have called your attention -- to

1    certain facts or factual conclusions, that they thought were

2    important, what the lawyer said is not evidence and it is not

3    binding upon you.  It is your own recollection and

4    interpretation of the evidence that controls your decision in

5    this case.

6              Also, do not assume from anything that I have said or

7    done during the course of the trial, that I have any opinion

8    about any of the issues in this case or about what your verdict

9    should be.

10             We've talked earlier about the two different types of

11   evidence, direct evidence that something happened and

12   circumstantial evidence to prove a fact.

13             You may use both types of evidence in reaching your

14   verdict.  Direct evidence is simply, evidence which if accepted

15   by you as credible, directly proves a fact at issue.

16             An example of direct evidence occurs when a witness

17   testifies about something that the witness knows from his or her

18   own senses, the witness saw it, the witness heard it, the

19   witness touched it, the witness smelled it, the witness tasted

20   it.  So, it involves all of the senses.

21             Circumstantial evidence on the other hand, is evidence

22   which is accepted as credible by you, indirectly proves a fact

23   at issue.  It is evidence that proves one or more facts from

24   which you could reasonably find or infer the existence of some

25   other fact or facts at issue.

Charge of the Court                                    81

1          A reasonable inference, members of the jury is simply

2    a deduction or conclusion that reason, experience and common

3    sense leads you to make from the evidence presented.  A

4    reasonable inference is not a suspicion or a -- or a guess or

5    conjecture.  It is a reasoned, logical decision to find that a

6    disputed fact exists on the basis of another fact proven.

7          I gave you the example earlier of if someone was to

8    walk in to this courtroom wearing a wet raincoat or carrying a

9    -- and carrying a wet umbrella, that would be circumstantial

10   evidence or indirect evidence from which you, the jury, could

11   find or conclude that it was raining outside.  You would not

12   have to find that it was, but you could find that it was raining

13   outside.

14         Sometimes, different inferences may be drawn from the

15   same set of facts or circumstances.  The Government, on the one

16   hand, may ask you to draw one inference and the defense may ask

17   you to draw another.  You and you alone, must decide what

18   reasonable inferences you will draw based on all of the evidence

19   and your reason, experience and common sense.

20         You should consider all of the evidence that is

21   presented in this trial, direct or circumstantial, the law makes

22   no distinction between the weight that you, the jury, should

23   give either direct or circumstantial evidence.  It is for you,

24   the jury, to decide how much weight to give any of the evidence,

25   whether direct or circumstantial.

Charge of the Court                                              82

1          If any reference by me or the lawyers to matters of

2    testimony or exhibits does not coincide with your recollection

3    of the evidence, I want you to know, members of the jury, that

4    it is your recollection which -- which should control during

5    your deliberations and not the statements of the Court or of the

6    attorneys.  You are the sole judges of the evidence received in

7    this case and that -- and that responsibility, nobody can

8    infringe upon your duties.

9          As I said during my preliminary instructions at the

10   beginning of the trial, in deciding what the facts are, you must

11   decide what you believe and what testimony do you not -- you do

12   not believe.  You are the sole judges of the credibility of the

13   witnesses.

14         Credibility refers to whether a witness is worthy of

15   belief.  Was the witness truthful?  Was the witness's testimony

16   accurate?  Remember, members of the jury, that you could believe

17   everything a witness tells you or only part of it or none of it.

18         Think if you will of a toaster oven and the toast, you

19   put the toast in the toaster oven, you take it out, sometimes,

20   you scrape it and eat the toast.  Sometimes, you take it out,

21   it's burnt, you cut one half and eat one half and sometimes, you

22   get it out and you just have to throw it away. That's pretty

23   much, the same process that you go about in deciding whether to

24   believe all, none or part of a witness's testimony.

25         You may decide whether to believe a witness based on

1  his or her own behavior or manner of testifying from the witness

2  stand, the explanation that the witness gave and all of the

3  other evidence in the case, just as you would in any important

4  matter where you are trying to decide for yourselves, whether

5  the witness is being truthful, straightforward and accurate in

6  his or her recollection of events.

7          In deciding the questions of credibility, remember to

8  use your good common sense, our good judgment and your

9  experience as you have lived life.

10          In deciding what to believe, you may consider a number

11  of factors, such as, the opportunity and the ability that the

12  witness had to see or hear or know the things about which the

13  witness testified from the witness stand.  The quality of the

14  witness's knowledge, understanding and the witness's memory.

15  The witness's appearance, behavior or manner -- and manner --

16  while the witness was testifying.  Whether the witness has any

17  interest in the outcome of the case or any motive, bias or

18  prejudice.  Any relation, the witness may have with a party in

19  the case and any effect, the verdict may have on the witness.

20          Whether the witness said or wrote anything before the

21  trial, that was different from the witness's testimony here in

22  court.  Whether the witness's testimony was consistent or

23  inconsistent with the other evidence that you believe and any

24  other factors that bear upon whether the witness should be

25  believed by you.

1     Remember, inconsistency or discrepancies between

2   witnesses or discrepancies and inconsistencies of a witness, ah,

3   may be different and may not cause you to disbelieve a witness,

4   just because there are inconsistences.  Remember that two or

5   more people witnessing an event, simply see it or hear it happen

6   differently.  A mistake in recollection, like failure to

7   recollect is a common human experience.

8     In weighing the effect of an inconsistency, however,

9   you should also consider whether it was about a matter of

10   importance or an insignificant detail.  And you should also

11   consider whether the inconsistent -- inconsistency -- was

12   innocent or intentional.

13     You are not required to accept the testimony even if

14   the testimony was not contradicted and the witness was not

15   impeached.  You may decide that the witness is not worthy of

16   your belief, because of the witness's bearing and demeanor or

17   because of the inherent improbability of the witness's testimony

18   or for other reasons that are sufficient to you.

19     After you made up your own judgment about whether to

20   accept the testimony of the witness as credible, you can then

21   attach to that witness's testimony, the importance or the weight

22   that you think it deserves to receive.

23     The weight of the evidence to prove a fact, does not,

24   necessarily, depend on the number of witnesses who testify or

25   the quantity of evidence that was presented.  What is more

Charge of the Court                                    85

1  important than numbers or quantity is how credible the witnesses

2  were and how much weight you think their testimony deserves to

3  receive.

4          During the course of the trial, you heard testimony of

5  law-enforcement officers.  The fact that a witness is employed

6  as a law-enforcement officer does not mean that his or her

7  testimony, necessarily, deserves more or less consideration or

8  greater or less weight than that of any other witness.

9          At the same time, it is quite legitimate for defense

10  counsel to try to attack the credibility of law-enforcement

11  witnesses on the ground that his or her testimony may be colored

12  by a personal or professional interest in the outcome of the

13  case.  You must decide after considering and reviewing all of

14  the evidence, whether you believe the testimony of a law-

15  enforcement witness and how much weight, if any, it deserves to

16  receive.

17          Now, members of the jury, the Rules of Evidence

18  ordinarily do not allow witnesses to state their opinions about

19  important questions in a trial, but there are some exceptions to

20  these rules.

21          And in this case, you heard testimony from Detective

22  David Schanes, because of his knowledge, skill, experience,

23  training or education in the field of computer forensic, I

24  permitted him to testify as an expert and to offer an opinion in

25  his area or field and the reasons for those opinions.

1          The opinion this witness stated, should receive

2     whatever weight you think appropriate, given all of the other

3     evidence in this case.

4          In weighing this opinion and testimony, you may

5     consider the witness's qualifications, the reasons for the

6     witness's opinions and the reliability of the information

7     supporting the witness's opinions, as well as the other factors

8     discussed in these instructions for -- for weighing the

9     testimony of witnesses.

10         You may disregard the opinion entirely, if you decide

11    that Detective Schanes' opinion is not based on sufficient

12    skill, experience, training or education.  You may also

13    disregard the opinion, if you conclude that the reasons give in

14    support of the opinions are not sound or if you conclude that

15    the opinion is not supported by the facts shown by the evidence

16    or if you think that the opinion is outweighed by the other

17    evidence.

18         Although the Government is required to prove the

19    defendant, Christopher Steele, guilty beyond a reasonable doubt,

20    the Government is not required to present all possible evidence

21    related to the case or to produce all possible witnesses, who

22    might have some knowledge about the case -- about the facts of

23    this case.

24         In addition, as I have explained to you, Mr. Steele is

25    not required to present any evidence or produce any witnesses in

1    this case.  Mr. Steele presented evidence and produced

2    witnesses, but remember, that he is not required to present all

3    possible evidence related to the case or to produce all possible

4    witnesses, who may have some knowledge about the facts of this

5    case.

6              Members of the jury, the defendant, Christopher Steele

7    has pleaded not guilty to the offenses charged in the

8    indictment.  Mr. Steele is presumed to be innocent.  He began

9    the trial with a clean slate with no evidence against him.

10             The presumption of innocence stays with Mr. Steele

11   unless and until the Government presents evidence that overcomes

12   that presumption by convincing you, the jury, that he guilty of

13   the offenses charged beyond a reasonable doubt.

14             The presumption of innocence requires that you'd find

15   Mr. Steele not guilty, unless you are satisfied that the

16   Government has proved guilt beyond a reasonable doubt.

17             The presumption of innocence means that Mr. Steele has

18   no burden or obligation to present any evidence at all or to

19   prove that he is not guilty.  The burden or obligation of proof

20   is on the Government to prove that Mr. Steele is guilty and this

21   burden stays with the Government throughout the trial.

22             In order for you to find Mr. Steele guilty of the

23   offense charged, the Government must convince you, the jury,

24   that Mr. Steele is guilty beyond a reasonable doubt.  That means

25   that the Government must prove each and every element of the

1    offenses charged beyond a reasonable doubt.

2            A defendant may not be convicted based on suspicion,

3    conjecture or surmise, but only on evidence proving guilt beyond

4    a reasonable doubt.

5            Proof beyond a reasonable doubt, does not mean proof

6    beyond all possible doubt or to a mathematical certainty.

7    Possible doubt or doubts based on conjecture or speculation or

8    surmise are not reasonable doubts.  A reasonable doubt is a fair

9    doubt based on reason, logic, common sense or experience.  A

10   reasonable doubt means a doubt that would cause an ordinary,

11   reasonable person to hesitate to act in matters of importance in

12   his or her own life.  It may arise from the evidence or from the

13   lack of evidence or from the nature of the evidence.

14           If having now heard all of the evidence, you are

15   convinced that the Government proved each and every element of

16   the offenses charged beyond a reasonable doubt, you should

17   return a verdict of guilty for that offense.  If, however, you

18   have a reasonable doubt as to an element of the offense, then

19   you must return a verdict of not guilty of that offense.

20           The punishment provided by law for the crimes charged

21   in the indictment is a matter exclusively for the Court to

22   decide and should never be considered by the jury in any way in

23   arriving at a fair and impartial verdict as to the crimes

24   charged.

25           Members of the jury, a defendant has a constitutional

1  right not to testify, however, if he chooses to testify, he is,

2  of course, permitted to take the stand on his own behalf.  In

3  this case, the defendant, Christopher Steele testified on his

4  own behalf, you should examine and evaluate his testimony just

5  as you would the testimony of any witness.

6          The Government introduced evidence that the defendant,

7  Christopher Steele made statements to law-enforcement officers.

8  I caution that you may consider the defendant's statements to

9  law-enforcement officers only in resolving whether the defendant

10  is guilty or not guilty.  You must decide whether the defendant

11  did, in fact, make the statement.  If you find that he did make

12  the statement, then you must decide what weight, if any, you

13  feel the defendant deserves to receive.  In making this

14  decision, you should consider all matters in evidence having to

15  do with the statement, including those concerning the defendant,

16  himself, and the circumstances under which the statement was

17  made.

18          If after considering the evidence, you determine that

19  a statement was made voluntarily, you may give it such weight as

20  you feel it deserves to receive under the circumstances.  On the

21  other hand, if you determine that the statement was not made

22  voluntarily, you must disregard it.

23          In determining whether any of his statement was

24  voluntary, you should consider Mr. Steele's age, training,

25  education, occupation, physical and mental condition and his

1  treatment while in custody or under interrogation as shown by

2  the evidence in this case.  Also, consider all of the

3  circumstances and evidence surrounding the making of the

4  statement.

5          You may recall, that the defendant, Christopher Steele

6  testified during the trial on his own behalf.  You will also

7  recall there was evidence that the defendant made a statement to

8  law-enforcement officers before the trial, this earlier

9  statement by the defendant was brought to your attention in part

10 to help you decide if you believe what the defendant testified

11 here in court.  If you find that the defendant once said

12 something different, then you should decide if what he said here

13 in court was true.  In addition, however, you may consider the

14 earlier statement as evidence of Mr. Steele's guilt.

15         You have heard reputation evidence about whether the

16 defendant has a character trait for truthfulness, you should

17 consider this character evidence together with and in the same

18 ways as all of the other evidence in this case in deciding

19 whether the Government has proved the charges beyond a

20 reasonable doubt.

21         Members of the jury, under our system of justice, you

22 took an oath as jurors, you are not to be swayed by sympathy or

23 by bias.  You are only to be guided solely by the evidence in

24 this case.  And the crucial, hard-fact questions, you must ask

25 yourself as you sift through the evidence is, whether you --

1    where is the truth?  This is a quest for truth as to the facts,

2    that is what trials are all about.  It's not a battle of the

3    wits, it's not a contest of salesmanship, it is not a contest of

4    personality, it's only trump -- the only trump in any case is

5    whether or not, the truth has trumped.  If it has, then justice

6    has been done, if not, justice would not have been done.

7            Remember that the burden of proof at all times rests

8    with the Government to prove the charges beyond a reasonable

9    doubt.

10           The conduct charged in the indictment is illegal under

11   federal law.  The issue and only issue for you to decide is,

12   whether or not, the defendant, Christopher Steele had violated

13   the law.  You are to determine the guilt or the innocence of Mr.

14   Steele, solely, on the basis of the evidence and the law as I

15   have now given it to you.

16           If you find that the law has been violated, you should

17   not hesitate for any reason to return a verdict of -- if you

18   find that the law has not been violated, you should not hesitate

19   for any reason to return a verdict of not guilty.  If on the

20   other hand, you find beyond a reasonable doubt, that the law has

21   been violated as charged, you should not hesitate to render a

22   verdict of guilty, because sympathy, bias, prejudice, fear of

23   public opinion or your views as to the propriety or social

24   desirability of this conduct.

25           In sum, you must not decide this matter based on

Charge of the Court                                          92

1   anything, other than the evidence in this case and the law as I

2   have given it to you as you said under your oath that you could

3   at the time of your selection as members of the trial jury.

4          Motive is not an element of the offenses charged with

5   which the defendant, Christopher Steele has been charged.  Proof

6   of bad motives is not required to convict.  Furthermore, proof

7   of bad motives, alone, does not establish that a defendant is

8   guilty and proof of good motives, alone, does not establish that

9   a defendant is not guilty.  Evidence of the defendant's motive

10  may, however, help you find the defendant's intent.

11         Intent and motive are two different concepts.  Motive

12  is what prompts a person to act.  Intent refers only to the

13  state of mind, which the particular act is done.  Personal

14  advancement, for example, and financial gain are motives for

15  much of human conduct, however, these motives may prompt one

16  person to intentionally do something perfectly acceptable, while

17  prompting another person to intentionally do an act that is a

18  crime.

19         Members of the jury, the defendant, Christopher Steele

20  is charged with more than one offense.  Each offense is charged

21  in a separate count of the indictment and we have three counts.

22         The number of offenses charged, is not evidence of

23  guilt and -- and this should not influence your decision in any

24  way.  You must separately consider the evidence that relates to

25  each offense and you must return a separate verdict as to each

Charge of the Court                                    93

1   offense.  For each offense charged, you must decide whether the

2   Government has proved the charges beyond a reasonable doubt and

3   has proven beyond a reasonable doubt, that Mr. Steele is guilty

4   of that particular offense.

5            Your decision on one offense, whether guilty or not

6   guilty should not influence your decision on any of the other

7   offenses charged, each offense should be considered separately.

8            Members of the jury, as you know, the defendant,

9   Christopher Steele is charged in the indictment with violating

10  federal law.  The indictment contains three separate counts.

11           Count 1 charges Christopher Steele with -- with the

12  use of an interstate commerce facility, namely, the Internet to

13  entice a minor to engage in sexual activity.

14           Count 2 charges Christopher Steele with interstate

15  travel with the purpose of engaging in an illicit sexual conduct

16  with a minor.

17           And Count 3 charges Christopher Steele with the use of

18  an interstate commerce facility, namely, the Internet to receive

19  child pornography.

20           As I've explained to you at the beginning of the

21  trial, an indictment is just the formal way of specifying the

22  exact crimes the defendant is accused of committing.  An

23  indictment is simply a description of the charges against the

24  defendant, it is an accusation only.  An indictment is not

25  evidence of anything and you should not give any weight to the

1   fact, that Mr. Steele has been indicted in making your decision

2   in this case.

3          You will note, that the indictment charges that acts

4   were committed on or about certain dates.  The Government does

5   not have to prove with certainty, the exact date of the alleged

6   offense.  It is sufficient, if the Government proves beyond a

7   reasonable doubt, that the offense was committed on a date

8   reasonably near the date alleged.

9          Before I discuss with you, the elements of the

10  offenses charged in the indictment, I want to instruct you in

11  the meaning of the word, and -- a-n-d -- and, when it is used in

12  statutes or indictments.

13         Where a statute specifies several alternate ways in

14  which an offense may be committed, the indictment may allege the

15  several ways in the conjunctive, that is, by using the word,

16  and.

17         If only one of the alternatives of those alter -- if

18  only of those alternatives, however, is proved -- proven --

19  beyond a reasonable doubt, that is sufficient for a conviction.

20         Members of the jury, the indictment alleges that some

21  acts in furtherance of the offense charged occurred here in the

22  Eastern District of Pennsylvania.  There is no requirement that

23  all aspects of the offenses charged take place here in the

24  Eastern District of Pennsylvania.  But for you to return a

25  guilty verdict, the Government must convince you that some acts

1    in furtherance of the substantive crime charged took place here

2    in the Eastern District of Pennsylvania.

3            Unlike all of the elements that I will describe,

4    venue, only has to be proved by a preponderance of the evidence.

5    This means the Government only has to convince you, that it is

6    more likely than not, that some acts -- that some act in

7    furtherance of the crime charged -- charged -- took place here

8    in the Eastern District of Pennsylvania.

9            Remember, that the Government must prove all elements,

10   I will describe to you, beyond a reasonable doubt.

11           So, that concludes the first part of my instructions,

12   members of the jury.  I'm now going to turn to the charges.

13           The defendant, Christopher Steele is charged in the

14   indictment with committing three offenses:

15           Count 1 of the indictment charges the use of an

16   interstate commerce facility to entice a minor to engage in

17   sexual activity in violation of Section 2422(b) of Title 18 of

18   the United States Code.

19           In order for the defendant to be found guilty of this

20   charge, the Government must prove each of the following elements

21   beyond a reasonable doubt:

22           One, that the defendant knowingly used a facility and

23   means of interstate and foreign commerce, that is, the Internet.

24           Two, that while doing so, he did knowingly persuade,

25   induce, entice or coerce an individual under the age of

Charge of the Court                                     96

1    eighteen.

2            Three, to engage in sexual activity.

3            And fourth, for which any person could be charged with

4    a criminal offense.

5            For the purpose of federal child-pornography law, a

6    minor is defined as any person under the age of eighteen years.

7            The offense charged in Count 1 of the indictment

8    requires that the Government prove beyond a reasonable doubt,

9    that Christopher Steele acted knowingly in using the Internet to

10   persuade, induce, entice or coerce a person, who had not

11   attained the age of eighteen years to engage in sexual activity

12   for which a person could be charged with a criminal offense.

13   This means, that the Government must prove that Christopher

14   Steele was conscious and aware of the nature of his actions and

15   of the surrounding facts and circumstances as specified in the

16   definition of the offense charged.

17           In deciding whether Christopher Steele acted

18   knowingly, you may consider evidence about what Christopher

19   Steele said, what CS did and failed to do, how Christopher

20   Steele acted and all of the other facts and circumstances shown

21   by the evidence that may prove what was in Christopher Steele's

22   mind at the time.  The Government is not required to prove that

23   Christopher Steele knew his acts were against the law.

24           Often, the state of mind with which a person acts at

25   any given time cannot be proved directly, because one cannot

1    read another person's mind and tell what he or she is thinking,

2    however, Christopher Steele's state of mind can be proved

3    indirectly from the surrounding circumstances.  Thus, to

4    determine what Christopher Steele intended or knew at a

5    particular time, you may consider evidence about what

6    Christopher Steele said, what he did and failed to do, how he

7    acted and all of the other facts and circumstances shown by the

8    evidence and may prove what was in Christopher Steele's mind at

9    the time.

10          It is entirely up to you to decide what the evidence

11   presented during this trial proves or fails to prove about

12   Christopher Steele's state of mind.

13          You may also consider the natural and probable results

14   or consequences of any acts Christopher Steele knowingly did and

15   whether it is reasonable to conclude that Christopher Steele

16   intended those results or consequences.  You may find -- but are

17   not required to find -- that Christopher Steele knew and

18   intended the natural and probable consequences or results of his

19   -- of acts, he knowingly did.

20          This means that if you find, an ordinary person in

21   Christopher Steele's situation would have naturally realized

22   that certain consequences that would result from his actions,

23   then you may find -- but are not required to find -- that

24   Christopher Steele did know and did intend that those

25   consequences would result from his actions.  This is entirely up

Charge of the Court                                    98

1    to you to decide as the finders of facts in this case.

2          The term, interstate commerce simply means travel,

3    trade, traffic, commerce, transportation or communications among

4    or between on state of the United States and another state of

5    the United States by commerce, it includes commerce with foreign

6    countries.  This means that the visual depiction was produced

7    using materials that have traveled or moved between one state or

8    a foreign county.

9          In Count 1 of the indictment, it is charged that the

10   defendant used a means or facility of interstate or foreign

11   commerce, that is, the Internet.  It doesn't matter whether the

12   defendant knew that the Internet was a facility of interstate or

13   foreign commerce.  The Government only has to prove that the

14   defendant, actually, used the Internet in the communication of

15   this crime.

16         The words, induce or persuade or entice or coerce

17   should be given their ordinary meaning as you understand them.

18         For this offense, sexual activity means any sexual act

19   which can be charged as a criminal offense under any applicable

20   federal or state law.

21         You are instructed, oral sex, which is sex by mouth of

22   one person with the genitals of another and anal sex, penile

23   penetration of the anus of another with a person, who is under

24   sixteen years of age and the defendant, who is four or more

25   years older are crimes under the laws of the Commonwealth of

1   Pennsylvania.  There is no requirement that the defendant

2   completed a sex act with the intended victim.

3          That concludes Count 1.

4          Count 2 of the indictment charges Christopher Steele

5   with interstate travel with the intent to engage in illicit

6   sexual conduct with a minor, in violation of Section 2423(b) of

7   Title 18 of the United States Code.

8          In order for the defendant to be found guilty of this

9   charge, the Government must prove beyond a reasonable doubt, the

10   following elements:

11          First, that the defendant crossed the state line with

12   intent to engage in sexual -- in a sexual act -- with a minor.

13          In this case, Minor 1 testified during the course of

14   the trial.  That Minor 1 had reached age of twelve years, but

15   had not yet reached the age of sixteen years.

16          And third, that Minor 1 was, at least -- at least,

17   four years younger than the defendant.  The testimony was, he

18   was fourteen at the time and the defendant is in his thirties --

19   in his thirties.

20          If you find from your consideration of all of the

21   evidence that the Government has proved each of the elements

22   beyond a reasonable doubt, then you should find the defendant

23   guilty.  On the other hand, if you find from your consideration

24   of all of the evidence, that the Government has failed to prove

25   any of these elements beyond a reasonable doubt as to Count 2,

1   then you should find the defendant not guilty of this charge.

2        It is not necessary for the Government to prove that a

3   criminal sexual act was the sole purpose for a defendant

4   traveling from one state to another.  A person may have more

5   than one dominant purpose for traveling across state lines.

6        The illicit sexual conduct, it means sexual acts with

7   a person under eighteen years of age.  Sexual act is defined

8   under Title 18, Section 2246(2) to mean, contact between the

9   penis and the vulva or the penis and the anus.  And for the

10  purpose of this paragraph, contact involving the penis occurs

11  when -- occurs upon -- penetration however slight.  Contact

12  between the mouth and the penis, the mouth and the vulva or the

13  mouth and the anus.  The penetration however slight of the anal

14  or genital opening of another by a hand or finger or any object

15  with the intent to abuse, humiliate, harass, degrade or arouse

16  or gratify the sexual desire of another person or the

17  intentional touching, not through the clothing of the genitalia

18  of another person, who has not attained the age of sixteen years

19  with the intent to abuse or humiliate, harass, degrade or arouse

20  or gratify the sexual desire of any -- of any person.

21       Count 3 charges in the indictment, Christopher Steele

22  with the receipt of child pornography, in violate of Section

23  2252(a)(2) of Title 18 of the United States Code.

24       In order to prove -- in order to prove the defendant

25  to be found guilty of that charge, the Government must prove

1   each of the following elements beyond a reasonable doubt:

2          One, that the defendant used any means or facility of

3   interstate or foreign commerce, that is, the Internet in and

4   affecting interstate or foreign commerce.

5          Two, that he did so, knowingly receive material that

6   the defendant knew contained visual depiction of minors engaged

7   in sexual explicit conduct.

8          And three, the producing of the visual depiction

9   involved the use of a minor engaged in sexually-explicit

10  conduct.

11         Visual depiction includes undeveloped film and

12  videotape, data that has been stored on a computer disk or data

13  that has been stored by electronic means and that capable of

14  conversion into visual image.

15         A minor is any person under eighteen years of age.

16         Sexually-explicit conduct means actual or simulated

17  sexual intercourse, including genital oral -- genital anal --

18  and genital oral and anal -- whether between persons of the same

19  or opposite sex, fistality (ph), masturbation, sadistic or

20  masochistic abuse or lascivious exhibition of the genitals or

21  public areas of any person.

22         Computer means an electronic, magnetic, optical

23  electrochemical or other high speed data processing device,

24  performing logical arithmetic or storage function and includes

25  any data storage facility or communication facility directly

1  related to or operating in conjunction which such device, but

2  such terms does not include an automatic typewriter or

3  typesetter or a portable, hand-held calculator or other similar

4  devices.

5        There is no dispute in this case, that the computers

6  which the Government seized from the defendant's residence

7  pursuant to the search warrant meets the definition of computer

8  under the definition that I have given you in the law.

9        As previously instructed to you, members of the jury,

10  the term, interstate commerce simply means travel, trade

11  traffic, commerce, transportation or communication among or

12  between one state of the United States and another state of the

13  United States.  Foreign commerce includes commerce with a

14  foreign country.  This means that the visual depiction was

15  produced using materials that have traveled or moved between one

16  state or foreign country and another.

17        The interstate or foreign transport of images can be

18  accomplished by several means, including the transmission of

19  visual images that cross telephone lines by way of computer.

20        Because of the interstate and foreign nature of the

21  Internet, if you find beyond a reasonable doubt, that the

22  defendant used the Internet in receiving a visual depiction of a

23  minor engaged in sexually-explicit conduct, then that visual

24  depiction traveled in interstate or foreign commerce.  It does

25  not matter whether the computer that visual -- strike that.

1     It does not matter whether the computer that visual

2   depiction was transported to was in Pennsylvania and it does not

3   matter whether the visual depiction he possessed was transmitted

4   from within Pennsylvania.  If the Internet was used in moving

5   these visual depictions, then it traveled in interstate

6   commerce, as I am instructing you that item received or -- or

7   transmitted over the Internet had moved in interstate or foreign

8   commerce.  It is for you to determine how, whether the

9   particular image at issue in Count 3 was transmitted or received

10  over the Internet.

11     And lastly, it does not matter whether the defendant

12  knew that child pornography had moved in interstate or foreign

13  commerce, the Government only has to prove that the child

14  pornography actually did move in interstate or foreign commerce.

15     The term, child pornography means any visual

16  depiction, including any photograph, film, video, picture or

17  computer -- or computer-generated image or picture, whether made

18  or produced by electronic, mechanical or other means of

19  sexually-explicit conduct, where the production of such visual

20  depiction involves the use of a minor engaging in sexually-

21  explicit conduct.

22     In order to determine whether a visual depiction is a

23  lascivious exhibition of the genitals or public area, you must

24  consider the overall content of the visual depiction or taking

25  into account the age of the child depicted.

1    The following lists the factors -- while not

2  exhaustive -- are among the things that you should consider:

3    Whether the focal point of the visual depiction is on

4  the child's genitals or -- or pubic area.  I think I said,

5  something, it's pubic area.

6    Whether the setting of the visual depiction is

7  sexually suggestive in play or pose, generally associated with

8  sexual activity.

9    Whether the child is depicted in an -- in an unnatural

10  pose or in inappropriate attire, considering the age of the

11  child.

12    Whether the child is fully or partially clothed or

13  nude.

14    Whether the visual depiction suggests sexual coyness

15  or willingness to engage in sexual activity.

16    Whether the visual depiction is intended or design to

17  elicit a sexual response in the viewer.

18    It is not necessary that the images be intended or

19  designed to elicit sexual response in the average view.  And you

20  consider -- and you must consider -- whether the visual

21  depictions will appeal to persons, who are sexually attracted to

22  a child -- the pedophile.

23    Of course, a visual depiction need not involve all of

24  these factors to be a lascivious exhibition and it is for you to

25  decide the weight or the lack of weight to be given to any of

1   these factors.

2            Members of the jury, that concludes my instructions on

3   Part 1 and Part 2 of the instructions.  I am going to ask

4   whether the lawyers want me to clarify anything else with

5   regards to Part 1 and Part 2, if so, I will clarify it, if not,

6   I will proceed to give you my concluding remarks.

7            Okay. Do you want to see me at side bar?

8            (Discussion at side bar held on the record at 1:47

9   p.m.)

10           THE COURT:  Page -- page?

11           MS. ROTELLA:  I'm sorry, Judge.  43.

12           THE COURT:  43.  Did I get something wrong, did I --

13           MS. ROTELLA:  Just -- 43.

14           THE COURT:  I'm on 43, yeah, go ahead.

15           MS. ROTELLA:  I just -- the --

16           (Indiscernible conversation at side bar.)

17           MS. ROTELLA:  I don't want them to get confused and

18   think they -- something else.

19           THE COURT:  All right.

20           So, what -- what do you want me to clarify?

21           MS. ROTELLA:  There's no dispute that the cell phone

22   reached the --

23           THE COURT:  Okay.

24           MS. ROTELLA:  -- Government's -- the computer.  That's

25   all.

1         THE COURT:  Okay.  The cell phone -- yeah, okay.  I'll

2   make that clarification.

3         MS. ROTELLA:  And whether the computer --

4         THE COURT:  What -- okay.

5         MS. ROTELLA:  -- Page 45.

6         It doesn't matter whether the computer -- if the

7   visual depiction was transported to -- it was on a computer, it

8   was on this -- on his Jack'd account, which was his cell phone.

9         THE COURT:  All right.

10         MS. ROTELLA:  So, we can substitute cell phone for --

11         THE COURT:  So, it does not matter whether the

12   computer --

13         MS. ROTELLA:  Right, the cell phone.

14         THE COURT:  Okay.

15         MS. ROTELLA:  That's all.

16         THE COURT:  All right.  Do you agree?

17         MR. WRAY:  Yes.

18         THE COURT:  All right.  That's -- that's fine.

19         We'll make that change in the -- in the jury -- in the

20   pages --

21         DEPUTY CLERK:  The jury --

22         THE COURT:  -- yes, yes, that will be done.

23         (Concluded at side bar at 1:48 p.m.)

24         THE COURT:  Just one clarification, members of the

25   jury, so there is no confusion.

1      If you recall, there was testimony that following the

2  execution of the search warrant at the defendant's house, the

3  cell phone was seized.  And I -- I said, computer, but this is

4  what I -- I think -- I should have read when I gave you the

5  definition of visual depiction, sexually-explicit conduct and

6  computer.

7      There is no dispute in this case, that the cell phone

8  which the Government seized from the defendant's residence

9  pursuant to a search warrant meets the definition of computer

10 under the law.  Cell phone is a computer.

11     And I think I -- I need to clarify that on Page 43 of

12 my instructions, which you will have in the jury room and on

13 Page 44.  Again, I've got to substitute:

14     It is not -- it does not matter -- whether the cell

15 phone that visual depiction was transported to was in

16 Pennsylvania and it doesn't matter whether the visual depiction

17 he possessed was transmitted from within Pennsylvania, the cell

18 phone, it should be substituted for the word of computer on

19 Pages 44.  I will make the correction in the instructions that I

20 am going to give you, so that you will have them available

21 during your deliberations.

22     But with that, correction, I think, I've concluded

23 Part 1 and Part 2 of my instructions and now, I am going to give

24 you my concluding remarks and in a few minutes, you're going to

25 have the case.

1        So, again, that concludes my instructions explaining

2   the law, regarding the testimony and the other evidence and the

3   offenses charged.

4        Now, let me explain to you, how you go about your

5   deliberations in the jury room and your possible verdict.

6        The first thing that you should do is for you to

7   choose someone in the jury room to be the presiding juror.  The

8   presiding juror will speak for the jury here in open court.  He

9   or she will also preside over your discussions, however, the

10  views and the vote of the presiding juror is entitled to no

11  greater weight than those of any of the other fellow jurors.

12       Second, I want to remind you that your verdict

13  regarding each count against -- against each -- against the

14  defendant, whether he's guilty or not guilty, it must be

15  unanimous.  So, your verdict must be unanimous as to each count.

16       To find a defendant guilty of one or more of the

17  offenses with which he has been charged, every one of you must

18  agree that the Government has overcome the presumption of

19  innocence with evidence that proved each element of the offenses

20  charged beyond a reasonable doubt.  To find a defendant not

21  guilty of an offense, every one of you must agree that the

22  Government has failed to convince you beyond a reasonable doubt.

23       Third, if you decide that the Government has proved a

24  defendant guilty of an offense, then it will be my

25  responsibility to decide the appropriate punishment or what the

1    appropriate punishment should be.  You should never consider the

2    possible punishment in reaching your verdict.

3           Fourth, as I have said before, your verdict must be

4    based solely on the evidence received in this case and the law

5    that I have given to you.  You should not take anything that I

6    might have said or done during the course of the trial as

7    indicating to you what I think of the evidence or about what

8    your verdict should be.  What the verdict should be is the

9    exclusive responsibility of you, the trial jury.

10          Fifth, now that all of the evidence is in and the

11   arguments are completed and I have finished my instructions, you

12   will be free to talk about the case in the jury room to your

13   heart's content.  In fact, it is now your duty to talk with each

14   other about the evidence and to make every reasonable effort you

15   can to reach a unanimous agreement.  Talk with each other,

16   listen carefully and respectfully to each other's views and keep

17   an open mind as you listen to what your fellow jurors have to

18   say.

19          Do not hesitate to change your mind, if you are

20   convinced that the other jurors are right and that your original

21   position was wrong.  But do not ever change your mind, just

22   because other jurors see things differently or just to get the

23   case over with.  In the end, your vote must be exactly that,

24   your own vote.  It is important for you to reach a unanimous

25   agreement, but only if you can do so honestly and in good

1  conscience.  Listen carefully to what the other jurors have to

2  say and then, decide for yourself, if the Government has proven

3  the defendant guilty beyond a reasonable doubt.

4        No one will be allowed to hear your deliberations and

5  discussions in the jury room and no record will be made of

6  whatever you say.  You should also all feel free to speak your

7  minds.

8        Remember, if you elected to take notes during the

9  course of the trial, your notes should be used only as memory

10  aids.  You should not give your notes greater weight than your

11  independent recollection of the evidence.  You should rely upon

12  your own independent recollection of the evidence or the lack of

13  evidence and you should not be unduly influenced by the notes of

14  your other jurors.  Notes are not entitled to any greater weight

15  than the memory or impression of each juror.

16        Sixth, once you start deliberating, do not talk about

17  the case to the court officials, who will be standing outside

18  the courtroom or to me or to anyone, except to each other.

19        During your discussions and deliberations, you may not

20  use any electronic devices or media, such as telephone, cell

21  phone, Smart Phone, iPhone, Blackberry or computer, the

22  Internet, any Internet service or any text or Internet-messaging

23  service or Internet chat room, blog or website, such as

24  Facebook, MySpace, Linked-In, YouTube or Twitter, to communicate

25  with anyone any information about this case or to conduct any

1    research about this case.

2           If you have any questions or messages, your presiding

3    juror should write it down on a piece of paper, sign it, date it

4    and give it to the court official, who will then deliver it to

5    my staff, who will deliver it to me.  I generally, will speak to

6    the lawyers about it and I will get to you as soon as I can.  In

7    the meantime, you should continue with your deliberations on

8    another subject.

9           If you want to see any of the exhibits in evidence in

10   this case that were admitted during the course of the trial, you

11   may send me a message and if I can, legally, do so, I will give

12   you those exhibits, provide it to you.

13          One more thing about messages, do not ever write down

14   or tell anyone, how you or anyone else voted, that should be

15   secret until you have finished your deliberations.  If you have

16   any occasion to communicate with the Court while you are

17   deliberating, do not disclose the number of jurors, who have

18   voted to convict or to acquit on any of the offenses.

19          Members of the jury, I -- I have a verdict slip.

20          (Pause at 1:55 p.m.)

21          THE COURT:  Counsel, do you have a copy of the verdict

22   slip, I think --

23          MS. ROTELLA:  Yes, sir.

24          THE COURT:  -- my Law Clerk has it.  I have the old

25   one.

1        We have prepared a verdict slip for you, it's a one-

2   paged form.  There would be one titled, verdict form for each

3   one of you, so that you could follow the discussions.  But the

4   presiding juror will have to turn in one that is marked,

5   official verdict form -- official verdict form, it's the

6   official verdict of the jury, that has to be returned by the

7   presiding juror, so that would be recorded by the presiding

8   juror.

9        You will take this form into the jury room, when you

10  have reached a unanimous verdict as to each of the counts,

11  members of the jury, the presiding juror should write your

12  verdict on the form, date it, sign it, return it to the

13  courtroom and give it to my Courtroom Deputy, so that the Deputy

14  could give it to me.

15       If you decide that the Government has proved the

16  defendant guilty of the offenses charged beyond a reasonable

17  doubt, say so by having your presiding juror mark the

18  appropriate place on the form.  If you decide that the

19  Government has not proved the defendant guilty of the offenses

20  charged beyond a reasonable doubt, say so by having your

21  presiding juror mark the appropriate place on the form.

22       There are three counts:

23       Count 1, use of an Internet commerce facility to

24  entice a minor to engage in sexual conduct, guilty or not

25  guilty.

Charge of the Court                                113

1      Count 3 -- Count 2 -- Internet travel with the intent

2  to engage in illicit-sexual conduct with a minor, guilty, not

3  guilty.

4      Count 3, receipt of child pornography, guilty or not

5  guilty, date it, sign it and when you have reached a unanimous

6  verdict, we will take your verdict here in open court.

7      So, members of the jury, those are my instructions.  I

8  am going to direct that Jurors No. 1 through No. 12 go with my

9  Deputy Stacy Wertz.

10     We are going to swear in the correctional officer

11 here, so -- who is here and he will keep you safe during your

12 deliberations, he will be standing outside of the jury

13 deliberations.  But in a few minutes, I am going to send you to

14 the jury room.

15     DEPUTY CLERK:  Please raise your right hand.

16     (Correctional Officer, Sworn.)

17     THE COURT:  Okay.  Jurors 1 through 12, please follow

18 my Deputy and you may now begin your deliberations.

19     ESR OPERATOR:  All rise.

20     (Jury out at 1:58 p.m. to begin deliberations.)

21     THE COURT:  The Alternates, please, come close up here

22 at this time and you may take a seat.

23     Could you tell Stacy, I'm going to send this

24 electronic charge, the verdict slip and the indictment -- do you

25 have a copy of the indictment to send?

1          DEPUTY CLERK:  Sure.

2          THE COURT:  Yes.  And here is your verdict slip.

3   We're going to send it to the jury.  Mimi has it, so my Deputy

4   has it.

5          ESR OPERATOR:  Okay.

6          THE COURT:  So, she'll bring it in.

7          That -- that's for Ms. Rotella, she has to bring that

8   indictment to -- I'm confusing you, right?

9          A VOICE:  Sorry, Judge.

10         THE COURT:  No, yes.  She will have to have this.

11         So, Counsel, may I see you at side bar?

12         (Discussion at side bar held off the record at 1:59

13  p.m.)

14         THE COURT:  This is what I need you to do, why don't

15  you go in the jury room and get your bags and your cell phones

16  and then, come back into the courtroom, because I have to give

17  you some instructions.  All right.  You don't have anything,

18  you're fine, okay.

19         (Alternate jurors leave the courtroom at 2:00 p.m.)

20         (Discussion held off the record.)

21         (At 2:01 in open court.)

22         THE COURT:  Okay.

23         So, in consultation with the lawyers, I am going to

24  give you some instructions and a little bit of guidance as to

25  what going to happen next.

1          I am not going to dismiss you as jurors in this case,

2     you are still a potential juror in this case.  So, it's really

3     important that you continue to follow my instructions, not to

4     talk with each other about any of the evidence that you've heard

5     or any of the issues in this case, you cannot talk to each other

6     or anyone about the case.  Your responsibilities in connection

7     with this case are not over.

8          And that is, because I don't know how long the jury is

9     going to be out, I don't know whether in the process, I'd lose

10    one of the original jurors, in which case I would call upon you

11    to substitute and then, we'll start the deliberations all over,

12    if that happens.  And that is the way, I am going to assure that

13    this comes to an orderly conclusion.

14         So, it's really important that you still continue to

15    heed my instructions, not to talk among yourselves or with

16    anyone else.  Do not conduct any independent research of your

17    own.  Do not access information from an outside source using any

18    electronic devices.  Do not be tempted to get in any chat room

19    to find more information to supplement your knowledge about this

20    case or to get knowledge from another source -- or send out

21    information through these electronic devices to people in the

22    outside world about your experience here that would be highly

23    inappropriate and it could create serious problems for me and

24    for the court system.

25         So, to ensure that this case ultimately, is resolved

1   either today or at some other point in time, I need you to do

2   that.

3           So, I am going to permit you go home now, if -- if you

4   wish.  Mindful, that you could potentially be called back as a

5   juror and that you'd have to continue to heed my instructions.

6           If I get a verdict, my staff will call you and we'll

7   tell you that your services are no longer necessary.  But --

8   we'll call you, anyway, with the verdict -- but if I need you, I

9   always could call you.

10          So, you could go about your business tomorrow, if you

11  have to go to work or anything else and just be mindful that

12  until I call you and tell you, I have a verdict and your

13  services are no longer necessary, potentially, I could call you

14  and bring you back here.  Is that understood?

15          ALTERNATE JURORS:  Yes.

16          THE COURT:  Could you follow those instructions?

17          ALTERNATE JURORS:  Yes.

18          THE COURT:  Okay.

19          Now, you're welcome to go home if you wish and enjoy

20  the afternoon or if you decide to stay here to see what happens,

21  then I'll have to put you in a room separate from the rest of

22  the members of the public and we'd have to find a room in -- in

23  courthouse, so that you're comfortable.  But I don't want you

24  talking to each other about the case or anything like that.  Is

25  that clear?

1          ALTERNATE JURORS:  Yes.

2          THE COURT:  All right.

3          So, what is your preference?

4          ALTERNATE JURORS:  Go home.

5          THE COURT:  You want to go home, all right.

6          Well, okay, you're still part of my jury, but you

7     could go home, have a nice afternoon and hopefully, if I don't

8     -- if I get a jury today, you will be called, either, late today

9     or tomorrow morning.  But go about your business tomorrow as

10    usual.  Okay.

11         And -- and just in anticipation, thank you for your

12    services and I hope that the experience is a positive one,

13    allowing you -- how we select juries but also how we go about

14    trying cases in this -- in this courtroom.

15         And the lawyers have done a good job in not wasting

16    your time and getting to the issues that you need to decide.

17    So, have a nice afternoon.  Okay.

18         You don't need anything else, right, you're fine?

19    Okay.  You are -- you are dismissed until further notice.

20         ALTERNATE JURORS:  Thank you.

21         THE COURT:  You're welcome.

22         (Alternate jurors leave the courtroom at 2:05 p.m.)

23         (Discussion held off the record.)

24         THE COURT:  We've made the change.

25         MS. ROTELLA:  I'm sorry, I thought it was 43 and 44?

1          DEPUTY CLERK:  Oh, I'm sorry, so --

2          (Discussion held off the record.)

3          THE COURT:  What happened?  It was 43, 44, right?

4          DEPUTY CLERK:  The pagination was different, Judge,

5     because the jury isn't getting the first part of the --

6          THE COURT:  Oh.

7          MS. ROTELLA:  But I don't -- am I crazy, this is not

8     what we talked about.

9          THE COURT:  It was Page 43 and 44.

10          Why -- why don't we do this --

11          (Discussion held off the record.)

12          DEPUTY CLERK:  It's just the -- they aren't getting,

13    like, the first thirty pages, that's --

14          MS. ROTELLA:  Thank you.

15          DEPUTY CLERK:  Is that okay?

16          THE COURT:  All right.

17          But -- but I mean, how we did it, we changed the

18    numbers?

19          DEPUTY CLERK:  It's just because the pagination resets

20    when you take out the first part of it.  Like, I took out Page 1

21    of the --

22          THE COURT:  Okay.

23          DEPUTY CLERK:  -- jury instructions.  So, the numbers

24    are different.

25          THE COURT:  Should we tell them that?  I think we

1    should tell them, 'cause they may get confused.

2              MS. ROTELLA:  It is going to have a different page

3    number for them, too?

4              DEPUTY CLERK:  No, that's the page number they're

5    going to have.

6              THE COURT:  See, I -- I --

7              MS. ROTELLA:  Will it remain Page 43 and 44 for them?

8              THE COURT:  It will not remain --

9              MR. WRAY:  No.

10             MS. ROTELLA:  -- Page 43 and 44, right --

11             MR. WRAY:  It will just give the charge.

12             THE COURT:  -- you changed the page, right?

13             DEPUTY CLERK:  Right.

14             THE COURT:  Right.

15             So, this is -- this is -- all right -- so, have a

16   seat.

17             MS. ROTELLA:  Can't you just write on it in

18   handwriting?

19             THE COURT:  Yeah, we could write on it.

20             MS. ROTELLA:  And just insert it, where it goes?

21             THE COURT:  The problem is, I have a whole bunch of

22   copies, each juror is going to get a whole copy of it.

23             I think the best thing to do -- for me to do -- is

24   write them a little note saying, that the -- the changes -- that

25   -- because we are only giving them the second portion of the

1    instructions, the pagination changed and the changes that I

2    noted -- that I noted on the record -- are contained in the next

3    pages, Page 44 and 43 are now Page -- whatever the numbers are

4    -- what numbers are they?

5            MS. ROTELLA:  Well also, maybe, you can handwrite it

6    on there, so when -- and then, before you copy it, right?

7            THE COURT:  We could do that.

8            MS. ROTELLA:  Because now they're 12 and 13.

9            So, if you'd just handwrite it on and then, copy it,

10   then they won't be --

11           THE COURT:  Okay

12           MS. ROTELLA:  -- they can substitute it themselves,

13   too, right?

14           THE COURT:  Yes, they can.  Right.

15           So, the problem is, we made a whole bunch of copies,

16   but let me see what -- this is -- yeah, we're going to need to

17   change the --

18           (Discussion held off the record at 2:08 p.m.)

19           THE COURT:  Okay.  That's fine.  Everybody is going to

20   write here, so take a second and write.  We did change the

21   pagination.  We're trying to be efficient and this is --

22           DEPUTY CLERK:  Can you tell us what the original --

23           THE COURT:  The original pages were --

24           DEPUTY CLERK:  I need the -- the first page, the --

25           THE COURT:  Is there a way, we could just print --

1          DEPUTY CLERK:  Do you want me to just reprint again?

2          THE COURT:  Reprint them with the original numbers?

3          DEPUTY CLERK:  Yes.  That's fine.

4          THE COURT:  Okay.

5          DEPUTY CLERK:  I think that would be easier.

6          THE COURT:  Yes.

7          Print them with the original numbers to -- we're going

8 to reprint them with the original numbers.

9          MR. WRAY:  That's fine.

10         THE COURT:  Ms. Rotella.

11         MS. ROTELLA:  Yes, sir.

12         THE COURT:  We're going to print them with the

13 original numbers, so --

14         MS. ROTELLA:  Okay.

15         THE COURT:  -- that it's the original pagination,

16 okay?

17         DEPUTY CLERK:  Do you have a copy of --

18         THE COURT:  She was perfect until now.

19         (Laughter at 2:09 p.m.)

20         THE COURT:  And this is her second week on the job.

21         DEPUTY CLERK:  Sorry.  Do you have --

22         MR. WRAY:  So, your Honor, we're printing that middle

23 section with the original numbers?

24         THE COURT:  Right.

25         MR. WRAY:  Fine.

1          MS. ROTELLA:  What did you end up doing with the other

2    juror, No. 19?

3          THE COURT:  I scolded her.  She took a -- a small

4    break and it looks like, she went a little bit over.

5          (Recess is held at 2:10 p.m.)

6          (Resumed in open court at 3:07 p.m.)

7          THE COURT:  The jurors are asking for the following?

8          We, the jury, are requesting the pictures of Dominic

9    Huntzinger, that were recovered from Christopher Steele's cell

10   phone and the path where it was on the phone, if possible.

11         So, you have that right?

12         MS. ROTELLA:  Yes.

13         THE COURT:  May I -- may I have it?

14         MS. ROTELLA:  They can't get the -- they can't -- you

15   can't -- it's child pornography, so -- I mean, you could show

16   them, but it's not really supposed to go back with them.

17         THE COURT:  All right.

18         So, we've got -- what -- what is it, that we're going

19   to show them?

20         MS. ROTELLA:  It's a -- it's -- I'll show you, if

21   you'd like, it's a picture -- it's a picture of the victim with

22   his legs, back and his anus.

23         THE COURT:  Oh, okay.

24         MS. ROTELLA:  And --

25         THE COURT:  So, we need to set it up, so that shows

1    him -- them.

2              MS. ROTELLA:  Hm-hmm.

3              THE COURT:  And what is the path, what is the --

4              MS. ROTELLA:  That's the e-mail, the --

5              THE COURT:  Exhibit 40?

6              MS. ROTELLA:  -- Exhibit No. 40.  Hm-hmm.

7              THE COURT:  All right.

8              So, give me Exhibit 40, we're going to give them that

9    and let's bring them out then.  So, we need the defendant, we've

10   got to call the defendant.

11             MS. ROTELLA:  Okay.

12             (Pause and whispering held off the record at 3:08

13   p.m.)

14             THE COURT:  All right, I'm going to take a few

15   minutes.

16             Do you have a copy -- a hard copy of that?

17             MS. ROTELLA:  Of this?  I do.

18             THE COURT:  Exhibit 40?

19             MR. WRAY:  We have --

20             THE COURT:  May I see that?

21             MS. ROTELLA:  Yes.

22             (Pause and whispering continues off the record at 3:10

23   p.m.)

24

25             THE COURT:  Have you got it?  Okay.

1          Tell them we -- hold -- we need the defendant.

2          DEPUTY CLERK:  Yes, he's on his way.

3          (Pause and whispering continues off the record.)

4          (At 3:11 p.m. in open court.)

5          THE COURT:  Attorney Rotella, we'll be able to -- so,

6   we're going to show them the photo that was found on the cell

7   phone and you're going to show them Exhibit 40 and then, I am

8   going to give them a hard copy to take back into the jury room

9   or --

10          MS. ROTELLA:  Of Exhibit 40, if you want.

11          THE COURT:  Say that again?

12          MS. ROTELLA:  I don't think the hard copy of the photo

13   should go back.

14          THE COURT:  No, not the hard copy.

15          MS. ROTELLA:  But you could take the -- the --

16          THE COURT:  But the --

17          MS. ROTELLA:  Yes.

18          THE COURT:  Okay.  But you could also show it to

19   them.  You could pull it up on the lap -- no?

20          MS. ROTELLA:  You know what, that's one was not on the

21   laptop --

22          THE COURT:  Okay, that's fine.

23          MS. ROTELLA:  -- so --

24          THE COURT:  We'll give them that one.

25          (Discussion held off the record at 3:12 p.m.)

1          MS. ROTELLA:  Can you -- can you just give us one

2     second, Judge?

3          THE COURT:  Yes.  But he's still not here, that's

4     fine.

5          MS. ROTELLA:  Oh, okay.

6          (Pause and whispering continues off the record at 3:13

7     p.m.)

8          (At 3:17 p.m. in open court.  The jury is present.)

9          THE COURT:  Okay.  You may be seated.

10         MR. WRAY:  Thank you.

11         THE COURT:  Your presiding juror, please stand.

12         PRESIDING JUROR:  Yes.

13         THE COURT:  I -- I have the question from you:

14              We, the jury, are requesting the pictures of Dominic

15         Huntzinger that were recovered from Christopher Steele's

16         cell phone and the path where it was on the phone, if

17         possible.

18              So, we are going to respond by showing you the

19    photograph.  You cannot have it the jury room, but we are going

20    to show you the photograph that was recovered from Christopher

21    Steele's cell phone and we're going to show you Exhibit 40,

22    which is -- I think, the -- what you are asking us for, the path

23    where it was on the phone.  And you could take Exhibit 40 with

24    you.

25              If I misunderstood it, then, let me know?

1            MR. WRAY:  No, that's correct, your Honor --

2            THE COURT:  Okay.

3            MR. WRAY:  -- thank you very much.

4            THE COURT:  You're welcome.

5            So, I think your monitors are all set.  Yeah, that's

6     -- C-40, you could read it, tell us -- tell me when you're done.

7     That's Government's 40.

8            (Pause at 3:18 p.m.)

9            A JUROR:  Are we --

10           THE COURT:  I'm going to just send it out to you --

11           A JUROR:  -- okay.

12           THE COURT:  -- so, I will send you Exhibit 40, will --

13    Government 40 will go out with you, you could have it in the

14    jury room.

15           A JUROR:  Okay.

16           THE COURT:  Okay.  Are you done?

17           PRESIDING JUROR:  Yes.

18           THE COURT:  All right.

19           Now, we're going to show you the other exhibit, that

20    exhibit you cannot have with you in the jury room.

21           MS. ROTELLA:  That's on -- it's not on the system,

22    you'd have to give them a hard copy.

23           THE COURT:  Which one?

24           MS. ROTELLA:  No. 40, the file path.

25           THE COURT:  Right.

1          We're going to give them the hard copy.

2          MS. ROTELLA:  Oh, I'm sorry, I thought you were

3    looking to me, because it's -- it's not on the computer.

4          THE COURT:  I understand that.  What is the --

5          MS. ROTELLA:  Okay.

6          THE COURT:  -- but the other exhibit is?

7          MS. ROTELLA:  They just saw it, yes.

8          THE COURT:  Oh, they just -- they saw both?

9          MS. ROTELLA:  No, no, they just saw -- there is one

10   photograph --

11         THE COURT:  Okay.

12         MS. ROTELLA:  -- there is only one photograph and

13   then, the file path.

14         THE COURT:  Right.

15         The file path, they've seen, right?

16         MS. ROTELLA:  Hm-hmm.  That was the photograph --

17         THE COURT:  No, no.

18         MR. WRAY:  No.  That was not the file path.

19         THE COURT:  You've got it backwards.

20         (Discussion held off the record at 3:19 p.m.)

21         THE COURT:  I put it on the --

22         MS. ROTELLA:  Oh.  Right, well -- all right.

23         I'm sorry, the other one was on my computer, okay.

24         THE COURT:  All right.

25         MS. ROTELLA:  So, I thought that's what they were

1    looking at when I was looking at it.

2              THE COURT:  All right.

3              So, the record is clear, they just saw Government

4    Exhibit 40, we published it through the ELMO.

5              MS. ROTELLA:  Okay.

6              THE COURT:  Now, they need to see the photograph that

7    was found on Christopher Steele's cell phone.

8              MR. WRAY:  Thank you.

9              THE COURT:  Do you have it on your monitors?

10             PRESIDING JUROR:  Yes.

11             THE COURT:  It -- tell me when you're done.  All

12   right, that you cannot have.  Okay.  Very well.

13             I think we have answered your questions?

14             PRESIDING JUROR:  Yes.  Very well.

15             THE COURT:  Okay.

16             PRESIDING JUROR:  Thank you.

17             THE COURT:  You may continue with your deliberations.

18             PRESIDING JUROR:  Thank you very much.

19             THE COURT:  You're welcome.

20             ESR OPERATOR:  All rise.

21             (Jury out at 3:20 p.m. to continue deliberations.)

22             (Discussion held off the record.)

23             THE COURT:  Sorry, Attorney Rotella, I -- I said, you

24   thought you didn't have it in the system.  So, I put it on the

25   ELMO.

1              MS. ROTELLA:  No, no, it's -- it's okay.  I just was

2      seeing something else on my computer, so --

3              THE COURT:  Right.

4              I am going to mark the question as Court Exhibit No.

5      2, dated today, October 1st, 2014.  Pat, take that.

6              Okay.  Please don't go far, because I think it's not

7      going to be long.

8              (Recess at 3:21 p.m.)

9              (Resumed in open court at 3:36 p.m.  The jury is

10     present.)

11             THE COURT:  I understand the jury has reached a

12     verdict?

13             PRESIDING JUROR:  Yes, we have, your Honor.

14             DEPUTY CLERK:  Will the Foreperson please remain

15     standing.  Will the foreperson please answer.

16             THE COURT:  You may be seated.

17             DEPUTY CLERK:  In Bill of Indictment No. 14-110,

18     between the United States of America and Christopher Steele as

19     to Count 1 of the indictment, charging use of an interstate

20     commerce facility to entice a minor to engage in sexual conduct

21     in or about the summer of 2013, do you find the defendant guilty

22     or not guilty?

23             PRESIDING JUROR:  Guilty.

24             DEPUTY CLERK:  As to Count 2 of the indictment,

25     charging interstate travel with the intent to engage in illicit-

1   sexual conduct with a minor in or about the summer of 2013, do

2   you find the defendant guilty or not guilty?

3            PRESIDING JUROR:  Guilty.

4            DEPUTY CLERK:  As to Count 3 of the indictment,

5   charging the use of an interstate commerce facility to receive

6   child pornography in or about the summer of 2013, do you find

7   the defendant guilty or not guilty?

8            PRESIDING JUROR:  Guilty.

9            DEPUTY CLERK:  Members of the jury, please rise.

10           Harken unto your verdict as the Court has recorded it

11  in the issue joined in Bill of Indictment No. 14-100 between the

12  United States of America and Christopher Steele, you find the

13  defendant guilty as to Count 1.

14           As to Count 2, you find the defendant guilty.

15           As to Count 3, you find the defendant guilty.

16           And so say you all?

17           THE JURY:  Yes.

18           PRESIDING JUROR:  Yes.

19           THE COURT:  Okay.

20           You may be seated.  Any motions?

21           MR. WRAY:  Not at this time, your Honor.

22           THE COURT:  Very well.

23           There being no motions, the verdict is properly

24  recorded.

25           And members of the jury, at this point, let me just

1    take one minute to thank you for your services in connection

2    with this case.  And for the time that you have given us away

3    from your jobs and your family to consider the issues that were

4    presented to you by the Government as well as the defense.

5              The only guidance I could give you is, sometimes,

6    people may want to talk to you about the case, the decision

7    whether to talk to them or not, is -- it's totally yours.

8    Nobody could force you to talk to anyone about -- about your

9    experience with the case.

10             If you do decide to speak to anyone outside of the

11   courtroom, including the lawyers and the press or anyone along

12   those lines, just make sure that you do not repeat what was said

13   in the jury room, because we maintain the confidentiality of

14   those discussions and the secrecy of the discussions to -- to

15   preserve the system.

16             It's certainly appropriate to say, you know, what

17   arguments you felt were persuasive or not persuasive and what

18   arguments the jury as a whole found -- well, persuade them to go

19   one way or the other.  But certainly, I think, it would be

20   inappropriate to repeat what any other juror said in the jury

21   room.

22             So, on behalf of our Chief Judge, Patrese B. Tucker,

23   on behalf of myself here in the courtroom and on behalf the

24   lawyers, I thank you for your services.

25             And often the lawyers may want to talk to you, again,

1   this decision is yours.  I will make myself available in the

2   next couple of minutes to go into the jury room and talk to you

3   for a few minutes with my staff, answer any questions or

4   concerns that you may have.

5           And after that, your services in connection with this

6   case have concluded and you will be discharged.

7           And my Deputy will also call the Alternates, who I

8   dismissed early this afternoon, but I wanted them, they could be

9   recalled.

10          So, with that, members of the jury, you could follow

11  my Courtroom Deputy, Ms. Wertz and I'll be there with you in a

12  few minutes.

13          (Jury is dismissed at 3:40 p.m.)

14          THE COURT:  Okay.  Very well.  Very well.

15          Any -- anything I need to do before we proceed?  I

16  know he filed a motion for bail.

17          MR. WRAY:  Your Honor, I -- that's withdrawn as its

18  moot.

19          THE COURT:  The motion is withdrawn.

20          Anything that I need to do --

21          MS. ROTELLA:  No, your Honor.

22          THE COURT:  -- before that -- very well.

23          I will schedule -- you will get notice for sentencing

24  in about --

25          (Concluded in this matter at 3:41 p.m.)

1                              *  *  *

                        I N D E X

WITNESS                  DIRECT      CROSS      REDIRECT    RECROSS

JOHN SHAW
  By Mr. Wray            2
  By Ms. Rotella                     7           –           –

BOBBY R. STEELE
  By Mr. Wray            13
  By Ms. Rotella                     15
  By Mr. Wray                                   20           –

        (The testimony of Christopher Steele has been previously transcribed and is filed under separate cover.)

                            *  *  *

GOVERNMENT EXHIBITS                    IDENTIFIED    EVIDENCE

  G-1                                                  24
  G-2                                                  24
  G-3, G-4 and G-5                     Previously received
  G-6                                                  24
  G-7-3    Cropped Photograph          Previously received
  G-8                                  Previously received
  G-9                                                  25
  G-10-1 & G-10-2                      Previously received
  G-11     Criminal Complaint                          25
  G-12                                 Previously received
  G-17                                 Previously received
  G-18-1 & G-18-2                      Previously received
  G-19     Hard Copy of Transcript                     25
  G-22                                 Previously received
  G-23-1 through G-23-4                                26
  G-24     Cell-Site Map                               26
  G-24                                 Previously received
  G-38     Booking Photo w/Tattoo                      27
  G-39     12 Photographs                              27
  G-40     E-mail Image                                28

                            *  *  *

DEFENSE EXHIBITS                       IDENTIFIED    EVIDENCE

```
D-1        DVDs                          -              28
thru D-4
```

| COURT EXHIBITS | | IDENTIFIED | EVIDENCE |
|---|---|---|---|
| C-2 | Jury Question | 129 | 129 |

*  *  *

|  | PAGE |
|---|---|
| Closing Statement - Ms. Rotella | 34 |
| Closing Statement - Mr. Wray | 44 |
| Closing Rebuttal  - Ms. Rotella | 67 |
| Charge of the Court | 74 |

*  *  *

C E R T I F I C A T E

        I do hereby certify that the foregoing is a correct
transcript of the electronic-sound recording of the
proceedings in the above-entitled matter.


_____              Date: February 26, 2016
Gail Drummond
28 8th Avenue
Haddon Heights, New Jersey  08035
(856) 546-6270